RANDALL G. PHILLIPS (6311)
405 East 3475 North
North Ogden, Utah  84414
Telephone: (801) 510-3434
Email:  attorneyrgp@gmail.com

**Attorney for Plaintiff**

---

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KERRY JASON MAW, an individual <br><br>     Plaintiff <br><br> vs. <br><br> TRAVIS KEARL, in his individual capacity; and LARRY LEWIS, in his individual capacity <br><br>     Defendants | **COMPLAINT** <br> (Jury Trial Demanded) <br><br><br><br> Civil No.: <br><br>   Judge: |

COMES NOW, the above-named Plaintiff, Kerry Jason Maw ("Mr. Maw" or "Plaintiff"), through his undersigned counsel Randall G. Phillips, hereby complains and alleges against the above-named Defendant Travis Kearl, and Defendant Larry Lewis, individually as follows:

### PARTIES

1) That the Plaintiff is an individual residing in Weber County, State of Utah.

2) That Defendant Travis Kearl  (hereinafter "Detective Kearl") is a resident of Weber County, State of Utah, and at all times relevant to this case was an officer and/or detective of the Ogden Police Department, in Ogden, Weber County, State of Utah, acting under color of authority as a law enforcement officer, in his individual capacity.

1

3) That Defendant Larry Lewis  (hereinafter "Detective Lewis") is a resident of Weber County, State of Utah, and at all times relevant to this case was an officer and/or Detective of the Ogden Police Department, in Ogden, Weber County, State of Utah, acting under color of authority as a law enforcement officer, in his individual capacity.

## JURISDICTION AND VENUE

4) The Court has jurisdiction of this action under 42 U.S.C. § 1983 as Defendant Kearl and Defendant Lewis respectively and individually acted under color of state law, and caused Plaintiff, as a citizen of the United States to be subjected to the deprivation of rights, privileges, and immunities secured by the Constitution and laws of the United States.

5) This Court has jurisdiction pursuant to 28 U.S.C § 1331 as this is case is a civil action arising under the Constitution of the United States, as permitted through 42 U.S.C §1983 and the application of the United States Constitution to the states and their subdivisions through the Fourth Amendment to the United States Constitution.

6) That this Court may also exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. *28 U.S.C. § 1367*

7) The Plaintiff's causes of action occurred on June 4, 2019, in Ogden, Weber County,  State of Utah.

8) That or about June 3, 2021, the Plaintiff caused served an Amended Notice of Claim upon the Ogden City Recorder, within one year from the date that the Plaintiff's causes of  action arose pursuant to the Utah Governmental Immunity Act (P's Exh. "A").

9)  That over sixty days passed after the aforesaid Notices of Claims were duly served and no response was had.

10) That the Plaintiff alleges that Detective Kearl and Defendant Lewis respectively, to the extent a "culpable state of mind" is required, was/were each at all relevant times engaged in affirmative intentional misconduct as further set forth below.

**11)** Venue is proper in this Court pursuant to *28 U.S.C § 1331(b)* as all defendants reside in the district of Utah and a substantial part of the events or omissions give rise the claims in the Complaint occurred in the judicial district of Utah.

## STATEMENT OF FACTS

12) That the Plaintiff realleges and reincorporates the allegations set forth above and incorporates such herein.

13) That this case involves two bank robberies on June 4, 2019 and June 24, 2019, of the same Wells Fargo bank, located at 4301 Harrison Blvd. Ogden, Weber County, State of Utah, (hereinafter "Bank") by the same bank robber Anthony Thomas Murdzak (hereinafter "Murdzak") who fled each robbery in the identical vehicle described as a late 1990's early 2000's model green Dodge Ram pickup truck (hereinafter "getaway vehicle"), and which was investigated by the same Detective Kearl (P's. Exhs. "A," pge. 13, and "B," pge. 2).

14) That on or about September 29, 2019, Murdzak plead guilty to both the June 4, 2019, and June 24, 2019, bank robberies as charged (P's Exhs. "A," pge. 13, "B," pge. 2; and "C").

15) That on June 4, 2019, it would have been clear to a reasonable officer that it would have been unlawful if that officer (a) did not investigate basic evidence;  (b) ignored easily accessible evidence; (c) fail to investigate readily available exculpatory evidence; and/or (d) closed his or her eyes to facts that would help clarify the circumstances of an arrest.

## **Murdzak's first bank robbery on June 4, 2019**

16) That the first bank robbery occurred on June 4, 2019, at approximately 12:13 p.m. (Plaintiff's Exhibit "B").

17) That Detective Kearl arrived at aforesaid scene of the bank robbery at approximately 12:30 p.m. on June 4, 2019 (P's Exh. "B").

18) That an OPD "Incident Report" identified as "No. 19G40970" (hereinafter "Incident Report") was prepared accurately and contemporaneously with the investigation of the subject June 4, 2019, bank robbery and included accurate summaries by both Detective Lewis and Detective Kearl (P's Exh. "B," pges. 10, 11, 12, and 13).

19) That on June 4, 2019, Detective Kearl obtained the following basic evidence from bank employees:

   a) The robbery suspect was six feet tall.   (P. Exh. "B," pge. 3);

   b)  The robbery suspect was in his sixties.   (P. Exh. "B," pges. 3, 7, 9,  and 11);

   c) The robbery suspect was wearing eyeglasses with large dark frames that were quasi-rectangular in shape and appeared to have white and black color to the temple of the glasses.  (P's. Exh. "B," pges. 7, 9, 11, and 12);

   d) The robbery suspect fled the scene in a late 1990's early 2000's model green Dodge Ram 1500 pickup truck (hereinafter "getaway vehicle").  (P's Exh. "B," pges. 3, 7, 9, and 11);

   e) No one was injured and no weapon was used or mentioned.  (P's Exh. "B," pges. 3, 7, and 9); and

   f) Detective Kearl was also provided with one still surveillance photo of the robbery suspect (P's Exhs. "B," pge. 9 and "E").

20) That upon Detective Kearl's review of the still surveillance photo of the robbery suspect,

   I noted several unique features on the suspects face. The piece of skin near the entrance of the ear is known as the Tragus. This unique shape really stood out on the suspect when observed from a certain angle. There were many prominent wrinkles and lines in the suspect' s face.  . . . The suspect appeared older due to these facial features (P's Exh. "B," pge. 9; and "E").

4

21) That shortly after the subject robbery an OPD Press Release was posted on the OPD's Facebook page including a copy of the aforesaid still photo of the bank robbery suspect (hereinafter "OPD Facebook photo"), and specifically describing the robbery suspect as being six feet tall, sixty years old and fleeing the scene in a green Dodge Ram pickup truck (P's. Exh. "F").

22) That upon information and belief Detective Kearl completed initial on-site investigation of the bank robbery scene no later than 2:00 p.m. on June 4, 2019.  (P's. Exh. "B")

23) That on June 4, 2019, a reasonable detective would know that the number of possible robbery suspects may be reduced by entering the description of the suspect's getaway vehicle into the Department of Motor Vehicle (hereinafter "DMV") database which would provide the name of the current registered owners of vehicles matching the description of the suspect's vehicle (P's. Exh. "C," pge 2).

24) That a reasonable detective would know that the number of possible suspects may be further reduced by the detective entering the names of the aforesaid registered owners back into the DMV database which would display the driver's license photos of registered owners which could be then compared to the surveillance photo of the robbery suspect for a possible match. (P's. Exh. "C," pge 2).

25) That after Detective Kearl completed his initial on scene investigation of the noon bank robbery, Detective Kearl described his further investigation of the bank robbery up to 8:30 p.m., that evening as follows:

> I disseminated and caused to be disseminated these gathered photographs of the suspect. An Ogden City Press Release was issued with the suspect's photograph and I began to follow all of the news articles and social media posts related to this case in the event a suspect was identified. No leads were initially had so I ended my involvement for the day in this case (P's Exh. "B," pge 9).

26) That on June 4, 2019, Detective Kearl made no attempt to search the DMV database to find the possible registered owners of vehicles matching the robbery suspect's getaway vehicle.

27) That on June 4, 2019, had Detective Kearl entered the robbery suspect's vehicle description into the DMV database, Murdzak's name would have appeared as a registered owner of a vehicle matching the robbery suspect's getaway vehicle.

28) That on June 4, 2019, had Detective Kearl than entered Murdzaks name into the DMV database the driver's license photo of Murdzak would have been displayed.

29) That the driver's license photo displayed on the DMV database after the June 24, 2019, bank robbery is the same driver's license photo of Murdzak that would have been displayed had Murdzak's name been searched on June 4, 2019.

30) That on June 4, 2019, Detective Kearl violated the Plaintiff's clearly established rights under the Fourth Amendment by (a) not investigating basic evidence;  (b) ignoring easily accessible evidence; (c) failing to investigate readily available exculpatory evidence; and (d) closed his eyes to facts that would help clarify the circumstances of an arrest, by failing to search the DMV for registered owners of vehicles matching the suspect's getaway vehicle as had Detective Kearl done so Kearl would have known that (a) Murdzak was a registered owner of a vehicle matching the suspect's getaway vehicle and (b) Murdzak's driver's license photo matched that of the June 4, 2019, bank surveillance photo of the robbery suspect, thus Detective Kearl is imputed with that knowledge.

31) That had Detective Kearl known that Murdzak was a registered owner of a vehicle matching the suspect's getaway vehicle and (b) Murdzak's driver's license photo matched that of the June 4, 2019, bank surveillance photo of the robbery suspect, the Plaintiff would never have been considered as a potential robbery suspect.

## The Second phase of Detective Kearl's investigation

32) That on June 4, 2019, Chief Jackson personally knew the Plaintiff (Ps. Exh. "B," pge. 10).

33) That on June 4, 2019, Chief Jackson knew the physical features of the Plaintiff's face sufficiently to accurately determine whether or not Plaintiffs face matched that of the OPD Facebook media photograph of the robbery suspect (P's. Exhs. "B," pge. 10; "H," and "L").

34) That at approximately 8:30 p.m., the evening of the June 4, 2019, bank robbery Detective Kearl was contacted by Lt. Hanson of the Ogden Police Department who relayed to Kearl that Chief Jackson knew who the robbery suspect was (Ps. Exhs. "B, pge. 9; and "I").

35) That Detective Kearl contacted Chief Jackson by phone and Chief Jackson told Detective Kearl that ". . . the suspect matched the description of Kerry Maw." (Ps. Exhs. "B, pge. 9; and "I").

36) That Detective Kearl did not release how Chief Jackson knew the Plaintiff due to "sensitive personal information" and "safety concerns" in the Incident Report (P's. Exh. "B," pge. 10).

37) That upon information and belief Detective Kearl has never disclosed how Chief Jackson knew the Plaintiff in any written document contained in any official OPD files (P's. Exh. "B," pge. 10).

38) That on June 4, 2019, upon information and belief Chief Jackson requested that Detective Kearl not include how Chief Jackson knew the Plaintiff in the written Incident Report (P's. Exh. "B," pge. 10).

39) That on June 4, 2019, Chief Jackson never directly and/or indirectly advised Detective Kearl that an individual by the name of "Todd Davis" may have information about the June 4, 2019, bank robbery (Ps. Exhs. "B, pge. 9; and "I").

40) That on June 4, 2019, Chief Jackson never directly and/or indirectly advised Detective Kearl that any other third party not named "Todd Davis" may have information about the June 4, 2019, bank robbery (Ps. Exhs. "B, pge. 9; and "I").

41) That on June 4, 2019, after Detective Kearl spoke with Chief Jackson, Kearl upon information and belief became aware that Chief Jackson had intentionally misidentified the Plaintiff as the possible robbery suspect (P's. Exh. "B," pge. 10).

42) That during Detective Kearl's communication(s) directly and/or indirectly with Chief Jackson on June 4, 2019, concerning the subject robbery Chief Jackson was not acting in Chief Jackson's official capacity as the Chief of Police of the Harrisville Police Department (P's. Exhs. "B, pge. 9; and "I").

43) That in all of Chief Jackson's direct and/or indirect communications with Detective Kearl on June 4, 2019, concerning the subject robbery Chief Jackson was at all relevant times acting as a general member of the community, and not as a member of law enforcement (P's. Exhs. "B, pge. 9; and "I").

44) That Detective Kearl "ran the Plaintiff's information and found a driver's license photograph of the Plaintiff "which made him almost two young to be the suspect" as it lacked the physical characteristics as those that Detective Kearl had specially noted upon Kearl's aforesaid review of the still bank photo of the robbery suspect (P's. Exhs. "B," pge. 9; "E," "I," and "J").

45) That prior to Detective Kearl's direct and/or indirect communications with Chief Jackson, on June 4, 2019 Kearl did not know:

a)   the name of any of the Plaintiff's relatives;

b)   whether or not the Plaintiff was currently married or not;

8

   c)  if the Plaintiff was currently married, the name of the Plaintiff's wife;

   d)  the personal cell phone number of the Plaintiff's wife;

   e)  whether or not the Plaintiff's wife had a personal Facebook page;

   f)  the Plaintiff's wife's personal Facebook page contained publicly available photographs of the Plaintiff;

   g)  that those publicly available photographs on the Plaintiff's wife's personal Facebook page contained a photograph which Detective Kearl would opine matched the still photograph of the bank robbery suspect; nor

   h)  whether or not the Plaintiff ever wore eyeglasses that allegedly matched those of that the subject robbery suspect was wearing in the still bank surveillance photo of the suspect (P's. Exhs. "B," pge. 9; and "I").

46) That on June 4, 2019, based solely upon the information directly and/or indirectly provided by Chief Jackson that evening, Detective Kearl was made aware of the following:

   a)  the name of one of the Plaintiff's relatives, e.g. the Plaintiff's wife;

   b)  the Plaintiff was currently married;

   c)  the Plaintiff's wife's current wife's name was Shanci Maw (hereinafter "Shanice");

   d)  Shansi's personal cell phone number;

   e)  Shanci had a personal Facebook page;

   f)  Shanci's personal Facebook page contained publicly available photographs of the Plaintiff; and

   g)  that those publicly available photographs on Shanci's personal Facebook page contained a photograph which Detective Kearl believed matched the still photograph of the bank robbery suspect (P's. Exh. "B," pge. 9).

47) That Detective Kearl upon reviewing the photograph of the Plaintiff contained on Shanci's Facebook page, Detective Kearl opined:

     I saw this photograph and recognized the same facial features in regards to

facial hair, nose shape, facial wrinkles and ear shape that were consistent with the facial characteristics of the suspect. The Tragus of Kerry's ear in the Facebook photo matched the Tragus of the suspect's ear. This was a very unique factor that helped me match the suspect description to Kerry (P's Exhs. "B," pge. 9; "E," "G," "J" and "K").

48) That Detective Kearl's aforesaid identification of the Plaintiff being the robbery suspect based upon Kearl's opinion that the Facebook photo of the Plaintiff' matched the surveillance photo of the robbery suspect is a prime example of an Detective Kearl unreasonably closing his eyes to the facts, failing to investigate basic evidence, ignoring easily accessible evidence, and/or failing to investigate readily available exculpatory evidence as reasonable detective would conclude that other than being a white male, the physical characteristics of the Plaintiff clearly lack the distinct multiple lines and wrinkles of the suspect's face and unusual shape of the robbery suspect, even to the untrained naked eye (P's. Exs. "E," "F," "G" and "K").

49) That Chief Jackson directly and/or indirectly provided Detective Kearl with Shanci's personal cell phone number, and:

I spoke with her and she told me that she saw the press release photo and she confirmed the suspect was Maw. Shancie was extremely scared of Kerry and was very hesitant about giving me information that may aggravate Kerry and cause him to retaliate. Shancie stated Kerry missed court mediation today regarding their "ugly divorce." because he owed his attorney $2,000. Shancie said Kerry needed to pay that amount or else the attorney wouldn't represent him further (P's Exh. B, pge. 10).

50) That although not mentioned anywhere in the Incident Report, Detective Kearl's Affidavit of Probable Cause to arrest the Plaintiff declared under penalty of perjury that "I was also sent a photograph by Chief Jackson during this time that showed Maw wearing black framed glasses that matched the suspect's glasses." (P's. Exhs. "B," "I" and "L").

51) That the aforesaid photograph of the Plaintiff wearing glasses was received by Detective Kearl's cell phone at 9:19 p.m. on June 4, 2019, was dated December 13, 2015, and

contained a large photograph of Plaintiff sitting in a chair wearing glasses, and included 14 smaller pictures of the Plaintiff's three children engaged in various activities (P's. Exhs. "I," and "L").

52) That although it is may be questionable as to whether or not the glasses that the Plaintiff is wearing in the December 13, 2015 photo matches those of the robbery suspect, said photo is another prime example of Detective Kearl unreasonably closing his eyes to the facts, failing to investigate basic evidence, ignoring easily accessible evidence, and/or failing to investigate readily available exculpatory evidence as said December 13, 2015 photo includes a very clear view of the Plaintiff's normally shaped ear that a reasonable officer would easily conclude does not match that of the robbery suspect's unusually shaped ear (P's Exhs. "E," "F," "G" and "L").

53) That Chief Jackson denies speaking with Detective Kearl and denies that he sent the picture of the Plaintiff wearing glasses to Detective Kearl (P's Exhs. "B," pge. 10; "I," and "L").

54) That Chief Jackson asserts that the only information he provided concerning the June 4, 2019, bank robbery is Chief Jackson informed Ogden police an individual reported to him that the image of the bank robbery suspect in the OPD Facebook post resembled Plaintiff (P's Exhs. "B," pge. 10; "I," and "L").

**Third phase of Detective Kearl's Investigation and Detective Lewis' arrival**

55) That on June 4, 2019 after Detective Kearl received the photograph of the Plaintiff wearing glasses Detective Kearl states:

I met with Agent J. Hansen of the FBI Violent Crimes Task Force and with Det. Lewis as well.  Together we looked over and scrutinized the pictures of Kerry and the Wells Fargo pictures. I determined that probable cause, based on the matching suspect description was found to take Kerry into custody for the Utah State Code Violation of Robbery (F2) (Ps. Exh. "B," pge. 10).

56) That Detective Kearl was the only one who allegedly looked over and scrutinized the pictures of Kerry and the Wells Fargo pictures who " . . . determined that probable cause, based on the matching suspect description was found to take Kerry into custody for the Utah State Code Violation of Robbery (F2) (Ps. Exh. "B," pges. 10, and 13).

57) That neither Detective nor Detective Lewis make any attempt to secure a warrant for the Plaintiff's arrest prior to the Plaintiff's warrantless arrest the evening of June 4, 2019 (P's Exhs. "B," and "I").

58) That nothing prevented Detective Kearl nor Detective Lewis from seeking to obtain a warrant for the Plaintiff's arrest prior to the Plaintiff's warrantless arrest on June 4, 2019 (P's Exhs. "B," and "I").

59) That no emergency situation existed on June 4, 2019, which a reasonable officer would objectively believe necessitate the Plaintiff's warrantless arrest for the June 4, 2019, bank robbery (P's Exhs. "B," and "I").

60) That no exigent circumstances existed on June 4, 2019, which a reasonable officer would objectively believe necessitated the Plaintiff's warrantless arrest for the June 4, 2019, bank robbery (P's Exhs. "B," and "I").

61) That Detective Kearl, Detective Lewis and Agent Hansen arrived the Plaintiff's home around 9:30 p.m. the evening of June 4, 2019, to attempt a "knock and talk." (P's. Exh. "B," pges. 10, and 13).

62) That on June 4, 2019, Detective Kearl and Detective Lewis respectively knew based upon their respective training and experience that a "knock and talk investigation" was limited to knocking on the Plaintiff's door a few times and if there was no immediate response to leave the Plaintiff's property even if the Plaintiff was in his home and chose not to answer the door.

63) That Detective Kearl and Detective Lewis respectively knew that under clearly established law the Plaintiff had a legal right under the Fourth Amendment not to open his door nor answer any questions without first having a warrant.

64) That on June 4, 2019, it was clearly established law that officers must have probable cause to arrest an individual and exigent circumstances to arrest someone their home without a warrant.

65) That on June 4, 2019, warrantless arrests of someone in their home was presumed unreasonable.

66) That on June 4, 2019, Detective Kearl pounded on the Plaintiff's front door for several minutes demanding that the Plaintiff open the door (P's. Exh. "B," pges. 10, and 13).

67) That subsequently, after the persistent pounding and demands by Detective Kearl to the Plaintiff to open the Plaintiff's front door, Detective Kearl obtained the Plaintiff's cell phone number from Chief Jackson and called the Plaintiff again demanding that the Plaintiff open his door (P's. Exh. "B," pges. 10, and 13).

68) That upon the Plaintiff not immediately complying with Detective Kearl's phone demands to open the door Detective Kearl threatened the Plaintiff to the effect that if the Plaintiff did not open the door "we're coming in." (P's. Exh. "B," pges. 10, and 13).

69) That the Plaintiff first became aware of something going on when he heard his dogs barking and when he looked outside, he saw several flashlights crisscrossing his back yard.

70) That the Plaintiff was terrified as he was home alone and had no idea who was walking through his back yard.

71) That the Plaintiff fled to his basement for safety than heard Detective Kearl violently banging on his front door demanding that he open his door and come out.

72) That the Plaintiff had no criminal record except for a few minor traffic citations, and had never been arrested so he had no idea why the police were at his home demanding that he come out, so he didn't answer the door.

73) That after several minutes of continual violent banging and demanding that the Plaintiff open up his door and come out, the Plaintiff received a phone call from Detective Kearl who insisted that the Plaintiff open his door and come out but the Plaintiff stayed put.

74) That "Detective Kearl" called the Plaintiff again on his phone and this time Detective Kearl told the Plaintiff to the effect that if the Plaintiff does not open the door and come out "we're coming in." (P's. Exh. "B," pges. 10, and 13).

75) That the Plaintiff reasonably believed that he was not free to leave and had no other option but to comply with the demands of Detective Kearl, by opening his door (P's. Exh. "B," pges. 10, and 13).

76) That during the time that Detective Kearl and Detective Lewis and other law enforcement officers were present at the Plaintiff's home prior to the Plaintiff's warrantless arrest the Plaintiff would not have been free to walk out of his home and leave (P's. Exh. "B," pges. 10, and 13).

77) That immediately as the Plaintiff opened his door and was told to turn around and put his hands behind his back at gunpoint.

78) That under clearly established law the Plaintiff was arrested or seized by Detective Kearl and Detective Lewis inside the Plaintiff's home based upon their aforesaid unreasonable conduct in violation of the Plaintiff's Fourth Amendment rights not to be subject to a warrantless seizure in the Plaintiff's own home.

79) That after the Plaintiff was hand-cuffed both Detective Kearl and Detective Lewis respectively were able to clearly observe and notice the Plaintiff's actual facial features and ear shape, and height (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

80) That Detective Kearl upon seeing the Plaintiff's face and ear shape in person knew as a reasonably objective detective that the Plaintiff was not the robbery suspect as beyond being a Caucasian male the Plaintiff's face did not have the " . . . many prominent wrinkles and lines" nor the very distinctive ear shape as depicted in the surveillance photos of the bank robbery suspect, nor was the Plaintiff six feet tall (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

81) That Detective Lewis upon seeing the Plaintiff's face and ear shape in person knew as a reasonably objective detective that the Plaintiff was not the robbery suspect as beyond being a Caucasian male, the Plaintiff's face did not have the " . . . many prominent wrinkles and lines" nor the very distinctive ear shape as depicted in the surveillance photos of the bank robbery suspect (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

82) That an objectively reasonable detective with the same knowledge as Detective Kearl and Detective Lewis respectively upon seeing the Plaintiff's face and ear shape and height in person would reasonably conclude that the Plaintiff was not the robbery suspect as beyond being a Caucasian male, the Plaintiff's facial characteristics did not have the " . . . many prominent wrinkles and lines" nor the very distinctive ear shape as the robbery suspect, nor was the Plaintiff six feet tall as was the suspect (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

83) That under clearly established law Detective Kearl and Detective Lewis were required to consider the contrasting facial characteristics and ear shape of the Plaintiff and height

difference as compared to the robbery suspect in evaluating the totality of the circumstances with respect to whether probable cause continued to exist to continue the seizure of the Plaintiff for the subject robbery (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

84) That Detective Kearl and Detective Lewis respectively upon seeing the Plaintiff's actual face, and ear shape in person unreasonably closed their eyes to the facts, failed to investigate basic evidence, ignored easily accessible evidence, and/or failed to investigate readily available exculpatory evidence as reasonable detective would conclude that other than being a white male, the physical characteristics of the Plaintiff clearly lack the distinct multiple lines and wrinkles of the suspect's face and unusual shape of the robbery suspect, thereby negating any probable cause to continue to hold the Plaintiff for the subject June 4, 2019 bank robbery negating any probable cause to continue to hold the Plaintiff for the subject June 4, 2019 bank robbery and should have immediately released the Plaintiff, but they unreasonably failed to do so.   (P's. Exs. "E," "F," "G" and "K").

85) That Detective Kearl and Detective Lewis respective  knew under clearly established law that because probable cause to arrest the Plaintiff had been negated by the unreasonable misidentification of the Plaintiff by Detective Lewis and the unreasonable misidentification by Detective Kearl respectively that each officer had a duty to prevent the other officer from violating the Plaintiff's rights to be free from a warrantless seizure without probable cause, but each officer breached their respective duties by allowing the other detective to continue the unlawful seizure of the Plaintiff without probable cause (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

86) That Plaintiff arrived at and was booked into the Weber County Jail at approximately 1:30 a.m. on June 5, 2019.

87) That sometime after the Plaintiff's arrest for the subject robbery the evening June 4, 2019, Detective Kearl submitted an Affidavit of Probable Cause to arrest the Plaintiff for such (<u>P's Exhs. "B" and "I"</u>).

88) That at approximately 8:20 a.m., on June 5, 2019, the Second Judicial District Court in reliance on Detective Kearl's aforesaid Affidavit of Probable Cause determined that Detective Kearl had probable cause to arrest the Plaintiff for the subject June 4, 2019, bank robbery and issued a $10,000.00 bond (<u>P's Exhs. "I," and "M"</u>).

89) That shortly thereafter the Plaintiff paid a $1,000.00 bond and was released from custody (<u>P's. Exh. "N"</u>).

90) That under clearly established law arrest warrants violate the Fourth Amendment when they knowingly, or with reckless disregard for the truth, include false statements in an affidavit, or knowingly or recklessly omit from it information which, if included, would vitiate probable cause.

91) That Detective Kearl knowingly, or with reckless disregard for the truth, included false statements in his Affidavit of Probable Cause to arrest the Plaintiff, and/or knowingly or recklessly omitted from it information by not stating that the Plaintiff did not resemble the robbery suspect as the Plaintiff's actual facial characteristics did not have the " . . . many prominent wrinkles and lines" nor the very distinctive ear shape as the robbery suspect, nor was the Plaintiff 6 feet tall, nor did the Plaintiff appear to be in his sixties which if included in Kearl's affidavit "No reasonable magistrate would have found the existence of probable cause (<u>P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L"</u>).

92) That Detective Kearl and Detective Lewis respectively acted in deliberate indifference to the Plaintiff's clearly established rights to be free from arrest without probable cause in violation of the Fourth Amendment as neither Detective Kearl nor Detective Lewis took any action to prevent the Plaintiff from being charged with the subject June 4, 2019, bank robbery in spite of Kearl's and Lewis' respective knowledge that the Plaintiff was not the robbery suspect based upon the obviously different facial features and ear shape and height between that of the suspect and the Plaintiff which thereby negated all probable cause to arrest the Plaintiff for the June 4, 2019, bank robbery (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L")

93) That under clearly established law the fact that neither Detective Kearl nor Detective Lewis had probable cause to arrest the Plaintiff without a warrant on June 4, 2019, their respective malice can be inferred.

94) That the morning of June 5, 2019, the OPD posted a press release on its Facebook Page with a close-up picture of the Plaintiff's face, and stated:

> On 06-04-2019, at approximately 2300 hours, Kerry Jason Maw, DOB 08-03-1970, was taken into custody by OPD Major Crimes Detectives. He was booked into the Weber County Jail and charged with the robbery. This investigation is ongoing (P's Exh. "O").

95) That most if not all television and news media websites and newspapers throughout the State of Utah, neighboring States and even a few national media websites repeated the OPD press release, which resulted in the Plaintiff's family, friends, wife, children, neighbors, church members, customers, community members, and others who knew the Plaintiff to question the Plaintiff's character, morals, credibility, and innocence.

96) That even today nearly two years after the subject June 4, 2019, bank robbery, a "Google" search of "Kerry Maw" will result in several media sites that still have the Plaintiff's mugshot and arrest/charge for robbery posted.

97) That on June 6, 2019, based upon the aforesaid misrepresentations and/or omissions by Detective Kearl and Detective Lewis the Weber County prosecutor formally charged the Plaintiff with the subject June 4, 2019, bank robbery, a second-degree felony.

98) That the Plaintiff paid a $5,000.00 retainer to hire Attorney Ryan Bushell to represent him in defense of the subject June 4, 2019, robbery charge.

### The second June 24, 2019, bank robbery

99) That on June 24, 2019, Murdzak robbed the same bank and fled in the same getaway vehicle that was used in the June 4, 2019, bank robbery (P's Exhs. "B," "C," and "I").

100)   That Detective Kearl was again assigned to investigate the June 24, 2019, bank robbery.

101)   That on the same day of the subject June 24, 2019, bank robbery Detective Kearl was provided with the identical vehicle description of the robbery suspect's getaway vehicle as had been provided to Kearl the day of the June 4, 2019, bank robbery (P's Exhs. "B," "C," and "I").

102)   That this time, Detective Kearl unlike his unreasonable failure to do so after the June 4, 2019, bank robbery, investigated basic readily available exculpatory evidence and entered the description of the robbery suspect's vehicle into the DMV database which resulted in the names of approximately sixty registered owners of vehicles matching the robbery suspect's getaway vehicle, including that of Murdzak (P's Exhs. "B," "C," and "I").

103)    That thereafter on June 24, 2019, Detective Kearl entered Murdzak's name into the DMV database and reviewed a driver's license photo of Murdzak which matched the surveillance photos of both the June 4, 2019, and June 24, 2019, bank robbery suspect (P's Exhs. "B," "C," and "I").

104)    That on June 25, 2019, the State filed a Motion to Dismiss the June 4, 2019, bank robbery charges against the Plaintiff without prejudice "as new facts have come to light which necessitate additional investigation.

105)    That on June 27, 2019, the State District Court granted the State's Motion to Dismiss the robbery charge against the Plaintiff without prejudice (P's Exh. "P").

106)    That based solely upon the fact that Murdzak was identified as a registered owner of a vehicle matching the bank robbery suspect's getaway vehicle, and that Murdzak's driver's license photo matched that of the June 4, 2019, and June 24, 2019, bank surveillance photos, there existed sufficient probable cause to arrest Murdzak for both bank robberies (P's Exhs. "B," "C," and "I")

107)    That on June 28, 2019, Murdzak was located and the subject getaway vehicle was found parked in front of Murdzaks' home in Logan, Utah (P's Exh. "C").

108)    That on June 28, 2019 Murdzak was taken into custody by the FBI and advised of his rights under Miranda, wherein Murdzak admitted that he had committed both the June 4, 2019, and June 24, 2019, bank robberies (P's Ex. "C").

109)    That on or about September 18, 2019, Murdzak plead guilty as charged for both the June 4, 2019, and June 24, 2019, bank robberies (P's Exh. "C," and "D")

110)    That as a direct and proximate cause of Detective Kearl's aforesaid conduct and/or misconduct, the Plaintiff suffered damages including but not limited to: severe emotional

distress; physical and mental pain and suffering; loss of business; loss of opportunities; loss

of social relationships with his children, family, friends, and others; loss of reputation;

financial devastation; depression; suicidal thoughts; anguish; loss of enjoyment in life; loss of

business opportunities; feelings of helplessness; frustration; loss of sleep; paranoia; fear;

inability to retain social relationships; medical costs and treatment; attorney's fees and costs;

lost clients; embarrassment; and humiliation in an amount to be determined at trial.


### FIRST CAUSE OF ACTION

### AGAINST DEFENDANT TRAVIS KEARL

### UNREASONABLE FAILURE TO INVESTIGATE
### REASONABLY AVAILABLE EXCULPATORY EVIDENCE
### BY FAILING TO SEARCH THE DMV DATABASE

111)   That the Plaintiff realleges and reasserts the allegations set forth above and reincorporates

such herein.

112)   That on June 4, 2019, it would have been clear to a reasonable officer that it would have

been unlawful if that officer (a) did not investigate basic evidence;  (b) ignored easily

accessible evidence; (c) fail to investigate readily available exculpatory evidence; and/or (d)

closed his or her eyes to facts that would help clarify the circumstances of an arrest.

113)   That the first bank robbery occurred on June 4, 2019, at approximately 12:13 p.m.

(Plaintiff's Exhibit "B").

114)   That Detective Kearl arrived at aforesaid scene of the bank robbery at approximately

12:30 p.m. on June 4, 2019 (P's Exh. "B").

115)   That an OPD "Incident Report" identified as "No. 19G40970" (hereinafter "Incident

Report") was prepared accurately and contemporaneously with the investigation of the

subject June 4, 2019, bank robbery and included accurate summaries by both Detective

Lewis and Detective Kearl (<u>P's Exh. "B," pges. 10, 11, 12, and 13</u>).

116)   That on June 4, 2019, Detective Kearl obtained the following basic evidence from bank

employees:

a)   The robbery suspect was six feet tall.    (<u>P. Exh. "B," pge. 3</u>);

b)   The robbery suspect was in his sixties.   (<u>P. Exh. "B," pges. 3, 7, 9,  and 11</u>);

c)   The robbery suspect was wearing eyeglasses with large dark frames that were quasi-
rectangular in shape and appeared to have white and black color to the temple of the
glasses.  (<u>P's. Exh. "B," pges. 7, 9, 11, and 12</u>);

d)   The robbery suspect fled the scene in a late 1990's early 2000's model green Dodge Ram
1500 pickup truck (hereinafter "getaway vehicle").  (<u>P's Exh. "B," pges. 3, 7, 9, and 11</u>);

e)   No one was injured and no weapon was used or mentioned.  (<u>P's Exh. "B," pges. 3, 7,
and 9</u>); and

f)   Detective Kearl was also provided with one still surveillance photo of the robbery suspect
(<u>P's Exhs. "B," pge. 9 and "E"</u>).

117)   That upon Detective Kearl's review of the still surveillance photo of the robbery suspect,

I noted several unique features on the suspects face. The piece of skin near the entrance
of the ear is known as the Tragus. This unique shape really stood out on the suspect when
observed from a certain angle. There were many prominent wrinkles and lines in the
suspect' s face.  . . . The suspect appeared older due to these facial features (<u>P's Exh.
"B," pge. 9; and "E"</u>).

118)   That shortly after the subject robbery an OPD Press Release was posted on the OPD's

Facebook page including a copy of the aforesaid still photo of the bank robbery suspect

(hereinafter "OPD Facebook photo"), and specifically describing the robbery suspect as

being six feet tall, sixty years old and fleeing the scene in a green Dodge Ram pickup truck

(<u>P's. Exh. "F"</u>).

119)    That upon information and belief Detective Kearl completed initial on-site investigation of the bank robbery scene no later than 2:00 p.m. on June 4, 2019.  (P's. Exh. "B")

120)    That on June 4, 2019, a reasonable detective would know that the number of possible robbery suspects may be reduced by entering the description of the suspect's getaway vehicle into the Department of Motor Vehicle (hereinafter "DMV") database which would provide the name of the current registered owners of vehicles matching the description of the suspect's vehicle (P's. Exh. "C," pge 2).

121)    That a reasonable detective would know that the number of possible suspects may be further reduced by the detective entering the names of the aforesaid registered owners back into the DMV database which would display the driver's license photos of registered owners which could be then compared to the surveillance photo of the robbery suspect for a possible match. (P's. Exh. "C," pge 2).

122)    That after Detective Kearl completed his initial on scene investigation of the noon bank robbery, Detective Kearl described his further investigation of the bank robbery up to 8:30 p.m., that evening as follows:

> I disseminated and caused to be disseminated these gathered photographs of the suspect. An Ogden City Press Release was issued with the suspect's photograph and I began to follow all of the news articles and social media posts related to this case in the event a suspect was identified. No leads were initially had so I ended my involvement for the day in this case (P's Exh. "B," pge 9).

123)    That on June 4, 2019, Detective Kearl made no attempt to search the DMV database to find the possible registered owners of vehicles matching the robbery suspect's getaway vehicle.

124)    That on June 4, 2019, had Detective Kearl entered the robbery suspect's vehicle

description into the DMV database, Murdzak's name would have appeared as a registered

owner of a vehicle matching the robbery suspect's getaway vehicle.

125)    That on June 4, 2019, had Detective Kearl than entered Murdzaks name into the DMV

database the driver's license photo of Murdzak would have been displayed.

126)    That the driver's license photo displayed on the DMV database after the June 24, 2019,

bank robbery is the same driver's license photo of Murdzak that would have been displayed

had Murdzak's name been searched on June 4, 2019.

127)    That on June 4, 2019, Detective Kearl violated the Plaintiff's clearly established rights

under the Fourth Amendment by (a) not investigating basic evidence;  (b) ignoring easily

accessible evidence; (c) failing to investigate readily available exculpatory evidence; and

(d) closed his eyes to facts that would help clarify the circumstances of an arrest, by failing to

search the DMV for registered owners of vehicles matching the suspect's getaway vehicle as

had Detective Kearl done so Kearl would have known that (a) Murdzak was a registered

owner of a vehicle matching the suspect's getaway vehicle and (b) Murdzak's driver's

license photo matched that of the June 4, 2019, bank surveillance photo of the robbery

suspect, thus Detective Kearl is imputed with that knowledge.

128)    That had Detective Kearl known that Murdzak was a registered owner of a vehicle

matching the suspect's getaway vehicle and (b) Murdzak's driver's license photo matched

that of the June 4, 2019, bank surveillance photo of the robbery suspect, the Plaintiff would

never have been considered as a potential robbery suspect.

129)    That as a direct and proximate cause of Detective Kearl's aforesaid conduct and/or

misconduct, the Plaintiff suffered damages including but not limited to: severe emotional

distress; physical and mental pain and suffering; loss of business; loss of opportunities; loss

of social relationships with his children, family, friends, and others; loss of reputation;

financial devastation; depression; suicidal thoughts; anguish; loss of enjoyment in life; loss of

business opportunities; feelings of helplessness; frustration; loss of sleep; paranoia; fear;

inability to retain social relationships; medical costs and treatment; attorney's fees and costs;

lost clients; embarrassment; and humiliation in an amount to be determined at trial.

### SECOND CAUSE OF ACTION

### AGAINST DEFENDANT TRAVIS KEARL

### UNREASONABLE FAILURE TO INVESTIGATE
### REASONABLY AVAILABLE EXCULPATORY EVIDENCE
### WITH RESPECT TO THE PHOTO OF THE PLAINTIFF WEARING GLASSES

130)   That the Plaintiff realleges and reasserts the allegations set forth above and reincorporates

such herein.

131)   That although not mentioned anywhere in the Incident Report,  Detective Kearl's

Affidavit of Probable Cause to arrest the Plaintiff declared under penalty of perjury that "I

was also sent a photograph by Chief Jackson during this time that showed Maw wearing

black framed glasses that matched the suspect's glasses." (P's. Exhs. "B," "I" and "L").

132)   That the aforesaid photograph of the Plaintiff wearing glasses was received by Detective

Kearl's cell phone at 9:19 p.m. on June 4, 2019, was dated December 13, 2015, and

contained a large photograph of Plaintiff sitting in a chair wearing glasses, and included 14

smaller pictures of the Plaintiff's three children engaged in various activities (P's. Exhs. "I,"

and "L").

133)   That although it is may be questionable as to whether or not the glasses that the Plaintiff

is wearing in the December 13, 2015 photo matches those of the robbery suspect, said photo

is another prime example of Detective Kearl unreasonably closing his eyes to the facts, failing to investigate basic evidence, ignoring easily accessible evidence, and/or failing to investigate readily available exculpatory evidence as said December 13, 2015 photo includes a very clear view of the Plaintiff's normally shaped ear that a reasonable officer would easily conclude does not match that of the robbery suspect's unusually shaped ear thereby negating probable cause to arrest the Plaintiff on June 4, 2019, without a warrant (P's Exhs. "E," "F," "G" and "L").

**134)**     That in spite of knowing that Detective Kearl lacked probable cause to arrest the Plaintiff resulting from the aforesaid exculpatory evidence the Plaintiff was still arrested without a warrant the evening of June 4, 2019, in violation of the Plaintiff's Forth Amendment Right to be free from unreasonable seizures.

135)     That as a direct and proximate cause of Detective Kearl's aforesaid conduct and/or misconduct, the Plaintiff suffered damages including but not limited to: severe emotional distress; physical and mental pain and suffering; loss of business; loss of opportunities; loss of social relationships with his children, family, friends, and others; loss of reputation; financial devastation; depression; suicidal thoughts; anguish; loss of enjoyment in life; loss of business opportunities; feelings of helplessness; frustration; loss of sleep; paranoia; fear; inability to retain social relationships; medical costs and treatment; attorney's fees and costs; lost clients; embarrassment; and humiliation in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### AGAINST DEFENDANT TRAVIS KEARL AND DEFENDANT LARRY LEWIS

### UNLAWFUL WARRANTLESS SEIZURE OF THE PLAINTIFF IN HIS HOME WITHOUT PROBABLE CAUSE NOR EXIGENT CIRCUMSTANCES

136)   That the Plaintiff realleges and reasserts the allegations set forth above and reincorporates

such herein.

137)   That on June 4, 2019 after Detective Kearl received the photograph of the Plaintiff

wearing glasses Detective Kearl states:

I met with Agent J. Hansen of the FBI Violent Crimes Task Force and with Det. Lewis as
well.  Together we looked over and scrutinized the pictures of Kerry and the Wells Fargo
pictures. I determined that probable cause, based on the matching suspect description was
found to take Kerry into custody for the Utah State Code Violation of Robbery (F2) (Ps. Exh.
"B," pge. 10).

138)   That Detective Kearl was the only one who allegedly looked over and scrutinized the

pictures of Kerry and the Wells Fargo pictures who " . . . determined that probable cause,

based on the matching suspect description was found to take Kerry into custody for the Utah

State Code Violation of Robbery (F2) (Ps. Exh. "B," pges. 10, and 13).

139)   That neither Detective nor Detective Lewis make any attempt to secure a warrant for the

Plaintiff's arrest prior to the Plaintiff's warrantless arrest the evening of June 4, 2019 (P's

Exhs. "B," and "I").

140)   That nothing prevented Detective Kearl nor Detective Lewis from seeking to obtain a

warrant for the Plaintiff's arrest prior to the Plaintiff's warrantless arrest on June 4, 2019 (P's

Exhs. "B," and "I").

141)   That no emergency situation existed on June 4, 2019, which a reasonable officer would

objectively believe necessitate the Plaintiff's warrantless arrest for the June 4, 2019, bank

robbery (P's Exhs. "B," and "I").

142)   That no exigent circumstances existed on June 4, 2019, which a reasonable officer would

objectively believe necessitated the Plaintiff's warrantless arrest for the June 4, 2019, bank

robbery (P's Exhs. "B," and "I").

143)   That Detective Kearl, Detective Lewis and Agent Hansen arrived the Plaintiff's home around 9:30 p.m. the evening of June 4, 2019, to attempt a "knock and talk." (P's. Exh. "B," pges. 10, and 13).

144)   That on June 4, 2019, Detective Kearl and Detective Lewis respectively knew based upon their respective training and experience that a "knock and talk investigation" was limited to knocking on the Plaintiff's door a few times and if there was no immediate response to leave the Plaintiff's property even if the Plaintiff was in his home and chose not to answer the door.

145)   That Detective Kearl and Detective Lewis respectively knew that under clearly established law the Plaintiff had a legal right under the Fourth Amendment not to open his door nor answer any questions without first having a warrant.

146)   That on June 4, 2019, it was clearly established law that officers must have probable cause to arrest an individual and exigent circumstances to arrest someone their home without a warrant.

147)   That on June 4, 2019, warrantless arrests of someone in their home was presumed unreasonable.

148)   That on June 4, 2019, Detective Kearl pounded on the Plaintiff's front door for several minutes demanding that the Plaintiff open the door (P's. Exh. "B," pges. 10, and 13).

149)   That subsequently, after the persistent pounding and demands by Detective Kearl to the Plaintiff to open the Plaintiff's front door, Detective Kearl obtained the Plaintiff's cell phone number from Chief Jackson and called the Plaintiff again demanding that the Plaintiff open his door (P's. Exh. "B," pges. 10, and 13).

150)   That upon the Plaintiff not immediately complying with Detective Kearl's phone

demands to open the door Detective Kearl threatened the Plaintiff to the effect that if the

Plaintiff did not open the door "we're coming in." (P's. Exh. "B," pges. 10, and 13).

151)   That the Plaintiff first became aware of something going on when he heard his dogs

barking and when he looked outside, he saw several flashlights crisscrossing his back yard.

152)   That the Plaintiff was terrified as he was home alone and had no idea who was walking

through his back yard.

153)   That the Plaintiff fled to his basement for safety than heard Detective Kearl violently

banging on his front door demanding that he open his door and come out.

154)   That the Plaintiff had no criminal record except for a few minor traffic citations, and had

never been arrested so he had no idea why the police were at his home demanding that he

come out, so he didn't answer the door.

155)   That after several minutes of continual violent banging and demanding that the Plaintiff

open up his door and come out, the Plaintiff received a phone call from Detective Kearl who

insisted that the Plaintiff open his door and come out but the Plaintiff stayed put.

156)   That "Detective Kearl" called the Plaintiff again on his phone and this time Detective

Kearl  told the Plaintiff to the effect that if the Plaintiff does not open the door and come out

"we're coming in." (P's. Exh. "B," pges. 10, and 13).

157)   That the Plaintiff reasonably believed that he was not free to leave and had no other

option but to comply with the demands of Detective Kearl, by opening his door (P's. Exh.

"B," pges. 10, and 13).

158)   That during the time that Detective Kearl and Detective Lewis and other law enforcement

officers were present at the Plaintiff's home prior to the Plaintiff's warrantless arrest the

Plaintiff would not have been free to walk out of his home and leave (<u>P's. Exh. "B," pges.</u> <u>10, and 13</u>).

159)    That immediately as the Plaintiff opened his door and was told to turn around and put his hands behind his back at gunpoint.

160)    That under clearly established law the Plaintiff was arrested or seized by Detective Kearl and Detective Lewis inside the Plaintiff's home based upon their aforesaid unreasonable conduct in violation of the Plaintiff's Fourth Amendment rights not to be subject to a warrantless seizure in the Plaintiff's own home.

161)    That as a direct and proximate cause of Detective Kearl's and/or Detective Lewis' aforesaid conduct and/or misconduct, the Plaintiff suffered damages including but not limited to: severe emotional distress; physical and mental pain and suffering; loss of business; loss of opportunities; loss of social relationships with his children, family, friends, and others; loss of reputation; financial devastation; depression; suicidal thoughts; anguish; loss of enjoyment in life; loss of business opportunities; feelings of helplessness; frustration; loss of sleep; paranoia; fear; inability to retain social relationships; medical costs and treatment; attorney's fees and costs; lost clients; embarrassment; and humiliation in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**AGAINST DEFENDANT TRAVIS KEARL AND DEFENDANT LARRY LEWIS**

**UNREASONABLE FAILURE TO INVESTIGATE
REASONABLY AVAILABLE EXCULPATORY EVIDENCE WITH RESPECT
TO THE PLAINTIFF'S DIFFERENT PHYSICAL CHARACTERISTICS**

162)   That the Plaintiff realleges and reasserts the allegations set forth above and reincorporates

such herein.

163)   That on June 4, 2019, it would have been clear to a reasonable officer that it would have

been unlawful if that officer (a) did not investigate basic evidence;  (b) ignored easily

accessible evidence; (c) fail to investigate readily available exculpatory evidence; and/or (d)

closed his or her eyes to facts that would help clarify the circumstances of an arrest.

164)   That after the Plaintiff was hand-cuffed both Detective Kearl and Detective Lewis

respectively were able to clearly observe and notice the Plaintiff's actual facial features and

ear shape, and height (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

165)   That Detective Kearl upon seeing the Plaintiff's face and ear shape in person knew as a

reasonably objective detective that the Plaintiff was not the robbery suspect as beyond being

a Caucasian male the Plaintiff's face did not have the " . . . many prominent wrinkles and

lines" nor the very distinctive ear shape as depicted in the surveillance photos of the bank

robbery suspect, nor was the Plaintiff six feet tall (P's Exhs. "B," pges. 10, and 13; "E," "G,"

"H, "K," and "L").

166)   That Detective Lewis upon seeing the Plaintiff's face and ear shape in person knew as a

reasonably objective detective that the Plaintiff was not the robbery suspect as beyond being

a Caucasian male, the Plaintiff's face did not have the " . . . many prominent wrinkles and

lines" nor the very distinctive ear shape as depicted in the surveillance photos of the bank

robbery suspect (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

167)    That an objectively reasonable detective with the same knowledge as Detective Kearl and

Detective Lewis respectively upon seeing the Plaintiff's face and ear shape and height in

person would reasonably conclude that the Plaintiff was not the robbery suspect as beyond

being a Caucasian male, the Plaintiff's facial characteristics did not have the " . . . many

prominent wrinkles and lines" nor the very distinctive ear shape as the robbery suspect, nor

was the Plaintiff six feet tall as was the suspect (P's Exhs. "B," pges. 10, and 13; "E," "G,"

"H, "K," and "L").

168)    That under clearly established law Detective Kearl and Detective Lewis were required to

consider the contrasting facial characteristics and ear shape of the Plaintiff and height

difference as compared to the robbery suspect in evaluating the totality of the circumstances

with respect to whether probable cause continued to exist to continue the seizure of the

Plaintiff for the subject robbery (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and

"L").

169)    That Detective Kearl and Detective Lewis respectively upon seeing the Plaintiff's actual

face, and ear shape in person unreasonably closed their eyes to the facts, failed to investigate

basic evidence, ignored easily accessible evidence, and/or failed to investigate readily

available exculpatory evidence as reasonable detective would conclude that other than being

a white male, the physical characteristics of the Plaintiff clearly lack the distinct multiple

lines and wrinkles of the suspect's face and unusual shape of the robbery suspect, thereby

negating any probable cause to continue to hold the Plaintiff for the subject June 4, 2019

bank robbery and should have immediately released the Plaintiff, but they unreasonably

failed to do so. (P's. Exs. "E," "F," "G" and "K").

170)    That as a direct and proximate cause of Detective Kearl's and/or Detective Lewis'

aforesaid conduct and/or misconduct, the Plaintiff suffered damages including but not limited

to: severe emotional distress; physical and mental pain and suffering; loss of business; loss of

opportunities; loss of social relationships with his children, family, friends, and others; loss

of reputation; financial devastation; depression; suicidal thoughts; anguish; loss of enjoyment

in life; loss of business opportunities; feelings of helplessness; frustration; loss of sleep;

paranoia; fear; inability to retain social relationships; medical costs and treatment; attorney's

fees and costs; lost clients; embarrassment; and humiliation in an amount to be determined at

trial.

## FIFTH CAUSE OF ACTION

### AGAINST DEFENDANT TRAVIS KEARL AND DEFENDANT LARRY LEWIS

### UNREASONABLE FAILURE TO PROTECT THE PLAINTIFF
### FROM THE OTHER'S FOURTH AMENDMENT VIOLATION

171)    That the Plaintiff realleges and reasserts the allegations set forth above and reincorporates

such herein.

172)    That on June 4, 2019, it would have been clear to a reasonable officer that it would have

been unlawful if that officer (a) did not investigate basic evidence;  (b) ignored easily

accessible evidence; (c) fail to investigate readily available exculpatory evidence; and/or (d)

closed his or her eyes to facts that would help clarify the circumstances of an arrest.

173)    That after the Plaintiff was hand-cuffed both Detective Kearl and Detective Lewis

respectively were able to clearly observe and notice the Plaintiff's actual facial features and

ear shape, and height (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

174)   That Detective Kearl upon seeing the Plaintiff's face and ear shape in person knew as a
reasonably objective detective that the Plaintiff was not the robbery suspect as beyond being
a Caucasian male the Plaintiff's face did not have the " . . . many prominent wrinkles and
lines" nor the very distinctive ear shape as depicted in the surveillance photos of the bank
robbery suspect, nor was the Plaintiff six feet tall (P's Exhs. "B," pges. 10, and 13; "E," "G,"
"H, "K," and "L").

175)   That Detective Lewis upon seeing the Plaintiff's face and ear shape in person knew as a
reasonably objective detective that the Plaintiff was not the robbery suspect as beyond being
a Caucasian male, the Plaintiff's face did not have the " . . . many prominent wrinkles and
lines" nor the very distinctive ear shape as depicted in the surveillance photos of the bank
robbery suspect (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

176)   That an objectively reasonable detective with the same knowledge as Detective Kearl and
Detective Lewis respectively upon seeing the Plaintiff's face and ear shape and height in
person would reasonably conclude that the Plaintiff was not the robbery suspect as beyond
being a Caucasian male, the Plaintiff's facial characteristics did not have the " . . . many
prominent wrinkles and lines" nor the very distinctive ear shape as the robbery suspect, nor
was the Plaintiff six feet tall as was the suspect (P's Exhs. "B," pges. 10, and 13; "E," "G,"
"H, "K," and "L").

177)   That under clearly established law Detective Kearl and Detective Lewis were required to
consider the contrasting facial characteristics and ear shape of the Plaintiff and height
difference as compared to the robbery suspect in evaluating the totality of the circumstances
with respect to whether probable cause continued to exist to continue the seizure of the

Plaintiff for the subject robbery (<u>P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L"</u>).

178)   That Detective Kearl and Detective Lewis respectively upon seeing the Plaintiff's actual face, and ear shape in person unreasonably closed their eyes to the facts, failed to investigate basic evidence, ignored easily accessible evidence, and/or failed to investigate readily available exculpatory evidence as reasonable detective would conclude that other than being a white male, the physical characteristics of the Plaintiff clearly lack the distinct multiple lines and wrinkles of the suspect's face and unusual shape of the robbery suspect, thereby negating any probable cause to continue to hold the Plaintiff for the subject June 4, 2019 bank robbery and should have immediately released the Plaintiff, but they unreasonably failed to do so. (<u>P's. Exs. "E," "F," "G" and "K"</u>).

179)   That Detective Kearl and Detective Lewis respective  knew under clearly established law that because probable cause to arrest the Plaintiff had been negated by the unreasonable misidentification of the Plaintiff by Detective Lewis and the unreasonable misidentification by Detective Kearl respectively that each officer had a duty to prevent the other officer from violating the Plaintiff's rights to be free from a warrantless seizure without probable cause, but each officer breached their respective duties by allowing the other detective to continue the unlawful seizure of the Plaintiff without probable cause (<u>P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L"</u>).

**SIXTH CAUSE OF ACTION**

**AGAINST DEFENDANT TRAVIS KEARL AND DEFENDANT LARRY LEWIS**

## MALICIOUS PROSECUTION

180)   That the Plaintiff reasserts and realleges the allegations set forth above and reincorporates such herein.

181)   That after the Plaintiff was hand-cuffed both Detective Kearl and Detective Lewis respectively were able to clearly observe and notice the Plaintiff's actual facial features and ear shape, and height (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

182)   That Detective Kearl upon seeing the Plaintiff's face and ear shape in person knew as a reasonably objective detective that the Plaintiff was not the robbery suspect as beyond being a Caucasian male the Plaintiff's face did not have the " . . . many prominent wrinkles and lines" nor the very distinctive ear shape as depicted in the surveillance photos of the bank robbery suspect, nor was the Plaintiff six feet tall (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

183)   That Detective Lewis upon seeing the Plaintiff's face and ear shape in person knew as a reasonably objective detective that the Plaintiff was not the robbery suspect as beyond being a Caucasian male, the Plaintiff's face did not have the " . . . many prominent wrinkles and lines" nor the very distinctive ear shape as depicted in the surveillance photos of the bank robbery suspect (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

184)   That an objectively reasonable detective with the same knowledge as Detective Kearl and Detective Lewis respectively upon seeing the Plaintiff's face and ear shape and height in person would reasonably conclude that the Plaintiff was not the robbery suspect as beyond being a Caucasian male, the Plaintiff's facial characteristics did not have the " . . . many prominent wrinkles and lines" nor the very distinctive ear shape as the robbery suspect, nor

was the Plaintiff six feet tall as was the suspect (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

185)     That under clearly established law Detective Kearl and Detective Lewis were required to consider the contrasting facial characteristics and ear shape of the Plaintiff and height difference as compared to the robbery suspect in evaluating the totality of the circumstances with respect to whether probable cause continued to exist to continue the seizure of the Plaintiff for the subject robbery (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

186)     That Detective Kearl and Detective Lewis respectively upon seeing the Plaintiff's actual face, and ear shape in person unreasonably closed their eyes to the facts, failed to investigate basic evidence, ignored easily accessible evidence, and/or failed to investigate readily available exculpatory evidence as reasonable detective would conclude that other than being a white male, the physical characteristics of the Plaintiff clearly lack the distinct multiple lines and wrinkles of the suspect's face and unusual shape of the robbery suspect, thereby negating any probable cause to continue to hold the Plaintiff for the subject June 4, 2019 bank robbery negating any probable cause to continue to hold the Plaintiff for the subject June 4, 2019 bank robbery and should have immediately released the Plaintiff, but they unreasonably failed to do so.   (P's. Exs. "E," "F," "G" and "K").

187)     That Detective Kearl and Detective Lewis respectively acted in deliberate indifference to the Plaintiff's clearly established rights to be free from arrest without probable cause in violation of the Fourth Amendment as neither Detective Kearl nor Detective Lewis took any action to prevent the Plaintiff from being charged with the subject June 4, 2019, bank robbery in spite of Kearl's and Lewis' respective knowledge that the Plaintiff was not the

robbery suspect based upon the obviously different facial features and ear shape and height between that of the suspect and the Plaintiff which thereby negated all probable cause to arrest the Plaintiff for the June 4, 2019, bank robbery (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L")

188)   That under clearly established law the fact that neither Detective Kearl nor Detective Lewis had probable cause to arrest the Plaintiff without a warrant on June 4, 2019, their respective malice can be inferred.

189)   That on June 24, 2019, Murdzak robbed the same bank and fled in the same getaway vehicle that was used in the June 4, 2019, bank robbery (P's Exhs. "B," "C," and "I").

190)   That Detective Kearl was again assigned to investigate the June 24, 2019, bank robbery.

191)   That on the same day of the subject June 24, 2019, bank robbery Detective Kearl was provided with the identical vehicle description of the robbery suspect's getaway vehicle as had been provided to Kearl the day of the June 4, 2019, bank robbery (P's Exhs. "B," "C," and "I").

192)   That this time, Detective Kearl unlike his unreasonable failure to do so after the June 4, 2019, bank robbery, investigated basic readily available exculpatory evidence and entered the description of the robbery suspect's vehicle into the DMV database which resulted in the names of approximately sixty registered owners of vehicles matching the robbery suspect's getaway vehicle, including that of Murdzak (P's Exhs. "B," "C," and "I").

193)   That thereafter on June 24, 2019, Detective Kearl entered Murdzak's name into the DMV database and reviewed a driver's license photo of Murdzak which matched the surveillance photos of both the June 4, 2019, and June 24, 2019, bank robbery suspect (P's Exhs. "B," "C," and "I").

194)   That on June 25, 2019, the State filed a Motion to Dismiss the June 4, 2019, bank robbery charges against the Plaintiff without prejudice "as new facts have come to light which necessitate additional investigation.

195)   That on June 27, 2019, the State District Court granted the State's Motion to Dismiss the robbery charge against the Plaintiff without prejudice (P's Exh. "P").

196)   That based solely upon the fact that Murdzak was identified as a registered owner of a vehicle matching the bank robbery suspect's getaway vehicle, and that Murdzak's driver's license photo matched that of the June 4, 2019, and June 24, 2019, bank surveillance photos, there existed sufficient probable cause to arrest Murdzak for both bank robberies (P's Exhs. "B," "C," and "I")

197)   That on June 28, 2019, Murdzak was located and the subject getaway vehicle was found parked in front of Murdzaks' home in Logan, Utah (P's Exh. "C").

198)   That on June 28, 2019 Murdzak was taken into custody by the FBI and advised of his rights under Miranda, wherein Murdzak admitted that he had committed both the June 4, 2019, and June 24, 2019, bank robberies (P's Ex. "C").

199)   That on or about September 18, 2019, Murdzak plead guilty as charged for both the June 4, 2019, and June 24, 2019, bank robberies (P's Exh. "C," and "D")

200)   That as a direct and proximate cause of Detective Kearl's and/or Detective Lewis' aforesaid deliberate indifference, the Plaintiff suffered damages including but not limited to: severe emotional distress; physical and mental pain and suffering; loss of business; loss of opportunities; loss of social relationships with his children, family, friends, and others; loss of reputation; financial devastation; depression; suicidal thoughts; anguish; loss of enjoyment in life; loss of business opportunities; feelings of helplessness; frustration; loss of sleep;

paranoia; fear; inability to retain social relationships; medical costs and treatment; attorney's fees and costs; lost clients; embarrassment; and humiliation in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

## AGAINST DEFENDANT TRAVIS KEARL

## FALSE AFFIDAVIT

201)   That the Plaintiff reasserts and realleges the allegations set forth above and reincorporates such herein.

202)   That after the Plaintiff was hand-cuffed both Detective Kearl and Detective Lewis respectively were able to clearly observe and notice the Plaintiff's actual facial features and ear shape, and height (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

203)   That Detective Kearl upon seeing the Plaintiff's face and ear shape in person knew as a reasonably objective detective that the Plaintiff was not the robbery suspect as beyond being a Caucasian male the Plaintiff's face did not have the " . . . many prominent wrinkles and lines" nor the very distinctive ear shape as depicted in the surveillance photos of the bank robbery suspect, nor was the Plaintiff six feet tall (P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L").

204)   That under clearly established law arrest warrants violate the Fourth Amendment when they knowingly, or with reckless disregard for the truth, include false statements in an affidavit, or knowingly or recklessly omit from it information which, if included, would vitiate probable cause.

205)   That Detective Kearl knowingly, or with reckless disregard for the truth, included false statements in his Affidavit of Probable Cause to arrest the Plaintiff, and/or knowingly or

recklessly omitted from it information by not stating that the Plaintiff did not resemble the robbery suspect as the Plaintiff's actual facial characteristics did not have the " . . . many prominent wrinkles and lines" nor the very distinctive ear shape as the robbery suspect, nor was the Plaintiff 6 feet tall, nor did the Plaintiff appear to be in his sixties which if included in Kearl's affidavit "No reasonable magistrate would have found the existence of probable cause and the Plaintiff would have been released and no charges filed (<u>P's Exhs. "B," pges. 10, and 13; "E," "G," "H, "K," and "L"</u>).

206)    That as a direct and proximate cause of Detective Kearl's aforesaid conduct and/or misconduct, the Plaintiff suffered damages including but not limited to: severe emotional distress; physical and mental pain and suffering; loss of business; loss of opportunities; loss of social relationships with his children, family, friends, and others; loss of reputation; financial devastation; depression; suicidal thoughts; anguish; loss of enjoyment in life; loss of business opportunities; feelings of helplessness; frustration; loss of sleep; paranoia; fear; inability to retain social relationships; medical costs and treatment; attorney's fees and costs; lost clients; embarrassment; and humiliation in an amount to be determined at trial.

WHEREFORE, the Plaintiff prays:

1) That the Plaintiff be awarded special damages against the above-named Defendant Travis Kearl in an amount to be determined at trial.

2) That the Plaintiff be awarded general damages against the above-named Defendant Travis Kearl in an amount to be determined at trial.

3) That the Plaintiff be awarded special damages against the above-named Defendant Larry Lewis  in an amount to be determined at trial.

4) That the Plaintiff be awarded general damages against the above-named Defendant Larry

   Lewis in an amount to be determined at trial; and

5) For such other relief as the Court deems fair and proper.

DATED this 3rd day of June 2021.


/s/ Randall G. Phillips
Attorney for Plaintiff