# Plaintiff's Exhibit "A"

## LAW OFFICE OF RANDY PHILLIPS, PLLC
2510 Washington Blvd., Suite 200
Ogden, Utah 84401
Telephone: (801) 621-6546
Email: rplaw1992@yahoo.com

---

May 29, 2020

Ms. Tracy Hansen
Ogden City Recorder
2549 Washington Blvd, Suite 210

Ogden, Utah 84401

Via certified mail postage prepaid
Via email at: tracyhansen@ci.ogden.ut.us

RE:   Notice of Claim -Date of Injury - June 4, 2019 through and including the present

        Claimant:      Kerry Jason Maw
        Respondents:  Ogden City Police Department
                            Detective Travis Luke Kearl (hereinafter "Detective Kearl")
                            Detective L. Lewis (hereinafter "Detective Lewis")


TO:    The City of Ogden, c/o Tracy Hansen

Please find below a Notice of Claim pursuant to the Utah Governmental Immunity Act, (Utah
Code Ann. Sec. 63G-7-401, as amended), concerning Claimant Kerry Jason Maw, for which I
have been retained to pursue on his behalf.


## I.     **BRIEF STATEMENT OF FACTS:**

### The two bank robberies by Thomas Murdzak

On or about June 4, 2014, the Wells Fargo Bank located at 4301 Harrison Blvd., Ogden,
Weber County, State of Utah, by the yet unknown Thomas Murdzak (hereinafter "Murdzak")
(Claimant's Exhibits "A," "B," "C," and "D").  Unbeknownst at that time, on June 24, 2019,
Murdzak would rob the same bank using the same getaway vehicle (Claimant's Exhibits "B,"
"C," and "D").

1

## The eyewitnesses' description of the robbery suspect

Respondent Kearl responded to the robbery scene and interviewed several eyewitnesses (Claimant's Exhibit "D").  According to the bank's robbery's eyewitnesses the suspect was described as being in his 60's, 6' 0" tall, with thin, gray hair, wearing a dark ballcap, a purple or blue sweatshirt, and wore rectangle large black framed glasses that were quasi-rectangular in shape and with a white and black color to the "temple"[1] of the glasses (Claimant's Exhibit "E").

## The suspect's vehicle and lack of investigation

The bank robbery eyewitnesses described the suspect's vehicle as being a late 1990's or early 2000's Forrest green Dodge Ram single cab pickup truck with a large shiny metal toolbox in the bed (Claimant's Exhibit "E").  Respondent Kearl failed to investigate basic evidence by failing to attempt to identify the owner of the suspect's vehicle at this time (Claimant's Exhibit "E"). Ironically, after Murdzak robbed the same bank driving the same vehicle on June 24, 2019, Respondent Kearl relying upon the *identical vehicle information* he had on June 4, 2019:

> . . . searched the DMV database for a 1998 or 1999 Forrest green Dodge Ram pickup truck in the Northern Utah area.  Detective Kearl obtained approximately 60 hits.  When he pulled the driver's license of Anthony Murdzak, he believed that Murdzak matched the photos of the suspect from the two incidents at the Wells Fargo bank.  A phone number was obtained from Murdzak's Facebook account, and was verified by Murdzak's probation officer.  A "ping warrant" for Murdzak's phone was obtained and based upon the "ping," Murdzak was taken into custody, mirandized, and admitted that he committed both the June 4, 2019, and the June 24, 2019, robberies (Claimant's Exhibit s "B," "C," and "D").

Murdzak ultimately plead guilty to both robberies and is currently in Federal prison (Claimant's Exhibits "B," "C," and "D").  Sadly, if Respondent Kearl would have ran the identical vehicle search as he did with Murdzak's June 24, 2019, robbery he would have identified Murdzak as the suspect, prevented the second robbery and avoided the Claimant's unlawful arrest and malicious prosecution (Claimant's Exhibits "B," "C," "D," and "E").

Respondent Kearl knowingly or recklessly omitted the details of the suspect's vehicle in his Affidavit of Probable Cause with respect to the vehicle being a late 1990's early 2000's, Dodge Ram, single cab (Claimant's Exhibits "E," and "J").  Rather, the reviewing Magistrate knew only that the suspect's vehicle was a green dodge pickup truck with an unknown model, cab size, or year, which "would explain" why Respondent Kearl did not mention nor perform a DMV database search for such a generic vehicle to either support or vitiate probable cause (Claimant's Exhibits "E" and "J").

---

[1] Long arms on the sides of the frame that extend from the hinge and over the ears to keep the glasses on your face.

## The possible suspect's fingerprints and lack of investigation

The Crime Scene Investigation Unit (hereinafter "CSI") also became involved in the investigation and was able to locate partial latent fingerprints that may have belonged to the suspect (Claimant's Exhibit "E"). Respondent Kearl failed to reasonably investigate basic evidence with respect to having CSI process and search the online fingerprint database for a possible match (Claimant's Exhibit "E," and "K"). Had Respondent Kearl requested CSI to process and search for the suspect's prints, such would have likely identified Murdzak as the suspect due to Murdzak's fingerprints being in both the Utah and national fingerprint database.[2]

Respondent Kearl knowingly or recklessly omitted the mere existence of any potential fingerprints in his Affidavit of Probable Cause (Claimant's Exhibits "E," "J," and "K"). As a result, the reviewing magistrate had no knowledge nor ability to inquire why Respondent Kearl did not have the CSI fingerprints searched to either support or vitiate probable cause (Claimant's Exhibits "E," "J," and "K")

## The possible video footage and lack of investigation

Businesses in the surrounding area were checked to see if they may have any potential video footage of the suspect and/or the suspect's vehicle (Claimant's Exhibit "E"). Two of the surrounding businesses stated that they may each have video footage of the suspect and/or the suspect's vehicle (Claimant's Exhibit "E"). Respondent Kearl failed to reasonably investigate the two store's videos for possible footage of the suspect which would have either supported or vitiated a finding of probable cause (Claimant's Exhibit "E").

Respondent Kearl knowingly or recklessly omitted the mere existence of the aforesaid two potential video footage of the suspect and/or his vehicle from his affidavit of probable cause (Claimant's Exhibits "E," and "J"). As a result the reviewing magistrate would not be able to view the potential footage nor inquire as to why Respondent Kearl did not review such to find possible evidence either supporting or vitiating a finding of probable cause (Claimant's Exhibits "E," "J," and "K").

---

[2] (e.g. Murdzack had been previously arrested and charged with Assault, a Class B misdemeanor (Case No. 181100747 - 06/18/2018); Vehicle theft, a second degree felony, and Unlawful possession of a weapon by a restrict person, a Class A misdemeanor (Case No. 1161100480 - 05/31/2018); A second degree felony Burglary and Theft charge, and a Class A misdemeanor Theft by deception charge (Case No. 051907139 - 10/12/2005); and two federal felony weapon's charges (Case No. 2:06CR00045 - 2005).

### OPD's Facebook photo and description of the suspect

Respondent Kearl received photos (emphasis added) of the suspect from the bank, *but relied exclusively on one single photo* to match the Claimant with the suspect (Claimant's Exhibits "E, "F,""G," "E" "F," "G," and "H"). Said bank photo was posted on the OPD's Facebook page with the following information:

> On 06-04-2019, at 1212 hours, OPD officers responded to a bank robbery at the Wells Fargo bank, located at 4301 Harrison Blvd. The suspect fled the scene prior to the officers' arrival. Bank employees reported that the suspect is described as a thin, 60-year-old Caucasian male, with grey hair, 6 feet tall, wearing a gray baseball style cap and a blue sweatshirt with an unknown logo. He was wearing thick-rimmed glasses. The suspect presented a note which demanded money. Once the suspect had the money in hand, he fled southbound on Harrison Blvd in a green dodge pick-up truck. This is an ongoing investigation. If you have any information related to the identity of the suspect, please contact Detective Travis Kearl with the Ogden Police Department at 801-629-8029 (Claimant's Exhibits "E," "F," and "J").

### The missing picture and pictures of the suspect from the bank

Respondent Kearl knowingly or recklessly did not attach a copy of the primary bank photo he exclusively relied upon in matching the Claimant's photo with that of the suspect to establish probable cause nor any of the other unknown bank photos of the suspect to his Affidavit of probable cause (Claimant's Exhibits "E," "F," and "J"). Without being able to review any of the bank's photos to compare with those of the Claimant, the reviewing magistrate could not determine if Respondent Kearl's matching of the Claimant's and the suspect's was reasonable, and whether such supported or vitiated a finding of probable cause (Claimant's Exhibits "E, "F,""G," "E" "F," "G," and "H").

### Chief Jackson's undisclosed "sensitive personal information and safety concerns

At approximately 8:30 p.m. on June 4, 2019, Respondent Kearl was contacted by dispatch who advised Kearl that the Harrisville Police Chief Maxwell Jackson (hereinafter "Chief Jackson"), may know who the suspect was (Claimant's Exhibits "E," "F," and "J"). Respondent Kearl contacted Chief Jackson who advised Kearl that he had seen the OPD Facebook photo and that it matched that of the Claimant Kerry Maw (Claimant's Exhibits "E," "F," and "J"). Respondent Kearl's incident report contained an extremely bizarre statement as to Chief Jackson's identification of the Claimant as a possible suspect, that:

> **"At this time, I am not releasing how Chief Jackson knew Kerry due to sensitive personal information and safety concerns."**(Emphasis added) (Claimant's Exhibit "E").

Respondent Kearl knowingly or recklessly omitted that Chief Jackson had any such concerns from his Affidavit of probable cause in order to "trick" the magistrate into making a finding of probable cause for the Claimant's arrest (Claimant's Exhibits "E," "J," and "K"). A reasonably objective magistrate without knowing more would reasonably expect that a Chief of Police's

4

identification of the Claimant as a suspect in and of itself likely support's a finding of probable cause to arrest the Claimant without a warrant (Claimant's Exhibits "J," and "K"). However, had the reviewing magistrate about Chief Jackson's identification and that how Jackson knew the Claimant would not be disclosed for "sensitive personal reasons and personal safety concerns," a reasonable magistrate would want to know the basis for said reasons and concerns to determine if Chief Jackson 's identification of the suspect needed to be "questioned" as it pertains to a finding of probable cause or lack thereof (Claimant's Exhibits "E," "J," and "K").

## Respondent Kearl's detailed description of the suspect

Respondent Kearl meticulously reviewed the photo of the suspect that was posted on OPD's Facebook page, and objectively concluded that:

> I noted several unique features on the suspects face. The piece of skin near the entrance of the ear is known as the Tragus. This unique shape really stood out on the suspect when observed from a certain angle. There were many prominent wrinkles and lines in the suspect' s face. The suspect appeared older due to these facial features." (Claimant's Exhibits "E,""F," and "J").

## The Claimant's driver's license photo, height, and age
## did not match that of the suspect

Respondent Kearl was able to locate the Claimant's driver's license which had been renewed on or about August 27, 2018 (Claimant's Exhibit "H"). The Claimant's driver's license information indicated that: the Claimant was 5'9" not 6'0" as described by the eyewitnesses; the Claimant was 48 years old, not in his sixties as described by the eyewitnesses; and the suspect was not required to wear corrective lenses (Claimant's Exhibit "H").

Respondent Kearl knowingly or recklessly omitted a copy of the Claimant's driver's license from his Affidavit of Probable Cause  and omitted in his Affidavit that the Claimant's height, age, and lack of need for corrective lenses vitiated Kearl's finding of probable cause (Claimant's Exhibits "E," "H," and "J").

Respondent Kearl knowingly or recklessly omitted from his Affidavit of Probable Cause that not only did the Claimant's driver's license photo look "too young" to be the suspect, but more importantly the Claimant's driver's license photo did  not  match Respondent Kearl's detailed description of the suspect (Claimant's Exhibits "E," "H," and "J") . In contrast, the reviewing magistrate only knew that the Claimant appeared to young to be the suspect Claimant's Exhibits "E," and "H"). Had the reviewing magistrate known that the detailed physical characteristics of the suspect also did not match that of the Claimant, such would have been a factor for the court to consider in determining probable cause or the lack thereof (Claimant's Exhibits "E," "F," "H," and "J").

## The Claimant's Facebook photo and Respondent Kearl's unreasonable misidentification of the Claimant

Respondent Kearl, not being able to match the Claimant's driver's license photo with that of the suspect somehow obtained a copy of the Claimant from the Facebook account of an undisclosed family member (Claimant's Exhibits "E," "I," and "J"). By comparing that one Facebook picture of the Claimant with the one OPD Facebook photo of the suspect, Respondent Kearl subjectively concluded that:

> I saw this photograph and recognized the same facial features in regard to facial hair, nose shape, facial wrinkles and ear shape that were consistent with the facial characteristics of the suspect. The Tragus of Kerry's ear in the Facebook photo matched the Tragus of the suspect's ear. This was a very unique factor that helped me match the suspect description to Kerry (Claimant's Exhibits "E," "F," "I," and "J").

Respondent Kearl knowingly or with reckless disregard for the truth stated in his Affidavit for Probable Cause that the Claimant's Facebook photo matched the physical description of the suspect's OPD Facebook photo (Claimant's Exhibits "E," "F," "I," and "J").

Respondent Kearl knowingly or recklessly omitted a copy of the aforesaid Facebook photo of the Claimant so that the reviewing judge would not know that the Facebook photo of the Claimant, clearly did not match the OPD Facebook photo of the suspect, which would have eliminated any finding of probable cause (Claimant's Exhibits "E," "F," "I," and "J").

Had the reviewing magistrate been provided with a copy of the suspect's OPD Facebook photo and the Facebook photo of the Claimant no reasonably objective magistrate would conclude that the Claimant's photo matched that of the suspect, because (a) the suspect's multiple and pronounced facial lines and wrinkles, (b) the shape of the suspect's nostrils, and (c) most importantly the very unusual shape of the suspect's ear "Tragus" obviously does not match that of the Claimant, thereby eliminating a finding of probable cause.

## The Claimant's reading glasses and the suspect' prescription glasses

At approximately 9:19 p.m. on the date of the June 4, 2019, robbery, Chief Jackson texted Respondent Kearl a photo of the Claimant wearing black framed glasses dated December 13, 2015 (Claimant's Exhibit "G"). Respondent Kearl knowingly, or with reckless disregard for the truth, falsely stated in his affidavit that the glasses worn by the Claimant in Chief Jackson's aforesaid photo of the Claimant matched those of the suspect (Claimant's Exhibit "E," "F," "G," and "J"). A reasonable detective would have determined that not only did the color of the temple, size and shape of the frames and lenses of the Claimant's and the suspect's glasses not match, but the Claimant was obviously wearing "reading glasses" to look at his cell phone, whereas the suspect's glasses were prescription glasses (Claimant's Exhibit "E," "F," "G," and "J"). Respondent Kearl also failed to include a copy of Chief Jackson's aforesaid photo of the Claimant wearing glasses, which if included would have vitiated if not eliminated probable cause (Claimant's Exhibit "E," "F," "G," and "J").

6

## The glasses photo and the non-matching "Tragus"

The photo of the Claimant wearing glasses contained a noticeably clear view of the "Tragus" of the Claimant's ear (Claimant's Exhibit "G"). The difference between the "Tragus" of the Claimant's ear in the aforesaid photo compared to the "Tragus" of the suspect's ear was so obvious that even the untrained eye of a reasonable lay person would conclude such do not match (Claimant's Exhibits "F," and "G"). Had the reviewing judge been provided a copy of the photo of the Claimant wearing glasses and compared such to the OPD Facebook photo of the suspect, no reasonable judge would have determined that probable cause existed to arrest the Claimant (Claimant's Exhibits "F," and "G").

## Respondent Kearl's conversation with the Claimant's "soon to be" ex-wife

Respondent Kearl's also spoke with Shancie Maw, the Claimant's current wife at that time, and stated in his incident report that:

> I was also given the phone number and was asked to contact Kerry's wife Shancie Maw. I called and spoke by phone with **Shancie, who was aware of this case** (emphasis added). She explained that she was familiar with the press release photo and identified the suspect as Kerry. Shancie was extremely scared of Kerry and was very hesitant about giving me information that may aggravate Kerry and cause him to retaliate. Shancie stated Kerry missed court mediation today regarding their "ugly divorce" because he owed his attorney $2,000. Shancie said Kerry needed to pay that amount or else the attorney wouldn't represent him further."(Claimant's Exhibit "E").

Respondent Kearl failed to reasonably investigate basic evidence and closed his eyes to the facts that would have helped clarify the circumstances of an arrest, by:

a)      failing to investigate how Shancie **knew** about Respondent Kearl's pending investigation of the Claimant (e.g. did Chief Jackson inform her of such) (Claimant's Exhibits "E," and "J");

b)      failing to investigate the status of the pending divorce by checking the Court docket on the Court's "Exchange" website wherein Respondent Kearl would have found that Shancie filed a Motion for Temporary Orders and a Contempt Order against the Claimant on the *same day of the aforesaid robbery*. Said filing by Shancie would make a reasonable detective to further inquire with this "ugly divorce" as to a possible "wrongful motive" in Shancie's identification of the Claimant which would have vitiated probable cause (Claimant's Exhibits "E," and "J");

c)      failing to investigate whether or not the Claimant may have robbed the bank to pay his divorce attorney to keep the attorney's legal representation by simply calling said divorce attorney and verify or refute Shancie's allegations (Claimant's Exhibit "E," and "J").

7

Respondent Kearl knowingly and intentionally omitted the fact that Shancie knew about Respondent Kearl's pending investigation of the Claimant and omitted any reference to Shancie's "ugly divorce," the Claimant's failure to attend the parties' divorce Mediation that day, and the possible motive for why the Claimant may of robbed the bank (Claimant's Exhibits "E," and "J").

A reasonable reviewing magistrate having known that Shancie was going through an "ugly divorce," and had missed the parties' divorce Mediation earlier that same day would have inquired further into the parties' divorce (Claimant's Exhibit "E"). The reviewing magistrate would have reviewed the parties' divorce docket and found that approximately 4:04 p.m. the day of the subject robbery, Shancie filed a Motion and Affidavit for Temporary Orders, and a Motion, Affidavit, and proposed Contempt Order against the Claimant (Claimant's Exhibit "N"). With said filings by Shancie approximately four hours before speaking with the Respondent would have made a reasonable magistrate question Shancie's motive for identifying the Claimant as the suspect, which would have been a factor that vitiates a finding of probable cause (Claimant's Exhibits "I," "J," "M, and "N").

A reasonable reviewing magistrate knowing that the Claimant's alleged failure to pay his attorney may be a conceivable motive for the Claimant's alleged bank robbery would have questioned why Respondent Kearl did not contact the Claimant's divorce attorney to verify or refute this conceivable motive (Claimant's Exhibits "I," "J," "M, and "N"). Knowing the validity or lack thereof of a potential motive for the Claimant robbing the bank is a factor that either supports or vitiates a finding of probable cause by the magistrate (Claimant's Exhibits "I," "J," "M, and "N").

### Respondent's second failure to reasonably investigate the Claimant's connection if any to the suspect's vehicle

Respondent Kearl now knowing the name and driver's license of the suspect failed to reasonably investigate as to what if any connection the Claimant had to the suspect's vehicle by either:

a)    running the Claimant's information through the online DMV database to see if the Claimant owns or owned a vehicle fitting the description of the suspect's vehicle;

b)    driving by the Claimant's home to see if the suspect's vehicle was parked at the Claimant's residence or nearby;

c)    asked Chief Jackson or Chancie if they were aware of the Claimant having any access or connection with the suspect's vehicle; and/or

d)    asking the Claimant's family members, neighbors, or friends if they were aware of the Claimant having any access or connection with the suspect's vehicle (Claimant's Exhibits "E," and "J").

The determination of what, if any access or connection the Claimant had to the suspect's vehicle was a factor that a reasonable detective and reviewing magistrate which would support or vitiate a finding of probable cause (Claimant's Exhibits "E," and "J").

### The public's own photo comparison

On June 5, 2019, the OPD posted an update on its Facebook page, advising the public that the Claimant had been arrested and included a copy of the Claimant's mugshot side by side the OPD's prior Facebook photo of the suspect (Claimant's Exhibit "I"). Several comments were made by random subscribers that the Claimant does not know as to their opinion of Respondent Kearl's matching of the Claimant and the suspect:





(Claimant's Exhibits "E,""H," and "J").

Although not dispositive to this case, the above comments demonstrate that even an untrained
ordinary citizen can readily conclude that the facial and ear characteristics of the Claimant and
the suspect obviously do not match (Claimant's Exhibits "E,""H," and "J").

### The warrantless unlawful arrest of the Claimant

After receiving and reviewing the photo of the Claimant wearing glasses texted to Respondent
Kearl at approximately 9:17 p.m., and after speaking with Shancie Respondent Kearl,
Respondent Lewis, and Agent Hansen looked over and scrutinized the pictures of Kerry and the
Wells Fargo pictures (Claimant's Exhibits "E," through "J").  Respondent Kearl determined that
probable cause, based on the matching suspect description was found to take the Claimant into
custody for the aforesaid robbery without a warrant (Claimant's Exhibits "E" through "J").

At approximately 21:30 hours (9:30 p.m.) Respondent Kearl, Respondent Lewis, and Agent
Hansen were at the Claimant's home for a "knock and talk encounter" (Claimant's Exhibits "E,"
and "G").  According to the incident report:

  a)   Respondent Kearl, Respondent Lewis, and Agent Hansen walked around the
       Claimant's residence before knocking on the Claimant's door;
  b)   Respondent Kearl knocked on the Claimant's front door numerous times and
       received no answer even though Kerry was home;
  c)   Respondent Kearl called the Claimant on his cell phone and requested several
       times for the Claimant to exit his house and speak with us [Kearl, Lewis, and
       Hansen];
  d)   Kerry refused at first but after Respondent Kearl spoke with the Claimant for
       several minutes Kearl was able get the Claimant to exit out his front door onto his
       porch wherein the Claimant was given commands to keep his hands up where
       we could see them, and was taken into custody without incident;
  e)   Respondent Lewis had his body worn camera, but forgot to turn it on until after
       Kerry was taken into custody (Claimant's Exhibit "E").

The Claimant was booked into the Weber County Jail on June 5, 2019, at 1:35 a.m., approximately four hours after Respondent Kearl and Respondent Lewis first arrived at the Claimant's home (Claimant's Exhibits "E," and "J").

The Claimant's version of events preceding his aforesaid warrantless arrest matches the Respondent's version with the following additional facts: The Claimant was home alone and getting ready to go to bed, when he heard his dogs barking outside. The Claimant went upstairs to let his dogs in and noticed flashlight beams crisscrossing his yard. Not knowing what was going on the Claimant fled to his basement. Soon thereafter Respondent Kearl pounded on the Claimant's door for several minutes demanding that the Claimant come out. Respondent Kearl than called the Claimant several times on the Claimant's cell phone again demanding that the Claimant come out, which the Claimant refused to do. Respondent Kearl than called the Claimant and advised the Claimant that if he did not come out "they were coming in." The Claimant having no other options and fearing that his door would be broken down if he did not comply, walked out his front door with his hands up to face several guns drawn and pointed at him. Even while the Claimant was fully complying he noticed in a reflection that there were two gun laser beams pointed at the back of his head. This incident caused the Claimant to fear for his life and resulted in the Claimant to suffer severe emotional distress among other damages contained herein.

### Respondent Lewis' failure to intervene

Immediately prior to going to the Claimant's home, Respondent Kearl and Respondent Lewis **looked over and scrutinized the pictures of Kerry and the Wells Fargo pictures."** (emphasis added) (Claimant's Exhibits "E," through "J") . Respondent Lewis would have noticed that the photos of the Claimant did not match the glasses worn by the suspect, nor the suspect's distinctive facial and ear features. Although maybe not "politically correct," and even potentially "insubordinate," Respondent Kearl had an opportunity and the ability to point out Respondent Kearl's aforesaid unreasonable identification of the Claimant as the suspect thus no probable cause existed to arrest the Claimant without a warrant (Claimant's Exhibits "E," through "J"). Respondent Lewis acting as a reasonable detective and law enforcement officer would have not participated in the Claimant's aforesaid arrest without a warrant, as the requisite exigent circumstances did not exist even with probable cause, but Lewis failed to do so (Claimant's Exhibits "E," through "J").

### Respondent Lewis's malicious prosecution of the Claimant

Respondent Lewis, knowing that because the physical characteristics of the Claimant did not match those of the Claimant thereby negating probable cause participated in the arrest and continued prosecution of the Claimant (Claimant's Exhibits "E" through "J"). Even after seeing the Claimant in person still Respondent continued to perpetuate Respondent Kearl's misrepresentation that the Claimant's physical characteristics matched that of the suspect resulting in robbery charges being filed against the Claimant (Claimant's Exhibit "E"). Said charges were ultimately dismissed without prejudice, yet had Respondent Lewis advised the prosecutor that there had no probable cause to arrest the Claimant from the onset, said charge would have been dismissed with prejudice. As a direct and proximate result of Respondent

11

Lewis' aforesaid malicious prosecution the Claimant suffered damages including, but not limited to:  o severe emotional distress; physical and emotional pain and suffering; financial devastation; lost of past present, and future business relations; loss of self worth; depression, fear and anxiety; loss of goodwill, reputation, dignity and respect; loss of friend and family relationships; subjected to judgment and ridicule; embarrassment; humiliation; loss of enjoyment in life; in an amount to be determined at trial.

### Respondent Lewis' lack of probable cause to arrest the Claimant without a warrant, and lack of exigent circumstances

Respondent Lewis upon looking over and scrutinizing the Claimant's photos with that of the suspect knew that the obvious facial features and ear shape did not match that of the suspect, thus there was insufficient probable cause to arrest the Claimant for the aforesaid robbery  (Claimant's Exhibits "E," through "J") .  In spite of said knowledge, Respondent Lewis participated in the Claimants aforesaid unlawful arrest without probable cause (Claimant's Exhibits "E," through "J").  Even if Respondent Lewis, did have sufficient probable cause to arrest the Claimant, the lack of any exigent circumstances makes the Claimant's arrest unlawful (Claimant's Exhibit "E").

### The lack of exigent circumstances

Assuming arguendo, that Respondent Kearl and/or Respondent Kearl had probable cause to arrest the Claimant, which of course they did not, the warrantless arrest of the Claimant at his home is presumed unreasonable absence the existence of exigent circumstances.  Exigent circumstances are those situations when an officer needs to immediately arrest the suspect due to either (1) danger to the officers or others; (2) risk of the suspect destroying evidence; or (3) risk that the suspect will flee.  Respondent Kearl's reference to the officer's going to the Claimant's home to attempt a "Knock and Talk," on its face indicates a complete lack of exigent circumstances for the Claimant to be arrested at his home without a warrant (Claimant's Exhibit "E").  Based upon the foregoing, Respondent Kearl and/or Respondent Lewis unlawfully arrested the Claimant even if they had "probable cause," due to a lack of exigent circumstances.

### Malicious prosecution of the Claimant by Respondent Kearl

A Section1983 malicious prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages (Wilkins v. DeReyes, 528 F. 3d 790, 799 - Court of Appeals, (10th Cir. 2008).

Respondent Kearl caused the Claimant's continued prosecution for robbery by:
  (a)     falsely representing in his Affidavit of Probable Cause that the Claimant's two photos matched the OPD Facebook photo of the suspect when an a reasonable detective and/or magistrate would have concluded that such obviously do not match (Claimant's Exhibits "E," through "J");

12

(b)     omitting and/or misrepresenting material information and evidence which would
        have vitiated probable cause, including but not limited to the three inch height
        discrepancy between the suspect and the Claimant; the Claimant's age of 48 not in
        his sixties; the existence of a detailed description of the suspect's vehicle; the
        existence of the suspect's possible fingerprints; the existence of possible video
        footage of the suspect and/or his vehicle; the existence of a detailed description of
        the suspect's glasses; the fact that the Claimant is not required to wear corrective
        lenses; the nondisclosure of how Chief Jackson knew the Claimant due to
        unspecified "sensitive personal information and safety concerns;" that Chancie
        knew about Respondent Kearl's investigation of the Claimant; that Shancie and
        the Claimant were currently going through an ugly divorce and that the Claimant
        has missed the parties' divorce mediation on the day of the robbery; and the
        Claimant's possible motive for robbing the bank, among others (Claimant's
        Exhibits "E" through "J");

(c)     failing to reasonably investigate the suspect's vehicle; CSI's possible fingerprints
        of the suspect; the possible video footage of the suspect and/or the suspect's
        vehicle; the parties' divorce status and what documents Shancie had filed that day;
        a possible ulterior motive for Chief Jackson's and/or Shancie's identification of the
        Claimant as the suspect; how Shancie was "aware" of Respondent Kearl's
        investigation; and the Claimant's possible motive for allegedly robbing the bank;
        among others (Claimant's Exhibit "E");

(d)     Respondent Kearl's failure to act as a reasonable detective by immediately
        releasing the Claimant when Respondent upon seeing the Claimant in person
        knew that the Claimant's physical characteristics and particularly the Claimant's
        facial hair (which the suspect did not have ten hours before) obviously did not
        match that of the suspects (Claimant's Exhibits "E" through "J");

(e)     Respondent Kearl knowing of the aforesaid probable cause deficiencies failed
        to advise the Weber County Attorney's Office of the aforesaid complete and
        total lack of probable cause which resulted in the continued prosecution of
        the Claimant (Claimant's exhibits "E" through "J" and "Ṛ"); and

(f)     Respondent Kearl knowing that on June 27, 2019, that the robbery charges had
        been dismissed without prejudice, knowing that said charges should never have
        been filed due to a lack of probable cause, failed to notify the prosecutor that
        said charges should have been dismissed with prejudice  (Claimant's exhibits "E"
        through "J" and "O," "P," and "Q").

On or about June 24, 2019, Murdzak robbed the same bank again and was soon located and arrested (Claimant's Exhibits "A," "B," "C," and "D"). As a result of Murdzak being identified and confessing to the June 4, 2019, robbery, the prosecutor on or about June 26, 2019 filed a Motion to dismiss the robbery charges against the Claimant without prejudice and such were dismissed by the Court on June 27, 2019 (Claimant's Exhibits "O," and "P"). Respondent Kearl upon information and belief acted with malice towards the client as set forth in paragraphs (a), (b), (c), (d), (e), and (f), incorporated and reasserted herein.

By being falsely arrested for robbery the Claimant has suffered damages including, but not limited to severe emotional distress; physical and emotional pain and suffering; financial devastation; lost of past present, and future business relations; loss of self worth; depression, fear and anxiety;  loss of goodwill, reputation, dignity and respect; loss of friend and family relationships; subjected to judgment and ridicule; embarrassment; humiliation; loss of enjoyment in life; in an amount to be determined at trial.

## II.    NATURE OF THE CLAIM:

The Claimant reasserts and realleges the above statement of facts and incorporates such fully herein.  This Claim is being brought against Respondent Kearl and Respondent Lewis for alleged violations of the Claimant's rights under 42 U.S. Code § 1983, and the Fourth and Fourteenth Amendments of the United States Constitution, as set forth below:

### Respondents Kearl and Lewis were acting withing the color of law

Respondent's Kearl and Respondent Lewis, were at all relevant times acting under color of law by virtue of the law of the State of Utah as OPD police officers/detecti..،s, and were at all relevant times acting within the course and scope of their respective employment and/or agency of the OPD (*United States v. Classic*, 313 U.S. 299, 326 (1941)) (Claimant's Exhibit "E," and "J").

### Qualified immunity and the lack thereof

Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct (Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011).  "[T]o overcome a government official's qualified immunity defense, a plaintiff must demonstrate (1) that the official violated a statutory or constitutional right and (2) that the law clearly establishes that right." (N.E.L. v. Douglas Cty., Colorado, 740 F. App'x 920, 928 (10th Cir. 2018), reh'g denied (July 17, 2018), cert. denied sub nom. N.E.L. v. Douglas Cty., Colo., 139 S. Ct. 1320, 203 L. Ed. 2d 564 (2019) (citing Pyle v. Woods, 874 F.3d 1257, 1262 (10th Cir. 2017)).

## The Claimant's right to be free from unlawful seizure without probable cause is clearly established

The Claimant's right against an unlawful arrest without probable cause is clearly established, by the Fourth Amendment of the United States Constitution which provides:

> The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized (US. Const. 4th Amend).

Fourth Amendment rights are enforceable against state actors through the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States (Mapp v. Ohio, 367 U.S. 643, 655 (1961); and United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008) ("[T]he Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment.").

## The existence the requisite probable cause

"Probable cause to arrest exists only when the `facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" (United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004). Although "[p]robable cause does not require facts sufficient for a finding of guilt . . ., it does require `more than mere suspicion.'" United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001).

The court must determine "whether a `substantial probability' existed that the suspect committed the crime, requiring something `more than a bare suspicion.'" (Kerns v. Bader, 663 F.3d 1173, 1188 (10th Cir. 2011). When evaluating whether probable cause supported an arrest, the court must "ask whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause," and must consider "facts supporting probable cause," **as well as "those that militate against it."** (emphasis added) (Valenzuela, at 897) . Thus, the primary concern is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." (Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir.2002).

15

### Respondent Kearl lacked probable cause to arrest the Claimant for the subject June 4, 2019, bank robbery without a warrant

A reasonable detective would have concluded based upon the facts known at that time that no probable cause existed to arrest the Claimant without a warrant for the June 4, 2019, bank robbery, based upon the following:

a)   the Claimant's height and age did not match that of the suspect as indicated by the bank robbery eyewitnesses (Claimant's Exhibits "E" and "H");

b)   the Claimant's driver's license photo, Facebook photo and photo of the Claimant wearing glasses did not match the suspect's very distinctive facial lines/wrinkles and the suspect's very odd ear shape" (Claimant's Exhibits "E" through "J") ;

c)   the glasses that the Claimant was wearing in the photo provided by Chief Jackson did not match those of the suspect (Claimant's Exhibits "E,"" G," and "J");

d)   Respondent Kearl upon seeing the Claimant in person would have recognized the obvious facial hair growth that did not exist ten hours before, the Claimant's facial features and ear shape did not in anyway match that of the suspect  (Claimant's Exhibits "E" through "J").

Based upon the foregoing, Respondent Kearl violated the Claimant's clearly established Fourth Amendment rights by unlawfully arresting the Claimant on June 4, 2019, without probable cause.

### Respondent Lewis lacked probable cause to arrest the Claimant for the subject June 4, 2019, bank robbery without a warrant

Although Respondent Lewis was not the primary investigator in this case, Respondent Lewis "carefully scrutinized and compared" the Claimant's photos with that of the suspect's OPD Facebook photo prior to arresting the Claimant at his home without a warrant (Claimant's Exhibit "E").  Respondent Lewis upon seeing the Claimant in person would have recognized the obvious facial hair growth that did not exist ten hours before, the Claimant's facial features and ear shape did not in anyway match that of the suspect and would have released the Claimant from custody (Claimant's Exhibits "E" through "I").  Based upon the foregoing, Respondent Kearl violated the Claimant's clearly established Fourth Amendment rights by unlawfully arresting the Claimant on June 4, 2019, without probable cause ((Claimant's Exhibits "E" through "I").

### Respondent Kearl's failure to reasonably investigate

It is well established law that "[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."( Romero v. Fay, 45 F.3d at 1476-77).  "[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent

16

probable cause determination based on that investigation." (Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). An officer may not have acted on probable cause where there is insufficient information or inadequate corroboration or where his or her conduct amounted to "'clos[ing] her or his eyes to the facts that would help clarify the circumstances of an arrest.'" (Cortez v. McCauley, 478 F.3d 1108, 1116-17 (10th Cir. 2007).

Respondent Kearl is not required search for any and all potential evidence that may eliminate the Claimant as the suspected bank robber. However, Respondent Kearl failed to reasonably investigate the relevant information that he possessed that likely would have vitiated, if not eliminated all probable cause to arrest the Claimant (Claimant's Exhibit "E"). First, had Respondent Kearl searched the online DMV records for a vehicle matching the description of the suspects, as he did after Murdzak robbed the same bank a second time on June 24, 2019, the Claimant would have been eliminated as the suspect (Claimant's Exhibits "B," "C," "D," and "E"). Secondly, with Murdzak's fingerprints being in both the Utah and national databases, even a partial fingerprint if properly processed would have led to Murdzak being identified as the suspect to the exclusion of the Claimant (Claimant's Exhibit "E"). Third, knowing that the Claimant were going through an "ugly divorce" and that the Claimant had missed the parties' divorce mediation that same day a "cursory check" of the parties' divorce docket would have revealed Shancie's filing of a Contempt petition and Motion for Temporary Orders also that same day. Respondent Kearl could have then further inquired as to whether the aforesaid missed Mediation and Shancie's adversarial court filings were merely a "coincidence" or motivated Shancie to falsely identify the Claimant as the suspect to gain an "unfair advantage" in the divorce proceedings (Claimant's Exhibit "E"). Finally, knowing from Shancie that the Claimant conceivably could have allegedly been motivated to rob the bank to pay his divorce attorney for continued legal representation, a reasonable detective would have at least verified or refuted said motive by contacting the Claimant's divorce attorney (Claimant's Exhibit "E").(Romero, at 1476-77; Baptiste, at 1259; and Cortez, at 1116-17).

### The fact that the magistrate judge ruled that Respondent Kearl had probable cause to arrest the Claimant does not defeat the Claimant's Claim for an unlawful arrest

On or about June 5, 2019, after the Claimant's warrantless arrest the night before, Judge Bean issued a finding of probable cause based upon Respondent Kearl's aforesaid Affidavit of Probable Cause (Claimant's Exhibits "E," "J," and "K"). A neutral magistrate judge's issuance of a warrant is "the clearest indication that the officers acted in an objectively reasonable manner or in `objective good faith.'" (Messerschmidt v. Millender, 132 S.Ct. 1235, 1245, 182 L.Ed.2d 47 (2012) (quoting United States v. Leon, 468 U.S. 897, 922-23, 104 S.Ct. 3430, 82 L.Ed.2d 677 (1984)).

The deference accorded a magistrate judge's probable cause determination, however, is not boundless. (United States v. Leon, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). "The fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." (Id.) If "it is obvious that no reasonably competent officer would have concluded that a warrant should issue," the warrant offers no protection (Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Even an arrest pursuant to a warrant violates the Fourth Amendment if law

enforcement secures it by tricking the magistrate into finding probable cause (<u>Franks v. Delaware</u>, 438 U.S. 154, 168-172 (1978). "A warrant does not protect an officer who misrepresents or omits material facts when applying it "(<u>Stonecipher</u>, at 1142).

Affiants seeking arrest warrants violate the Fourth Amendment when they knowingly, or with reckless disregard for the truth, include false statements in an affidavit, or knowingly or recklessly omit from it information which, if included, would vitiate probable cause.... In such a situation, we measure probable cause by (1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes probable cause for the warrant (<u>Puller v. Baca</u>, 781 F.3d 1190, 1197 (10th Cir. 2015) . Omissions are material if they would vitiate probable cause (<u>Id</u>.).

As applied, Respondent Kearl's "amended" Affidavit of probable cause would reflect among other things the following:

a)   the three photos of the Claimant do not match the distinct facial features and ear shape of the suspect;

b)   the glasses worn by the Claimant in the picture I received from Chief Jackson do not match those warn by the suspect;

c)   the Claimant's height of 5'9" does not match the suspect's described height of 6'0"; and

d)   the Claimant's age of 48, does not match the suspect's age of being in his sixties. (Claimant's Exhibit "E").

Respondent Kearl chose not to include any of the pictures he relied upon nor any information as to the height and age discrepancy in his Affidavit of Probable cause, as he knew if such were included no reasonable magistrate would have found probable cause to arrest the Claimant (Claimant's Exhibit "E" through "J") (<u>Stonecipher</u>, at 1142). Based upon the foregoing, no reasonable magistrate would have found that Respondent Kearl had probable cause to arrest the Claimant without a warrant (Claimant's Exhibit "E" through "J") (<u>Stonecipher</u>, at 1142).

## <u>Respondent's Kearl's misidentification of the Claimant as the suspect was unreasonable</u>

The Supreme Court's decision in <u>Hill v. California</u>, 401 U.S. 797, 802, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971), clarifies the standard in mistaken arrest cases: "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." (<u>United States v. Rosario</u>, 543 F.2d 6, 9 (2d Cir. 1976) (Meskill, J., dissenting) ("Analysis of mistaken identity cases under <u>Hill v. California</u> is a two-step process. The first step is to determine whether there was probable cause to arrest the right person, and the second step is to determine whether the arrest of the wrong person was a `reasonable,' `understandable,' or `good faith' mistake" (quoting Hill, 401 U.S. at 802-04)).

Respondent Kearl lacked probable cause to arrest Murdzak as the information he would have had about Murdzak would have been marginal at best. Chief Jackson would not have known Murdzak, thus he wouldn't have been to identify Murdzak as the possible suspect, nor provide

Respondent Kearl with Murdzak's name nor the photo of him wearing glasses to compare those glasses with the glasses of the suspect (Claimant's Exhibits "E," "F," "G," and "J"). Without knowing Murdzak's name Respondent Kearl would not have been able to review Murdzak's driver's license nor be able to obtain a Facebook photo of Murdzak to compare to the photo of the suspects (Claimant's Exhibits "E," "F" "H," "I," and "J"). Finally, Shancie, not being married or knowing Murdzak would not be able to identify Murdzak as a possible suspect (Claimant's Exhibits "E," "F," and "J"). Based upon the foregoing the only information Respondent Kearl would have is the eyewitnesses' physical description of the bank robbery suspect and the suspect's vehicle thus the available "probable cause" to arrest Murdzak would be:

> The suspect was described as being in his 60's, 6' 0" tall, with thin, gray hair, wearing a dark ballcap, a purple or blue sweatshirt, and wore rectangle large black framed glasses that were quasi-rectangular in shape and with a white and black color to the temple of the glasses. Eyewitnesses described the suspect's vehicle as being a late 1990's or early 2000's Forrest green Dodge Ram single cab pickup truck with a large shiny metal toolbox in the bed (Claimant's Exhibit "E").

The aforesaid very "generic facts" without more, clearly lack sufficient probable cause to arrest Murdzak for the robbery or even identify Murdzak as a possible suspect.

### Even if there was sufficient probable cause to arrest Murdzak, Respondent Kearl's misidentification of the Claimant as the suspect was unreasonable

For argument's sake, if the Court were to decide that Respondent Kearl did have sufficient information for probable cause to arrest Murdzak, but mistakenly arrested the Claimant, Respondent Kearl's arrest of the Claimant's would not have been a "reasonable, understandable, or good faith mistake" (Hill, supra). As set forth above, the suspect's distinct and multiple facial wrinkles and lines and the very unique ear (tragus) of the suspect obviously do not match even to the naked untrained eye, thus Respondent Kearl did not have any probable cause to arrest the Claimant without a warrant (Claimant's Exhibits "E" through "J, and "L").

### The warrantless arrest of the Claimant at his home

At approximately 9:30 p.m. Respondent Kearl and Respondent Lewis along with an FBI agent went to the Claimant's home to attempt a "Knock and Talk" with the Claimant (Claimant's Exhibit "E"). A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter. (Oliver v. Woods, 209 F.3d at 1186). For example, officers generally may "go to a person's home to interview him." (United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990). "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," (1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996) (e.g. what is considered a "Knock and Talk") (Claimant's Exhibit "E")

The Fourth Amendment generally requires a warrant for searches and seizures within a residence; otherwise, the search or seizure is presumptively unreasonable. (United States v. Mongold, 528 F.3d 944, 948 (10th Cir. 2013) (citing Brigham City v. Stuart, 547 U.S. 398 (2006) ("[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." (Id. at 403).

In Payton v. New York, 445 U.S. 573, 576, 590, 100 S.Ct. 1371, 1375, 1382, 63 L.Ed.2d 639 (U.S. 1980), the Supreme Court held that, absent exigent circumstances, police officers may not enter an individual's home without consent to make a warrantless routine felony arrest even with probable cause (Id.). The Tenth Circuit has held that "officers need not physically enter the home for Payton to apply." (United States v. Reeves, 524 F.3d 1161, 1165 (10th Cir. 2008). "Payton is violated where there is such a show of force that a defendant comes out of a home under coercion and submits to being taken into custody ... it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." (United States v. Maez, 872 F.2d 1444, 1451 (10th Cir. 1989).    "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." (United States v. Davis, 290 F.3d 1239, 1242 (10th Cir. 2002) (quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)).

## The Claimant was unlawfully seized within his home

A seizure occurs when the police identify themselves, order an individual to open a door, and the individual opens the door (United States v. Reeves, 524 F.3d at 1168 ("Further, this court has held that if an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." (citing United States v. Flowers, 336 F.3d at 1226 n.2)). Cf. Kentucky v. King, 563 U.S. at 470). An arrest or seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen...." (Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). (See also Dunaway v. New York, 442 U.S. 200, 207 n. 6, 99 S.Ct. 2248, 2253 n. 6, 60 L.Ed.2d 824 (1979). A show "of official authority such that `a reasonable person would have believed he was not free to leave'" indicates that an arrest has occurred. (Florida v. Royer, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Justice Stewart joined by Justice Rehnquist)). "Examples of circumstances that might indicate a seizure, even when the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer ... or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." (Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877. "[T]he determination of whether an arrest has occurred is not dependent on whether the citizen is formally placed under arrest...." (United States v. Hatfield), 815 F.2d 1068, 1071 (6th Cir. 1987) (quoting United States v. Hardnett, 804 F.2d 353, 356 (6th Cir. 1986), cert. denied, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987)).

In Reeves, at 1168-70, the 10th Circuit further held that "This court concluded "Payton is violated where there is such a show of force that a defendant comes out of a home under coercion and submits to being taken in custody." (Payton, at 1451). Further the Reeve's Court stated "Further, this court has held that if an individual's decision to open the door to his home to

20

the police is not made voluntarily, the individual is seized inside his home." (Id. at 1168) (United States v. Flowers, 336 F.3d 1222, 1226 n. 2 (10th Cir. 2003) ("[W]e hold that Flowers' decision to open his door was not voluntary and he was arrested while in his home.")

The Reeve's, supra Court went on to describe other decisions that determined that a person was "seized" inside that person's home, including (United States v. Jerez, 108 F.3d 684, 691-93 (7th Cir. 1997) that when officers knocked on a motel room door for three minutes, identified themselves as officers, asked the occupants to open the door, knocked on the window for one-and-a-half to two minutes, and shined a flashlight into the window, the subsequent opening of the door by the defendant was a submission to a show of authority and a seizure within the meaning of the Fourth Amendment (Id.);  (United States v. Conner, 127 F.3d 663, 665-66 (8th Cir. 1997) (holding when four officers knocked on the defendants' motel door three times, identified themselves as police, and demanded the defendant "open up," the defendants did not voluntarily consent to the entry); (United States v. Saari, 272 F. 3d 804, 808 (6th Cir. 2001); United States v. Mowatt, 513 F.3d 395, 400 (4th Cir. 2008) (holding the defendant's acquiescence to demands to open his door constituted a search); and Florida v. Bostick, 501 US 429, 435 (U.S. 1991) (A reasonable person faced with several police officers consistently knocking and yelling at their door for twenty minutes in the early morning hours would not feel free to ignore the officers' implicit command to open the door) (Id.).

"A police officer may seize someone either by physical force or a show of authority." (United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017) (citing United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)). "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen `submits to the assertion of authority.'" (United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). "`[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that ne was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" (United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 628). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." (United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006) (quoting United States v. Drayton, 536 U.S. 194, 201 (2002)). (See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been `seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))). The standard for submission is also objective, (see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission `requires, at minimum, that a suspect manifest compliance with police orders,'" (United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).

The Claimant was obviously "seized" by Respondent's without a warrant while within his home. Specifically, Respondent Kearl stated in the OPD incident report:

* Det. Lewis, Agent Hansen and I went to Kerry's residence at 970 N Harrisville Road and attempted a knock and talk encounter. Kerry did not answer the door, though he was home.  This took place at or about 2130 hrs. or so.

* After several attempts to get Kerry to come to the door, I called him on the phone.
* Kerry answered the phone and I requested several times that he exit his house and speak with us.
* Kerry refused at first but eventually I was able to talk him out of the house and to submit to custody without incident or use of force (Claimant's Exhibit "E").

Respondent Lewis also reported in the aforesaid OPD incident report:

* Det. Kearl and I met up with Agent Hansen from the FBI Violent Crimes Task Force. The suspect was identified as Kerry Maw. We then went to Kerry's listed address of 970 North Harrisville Rd.
* We walked around the residence.
* Det. Kearl knocked on the front door numerous times and received no answer.
* Det. Kearl then called Kerry on his cellphone.
* After speaking with Kerry for several minutes Kerry stated he would exit his residence out the front door.
* Kerry came out the front door and was given commands to keep his hands up where we could see them. I went up on the porch and Kerry was taken into custody without incident.
* (It should be noted that I had my body worn camera on me, but forgot to turn it on until after Kerry was taken into custody.) (Claimant's Exhibit "E").

The Claimant's version of events preceding his aforesaid warrantless arrest matches the Respondent's version with the following additional facts: The Claimant was home alone and getting ready to go to bed, when he heard his dogs barking outside. The Claimant went upstairs to let his dogs in and noticed flashlight beams crisscrossing his yard. Not knowing what was going on the Claimant fled to his basement. Soon thereafter Respondent Kearl pounded on the Claimant's door for several minutes demanding that the Claimant come out. Respondent Kearl than called the Claimant several times on the Claimant's cell phone again demanding that the Claimant come out, which the Claimant refused to do. Respondent Kearl than called the Claimant and advised the Claimant that if he did not come out "they were coming in." The Claimant having no other options and fearing that his door would be broken down if he did not comply, walked out his front door with his hands up to face several guns drawn and pointed at him. Even while the Claimant was fully complying he noticed in a reflection that there were police .gun laser beams pointed at the back of his head. This incident caused the Claimant to fear for his life and resulted in the Claimant to suffer severe emotional distress among other damages contained herein.

Based upon the foregoing, Respondent Kearl and Respondent Lewis "seized" the Claimant in his home as the conduct described above would make a reasonable person in the Claimant's situation reasonably feel compelled to submit to said Respondents' commands open his door and submit to custody (Salazar, 064 (quoting California v. Hodari D., 499 U.S. at 628). Ojeda-Ramos, 455 F.3d at 1183 (quoting United States v. Drayton, 536 U.S. 194, 201 (2002)); and California v. Hodari D., 499 U.S. at 627-28 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (Claimant's Exhibit "E").

22

**Malicious prosecution of the Claimant by Respondent Kearl**

A Section 1983 malicious prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest and/or continued prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. (Wilkins v. DeReyes, 528 F. 3d 790, 799 (10th Cir. 2008). Furthermore, the 10th Circuit has previously held that officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions (Robinson v. Maruffi), 895 F.2d 649, 655-56 (10th Cir. 1990).

(1)    **Respondent Kearl caused the Claimant's continued prosecution**

Respondent Kearl caused the Claimant's continued prosecution for robbery by:

(a)    falsely representing in his Affidavit of Probable Cause that the Claimant's two photos matched the OPD Facebook photo of the suspect when an a reasonable detective and/or magistrate would have concluded that such obviously do not match (Claimant's Exhibits "E," through "J");

(b)    omitting and/or misrepresenting material information and evidence which would have vitiated probable cause, including but not limited to the three inch height discrepancy between the suspect and the Claimant; the Claimant's age of 48 not in his sixties; the existence of a detailed description of the suspect's vehicle; the existence of the suspect's possible fingerprints; the existence of possible video footage of the suspect and/or his vehicle; the existence of a detailed description of the suspect's glasses; the fact that the Claimant is not required to wear corrective lenses; the nondisclosure of how Chief Jackson knew the Claimant due to unspecified "sensitive personal information and safety concerns;" that Chancie knew about Respondent Kearl's investigation of the Claimant; that Shancie and the Claimant were currently going through an ugly divorce and that the Claimant has missed the parties' divorce mediation on the day of the robbery; and the Claimant's possible motive for robbing the bank, among others (Claimant's Exhibits "E" through "J");

(c)    failing to reasonably investigate the suspect's vehicle; CSI's possible fingerprints of the suspect; the possible video footage of the suspect and/or the suspect's vehicle; the parties' divorce status and what documents Shancie had filed that day; a possible ulterior motive for Chief Jackson's and/or Shancie's identification of the Claimant as the suspect; how Shancie was "aware" of Respondent Kearl's investigation; and the Claimant's possible motive for allegedly robbing the bank; among others;

(d)    Respondent Kearl's failure to act as a reasonable detective by eliminating and not further pursuing any charges against the Claimant when Respondent

23

Kearl upon seeing the Claimant's facial hair, facial lines and wrinkles, and distinctive ear shape in person at the Claimant's knew that such in no way matched that of the suspect (Claimant's Exhibits "E" through "J");

(e) Respondent Kearl knowing of the aforesaid probable cause deficiencies failed to advise the Weber County Attorney's Office of the aforesaid complete and total lack of probable cause which resulted in the continued prosecution of the Claimant (Claimant's exhibits "E" through "J" and "P"); and

(f) Respondent Kearl knowing that on June 27, 2019, that the robbery charges had been dismissed without prejudice, knowing that said charges should never have been filed due to a lack of probable cause, failed to notify the prosecutor that said charges should have been dismissed with prejudice (Claimant's exhibits "E" through "J" and "O," "P," and "Q").

"A law-enforcement defendant is deliberately indifferent — and therefore not entitled to qualified immunity — if he mistakenly identifies an individual as a suspect when the individual does not match the suspect's description." (Webb v. US, 789 F.3d 647, 662 (6th Cir. 2015). Detective Kearl knew or should have known that the three photos of the Claimant did not match the very distinctive facial features and ear shape of the suspect (Claimant's Exhibits "E," "F," "G," and "H").

**(2)   The original action terminated in favor of the Claimant;**

On or about June 24, 2019, Murdzak robbed the same bank again and was soon located and arrested (Claimant's Exhibits "A," "B," "C," and "D"). As a result of Murdzak being identified and confessing to the June 4, 2019, robbery, the prosecutor on or about June 26, 2019 filed a Motion to dismiss the robbery charges against the Claimant without prejudice and such were dismissed by the Court on June 27, 2019 (Claimant's Exhibits "O," "P," and "Q").

**(3)   No probable cause supported the original arrest and/or continued prosecution**

No probable cause supported the Claimant's original arrest and/or continued prosecution by Respondent Kearl as set forth in section (1) above and incorporated by reference herein.

**(4)   Respondent Kearl acted with malice**

Respondent Kearl acted with malice based upon Kearl's actions and/or inactions as set forth in section (1) above and incorporated by reference herein. Malice may be inferred if a defendant causes the prosecution without arguable probable cause (Wilkins v. Derseyes, 528 F.3d 790, 800-01 (10th Cir. 2008).

**(5)    The Claimant suffered damages**

As a direct and proximate result of Respondent Kearl's aforesaid false arrest and malicious prosecution of the Claimant, Claimant suffered damages including, but not limited to severe emotional distress; physical and emotional pain and suffering; financial devastation; lost of past present, and future business relations; loss of self worth; depression, fear and anxiety; loss of goodwill, reputation, dignity and respect; loss of friend and family relationships; subjected to judgment and ridicule; embarrassment; humiliation; loss of enjoyment in life; in an amount to be determined at trial. By being falsely arrested for robbery the Claimant has suffered damages including, but not limited to severe emotional distress; physical and emotional pain and suffering; financial devastation; lost of past present, and future business relations; loss of self worth; depression, fear and anxiety; loss of goodwill, reputation, dignity and respect; loss of friend and family relationships; subjected to judgment and ridicule; embarrassment; humiliation; loss of enjoyment in life; in an amount to be determined at trial.

### Respondent Lewis' malicious prosecution of the Claimant

Respondent Lewis, knowing that because the physical characteristics of the Claimant did not match those of the Claimant thereby negating probable cause participated in the arrest and continued prosecution of the Claimant (Claimant's Exhibits "E" through "J").  Even after seeing the Claimant in person still Respondent continued to perpetuate Respondent Kearl's misrepresentation that the Claimant's physical characteristics matched that of the suspect resulting in robbery charges being filed against the Claimant (Claimant's Exhibit "E").  Said charges were ultimately dismissed without prejudice, yet had Respondent Lewis advised the prosecutor that there had no probable cause to arrest the Claimant from the onset, said charge would have been dismissed with prejudice.  As a direct and proximate result of Respondent Lewis' aforesaid malicious prosecution the Claimant suffered damages including, but not limited to:  o severe emotional distress; physical and emotional pain and suffering; financial devastation; lost of past present, and future business relations; loss of self worth; depression, fear and anxiety; loss of goodwill, reputation, dignity and respect; loss of friend and family relationships; subjected to judgment and ridicule; embarrassment; humiliation; loss of enjoyment in life; in an amount to be determined at trial.

### Respondent Lewis' lack of probable cause to arrest the Claimant without a warrant, and lack of exigent circumstances

Respondent Lewis upon looking over and scrutinizing the Claimant's photos with that of the suspect knew that the obvious facial features and ear shape did not match that of the suspect, thus there was insufficient probable cause to arrest the Claimant for the aforesaid robbery  (Claimant's Exhibits "E," through "J") .  In spite of said knowledge, Respondent Lewis participated in the Claimants aforesaid unlawful arrest without probable cause (Claimant's Exhibits "E," through "J").  Even if Respondent Lewis, did have sufficient probable cause to arrest the Claimant, the lack of any exigent circumstances makes the Claimant's arrest unlawful (Claimant's Exhibit "E").

### Respondent Lewis' failure to intervene

In <u>Vondrak v. City of Las Cruces</u>, 535 F.3d 1198, 1210 (10th Cir. 2008)), the Tenth Circuit found "[i]t is `clearly established' that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." "In order to be liable for failure to intervene, the officers must have "observe[d] or ha[d] reason to know" of a constitutional violation and have had a "realistic opportunity to intervene." (<u>Jones v. Norton</u>, 809 F.3d 564, 576 (10th Cir. 2015)

Immediately prior to going to the Claimant's home, Respondent Kearl and Respondent Lewis **looked over and scrutinized the pictures of Kerry and the Wells Fargo pictures."** (emphasis added) (<u>Claimant's Exhibits "E," through "J"</u>) . Respondent Lewis would have noticed that the photos of the Claimant did not match the glasses worn by the suspect, nor the suspect's distinctive facial and ear features.  Although maybe not "politically correct," and even potentially "insubordinate," Respondent Kearl had an opportunity and the ability to point out Respondent Kearl's aforesaid unreasonable identification of the Claimant as the suspect thus no probable cause existed to arrest the Claimant without a warrant (<u>Claimant's Exhibits "E," through "J"</u>). Respondent Lewis acting as a reasonable detective and law enforcement officer would have not participated in the Claimant's aforesaid arrest without a warrant, as the requisite exigent circumstances did not exist even with probable cause, but Lewis failed to do so (<u>Claimant's Exhibits "E," through "J"</u>).

### "Collateral damage"

As a direct and proximate result of the publication of the Claimant's arrest, which would not have occurred had the Respondent's not violated the Claimant's aforesaid Constitutional Rights, several social media outlets wrongfully published that the Claimant had been charged and/or continued to be charged with bank robbery which caused the Claimant to suffer additional damages.

"Defendants are liable for the harm proximately caused by their conduct." (<u>Trask v. Franco</u>, 446 F.3d 1036, 1046 (10th Cir. 2006).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations (<u>Id</u>.).  The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  (<u>Lippoldt v. Cole</u>, 468 F.3d 1204, 1220 (10th Cir. 2006).

## III.     THE CLAIMANT'S DAMAGES AS FAR AS THEY ARE KNOWN

As a direct and proximate result of the Respondent's respective violations of the Claimant's aforesaid Constitutional rights, the Claimant suffered damages including, but not limited to: severe emotional distress; emotional pain and suffering; physical pain and suffering; loss of past,

present, and future employment opportunities; financial devastation; irreparable loss of reputation, esteem, self worth, goodwill, trust, respect, social and family relationships; depression; anxiety; inability to sleep; constant fear of being arrested; frustration; inability to function socially; subject to constant ridicule, judgement, and criticism; loss of enjoyment in life; humiliation; and embarrassment in an amount to be determined at trial.

In addition, as a direct and proximate result of the publication of the Claimant's arrest, which would not have occurred had the Respondent's not violated the Claimant's aforesaid Constitutional Rights, several social media outlets wrongfully published that the Claimant had been charged and/or continued to be charged with bank robbery which caused the Claimant to suffer additional damages.

"Defendants are liable for the harm proximately caused by their conduct." (Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations (Id.). The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm. (Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

## IV.    IDENTIFICATION OF THE INVOLVED EMPLOYEES TO THE EXTENT KNOWN

Claimant identifies Ogden Police Department Detective Travis Luke Kearl and Detective L. Lewis (first name unknown) as the Respondent's involved in this case.

WHEREFORE, the Claimant prays for a reasonable award of special damages, general damages, and reasonable costs and attorney's fees to be determined at trial

The Claimant reserves the right to amend and/or modify this Notice of Claim upon further discovery and investigation.

Respectfully submitted,

Randall Q. Phillips
Attorney for Claimant

encls.

27

# Claimant's Exhibit
# "A"

Anthony Murdzak (The convicted bank robber)    The Claimant Kerry Maw's booking photo



# Claimant's Exhibit
# "B"

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

**JUL 0 1 2019**

BY D. MARK JONES, CLERK
_____
DEPUTY CLERK

JOHN W. HUBER, United States Attorney (#7226)
VEDA M. TRAVIS, Assistant United States Attorney (#6449)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone:  (801) 524-5682

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:19-mj-464 DBP |
| Plaintiff, | COMPLAINT |
| vs. | |
| ANTHONY THOMAS MURDZAK, | Judge Dustin B. Pead |
| Defendant. | |

Before the Honorable Dustin B. Pead, United States Magistrate Court Judge for

the District of Utah, appeared the undersigned, who on oath deposes and says:

### COUNT I
### Bank Robbery (18 U.S.C. § 2113(a))

On or about June 4, 2019, in the Northern Division of the District of Utah,

ANTHONY MURDZAK,

defendant herein, by force, violence, and intimidation, did take from the person and

presence of a teller, money belonging to and in the care, custody, control, management

and possession of the Wells Fargo Bank, 4301 South Harrison Boulevard, Ogden, Utah,

1

the deposits of which when then insured by the Federal Deposit Insurance Corporation; in

violation of 18 U.S.C. § 2113(a). , in violation of 18 U.S.C. § 2113(a).

## COUNT II
### Bank Robbery (18 U.S.C. § 2113(a))

On or about June 24, 2019, in the Northern Division of the District of Utah,

ANTHONY MURDZAK,

defendant herein, by force, violence, and intimidation, did take from the person and

presence of a teller, money belonging to and in the care, custody, control, management

and possession of the Wells Fargo Bank, 4301 South Harrison Boulevard, Ogden, Utah,

the deposits of which when then insured by the Federal Deposit Insurance Corporation; in

violation of 18 U.S.C. § 2113(a).


This complaint is based on the following:

1.   Your Affiant is a special agent with the Federal Bureau of Investigation

currently assigned to the Violent Crimes squad in the Salt Lake City field office.   The

information contained in this complaint is based on an investigation conducted by myself

along with FBI Task Force Office Justin Hansen and detectives with the Ogden Police

Department.

2.   According to police reports, on June 4, 2019, a male white, approximately 50-

60 years of age, entered the Wells Fargo Bank at 4301 South Harrison Boulevard in

Ogden.   The man handed a female teller and handed her a note which stated "This is a

2

robbery." The suspect directed the teller to give him all the "loose 100s" and told her to "hurry, hurry." The teller complied and gave the suspect $5200 in United States currency. The suspect left the bank and was seen by a witness getting into what was described as a late 90s early 2000s model green Dodge pickup truck with a silver metallic tool box in the bed.

3. On June 24, 2019, a man identified by two employees as the same suspect entered the same Wells Fargo Bank in Ogden and approached a different female teller. The suspect again handed the teller a note and directed the teller to give him money. The teller complied and gave the suspect $3450 in U.S. currency. The suspect left he bank and a witness followed, taking a photograph of the suspect and a truck which the suspect entered. According to the bank manager, the truck was the same truck as used by the suspect in the June 4 incident.

4. After the second incident, myself and TFO Hansen canvassed the area and obtained video of the suspect vehicle. Based on the information obtained, we were able to determine that the vehicle was a 1998 or 1999 Dodge Ram, with an "Arches" plate.

5. Detective Kearl of the Ogden Police Department was provided with this information and searched the DMV database for a 1998 or 1999 green Dodge Ram pickup truck in the Northern Utah area. Detective Kearl obtained approximately 60 hits. When he pulled the driver's license of Anthony Murdzak, he believed that Murdzak matched the photos of the suspect from the two incidents at the Wells Fargo bank.

3

6.   Your affiant checked a Facebook account for an Anthony Murdzak and located a telephone number and possible address in Logan, Utah.   I also contacted Murdzak's misdemeanor probation officer who provided me with the same phone number as located on the Facebook page.   TFO Hansen then obtained a ping warrant for the phone.

7.   Based on the ping, we located Anthony Murdzak at his residence, 656 North 400 East in Logan, the evening of June 28.   Murdzak was taken into custody, and advised of his rights under *Miranda*.   He admitted that he had committed both bank robberies.   Murdzak stated that he had spent approximately seven years in federal prison on a gun charge and had been told how to rob a bank by a cell mate who advised him not to use a gun.

8.   We also located the suspect pickup truck which was parked on the street in front of Murdzak's residence.

9.   At the time of his arrest, Murdzak was in possession of $1510 in U.S. currency.

10.   On both June 4, 2019, and June 24, 2019, the Wells Fargo Bank, 4301 South Harrison Boulevard in Ogden was insured by the Federal Deposit Insurance Corporation.

Based on the foregoing information, your affiant respectfully requests that an arrest warrant be issued for Anthony Thomas Murdzak for violation of 18 U.S.C. § 2113(a), Bank

4

Robbery.

     DATED this 1st day of July, 2019.


                                  JEREMY FOWLKE, Special Agent
                                  Federal Bureau of Investigation


     SUBSCRIBED AND SWORN to before me this 1st day of July, 2019.


                                  DUSTIN B. PEAD
                                  United States Magistrate Court Judge

APPROVED:

JOHN W. HUBER
United States Attorney


VEDA M. TRAVIS
Assistant United States Attorney

5

# Claimant's Exhibit
# "C"



JOHN W. HUBER, United States Attorney (#7226)
VEDA M. TRAVIS, Assistant United States Attorney (#6449)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:19-CR-00071 HCN |
| Plaintiff, | STATEMENT BY DEFENDANT IN ADVANCE OF PLEA OF GUILTY AND PLEA AGREEMENT |
| vs. | |
| ANTHONY MURDZAK, | Judge Howard C. Nielson |
| Defendant. | |

I hereby acknowledge and certify that I have been advised of and that I understand the following facts and rights, and that I have had the assistance of counsel in reviewing, explaining, and entering into this agreement:

1. As part of this agreement with the United States, I intend to plead guilty to Counts I and II of the Indictment. My attorney has explained the nature of the charges against me, and I have had an opportunity to discuss the nature of the charges with my attorney. I understand the charges and what the government is required to prove in order to convict me. The elements of Counts I and II, Bank Robbery are:

   That I intentionally took money from the person and presence of another;

   That the money belonged to, and was in the possession of, a federally insured bank at the time of the taking; and

   That I took the money by means of force, violence or intimidation.

2. I know that the maximum possible penalty provided by law for Counts I and II of the Indictment, violations of 18 U.S.C. § 2113(a), is a term of imprisonment of up to twenty (20) years, a fine of $250,000.00, a term of supervised release of three (3)

years, and any applicable forfeiture. I understand that if I violate a term or condition of supervised release, I can be returned to prison for the length of time provided in 18 U.S.C. § 3583(e)(3).

a. Additionally, I know the Court is required to impose an assessment in the amount of $100 for each offense of conviction, pursuant to 18 U.S.C. § 3013. Furthermore, I understand that restitution to the victims of my offenses will be ordered pursuant to 18 U.S.C. § 3663A.

b. I understand that, if I am not a United States citizen, I may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

3. I know that the sentencing procedures in this case and the ultimate sentence will be determined pursuant to 18 U.S.C. § 3553(a), and that the Court must consider, but is not bound by, the United States Sentencing Guidelines, in determining my sentence. I have discussed these procedures with my attorney. I also know that the final calculation of my sentence by the Court may differ from any calculation the United States, my attorney, or I may have made, and I will not be able to withdraw my plea if this occurs.

4. I know that I can be represented by an attorney at every stage of the proceeding, and I know that if I cannot afford an attorney, one will be appointed to represent me.

5. I know that I have a right to plead "Not Guilty" or maintain my earlier plea of "Not Guilty" and can have a trial on the charges against me.

6. I know that I have a right to a trial by jury, and I know that if I stand trial by a jury:

a. I have a right to the assistance of counsel at every stage of the proceeding.

b. I have a right to see and observe the witnesses who testify against me.

c. My attorney can cross-examine all witnesses who testify against me.

d. I can call witnesses to testify at trial, and I can obtain subpoenas to require the attendance and testimony of those witnesses. If I cannot afford to pay for the appearance of a witness and mileage fees, the government will pay them.

e. I cannot be forced to incriminate myself, and I do not have to testify at any trial.

f. If I do not want to testify, the jury will be told that no inference adverse to me may be drawn from my election not to testify.

2

g.  The government must prove each and every element of the offense charged against me beyond a reasonable doubt.

h.  It requires a unanimous verdict of a jury to convict me.

i.  If I were to be convicted, I could appeal, and if I could not afford to appeal, the government would pay the costs of the appeal, including the services of appointed counsel.

7.      If I plead guilty, I will not have a trial of any kind.

8.      I know that 18 U.S.C. § 3742(a) sets forth the circumstances under which I may appeal my sentence.

9.      I know that 18 U.S.C. § 3742(b) sets forth the circumstances under which the United States may appeal my sentence.

10.      I know that under a plea of guilty the judge may ask me questions under oath about the offense.  The questions, if asked on the record and in the presence of counsel, must be answered truthfully and, if I give false answers, I can be prosecuted for perjury.

11.      I stipulate and agree that the following facts accurately describe my conduct.  These facts provide a basis for the Court to accept my guilty plea:

> I admit that on June 4, 2019, I entered the Wells Fargo Bank, 4301 South Harrison Boulevard, Odgen, Utah, with the intent of robbing that establishment.  I admit that I handed a teller a note which stated to give me "all the loose 100s" and told the teller to "hurry, hurry." The teller complied with my demand and gave me $5200 in United States currency. I further admit that on June 24, 2019, I entered the same bank with the intent to again rob that establishment. I gave the teller a note and directed the teller to give me money. The teller then gave me $3450 in United States currency.  I admit that my conduct on June 4 and June 24 at the Wells Fargo Bank would cause a person~~et~~ of ordinary sensibilities to be fearful of bodily harm.  I agree and understand that the ~~Key Bank~~ I robbed was federally insured by the Federal Deposit Insurance Corporation at the time of both of my offenses. *Wells Fargo Bank*

9·18·19  RLS

9·18·19

12.      The only terms and conditions pertaining to this plea agreement between me and the United States are as follows:

a.  **Guilty Plea.**  I will plead guilty to Counts I and II of the Indictment.

b. **Acceptance of Responsibility**. The government agrees to recommend that I be given a three-level reduction for acceptance of responsibility if the offense level is 16 or greater, or a two-level reduction if the offense level is less than 16, if, in the opinion of the United States, I clearly demonstrate acceptance of responsibility for my offense, up to and including at the time of sentencing, as set forth in § 3E1.1 of the Sentencing Guidelines.

c. **Low End Recommendation.** The government agrees to recommend that I be sentenced to the low end of the guideline range as determined in my case.

d. **Presentence Report and Financial Information.** I agree to provide truthful and complete information, including financial information, as requested by the probation office for the preparation of my presentence report and for determination of the conditions of my supervised release. I also consent to allowing the United States Attorney's Office to run a credit check on me. I consent to being placed on the Treasury Offset Program and State Finder.

e. **Restitution.**

(1)    I agree that I am subject to mandatory restitution because my case falls within the provisions of 18 U.S.C. § 3663A(a)(1) and (c)(1) based on the charge to which I am pleading guilty. My attorney has explained what mandatory restitution means.

(2)    I understand that the amount of restitution and the schedule of payments will be determined as a part of the sentencing proceedings in accordance with the provisions of 18 U.S.C. § 3664. I agree to pay all restitution as ordered by the Court. I agree that the payment and enforcement of my restitution order is governed by 18 U.S.C. § 3664, and my lawyer has explained the consequences of an order of restitution.

(3)    I understand that the government will recommend, and I agree that the Court should order, that during incarceration my restitution will be payable on a schedule of the greater of $10.00 every three months or 50% of my income in prison from both institution and other sources. I agree to pay restitution during any period of incarceration imposed on me.

(4)    I understand and agree that payment of any restitution owed, pursuant to the schedule set by the Court at sentencing, should be a condition of any term of probation or supervised release imposed upon me. I know that if I fail to pay restitution as ordered, the failure can be considered a violation of probation or supervised release and, pursuant to 18 U.S.C. § 3614, the Court can resentence me to any sentence which might originally have been imposed in my case.

4

13. I understand and agree that this plea agreement is solely between me and the United States Attorney for the District of Utah and does not bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

14. I understand that I have a right to ask the Court any questions I wish to ask concerning my rights about these proceedings and the plea.

\*       \*       \*       \*

I make the following representations to the Court:

1. I am __5 3__ years of age. My education consists of ___G E D___.
I ___can___ [can/cannot] read and understand English.

2. This Statement in Advance contains all terms of the agreements between me and the government; if there are exceptions, the Court will be specifically advised, on the record, at the time of my guilty plea of the additional terms. I understand the government and I cannot have terms of this plea agreements that are not disclosed to the Court.

3. No one has made threats, promises, or representations to me that have caused me to plead guilty, other than the provisions set forth in this agreement.

4. Neither my attorney nor the government has promised me that I would receive probation or any other form of leniency because of my plea.

5. I have discussed this case and this plea with my lawyer as much as I wish, and I have no additional questions.

6. I am satisfied with my lawyer.

7. My decision to enter this plea was made after full and careful thought; with the advice of counsel; and with a full understanding of my rights, the facts and circumstances of the case and the consequences of the plea. I was not under the influence of any drugs, medication, or intoxicants when I made the decision to enter the plea, and I am not now under the influence of any drugs, medication, or intoxicants.

8. I have no mental reservations concerning the plea.

9. I understand and agree to all of the above. I know that I am free to change or delete anything contained in this statement. I do not wish to make changes to this

5

agreement because I agree with the terms and all of the statements are correct.

DATED this ___ day of September, 2019.

ANTHONY MURDZAK
Defendant

I certify that I have discussed this plea agreement with the defendant, that I have fully explained his rights to him, and that I have assisted him in completing this written agreement. I believe that he is knowingly and voluntarily entering the plea with full knowledge of his legal rights and that there is a factual basis for the plea.

DATED this ___ day of September, 2019.

ROBERT STEELE
Attorney for Defendant

I represent that all terms of the plea agreement between the defendant and the government have been, or will be at the plea hearing, disclosed to the Court, and there are no undisclosed agreements between the defendant and the United States.

DATED this ___ day of September, 2019.

VEDA M. TRAVIS
Assistant United States Attorney

# Claimant's Exhibit "D"

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### District of Utah

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| Anthony Thomas Murdzak | Case Number:  UTDX 1:19CR00071-001 |
| | USM Number:  15985-067 |
| | Robert L. Steele |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    One and Two of the Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2113 (a) | Bank Robbery | | One |
| 18 U.S.C. § 2113 (a) | Bank Robbery | | Two |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____  ☐ is  ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/3/2019

Date of Imposition of Judgment

_____
Signature of Judge

Howard C. Nielson, Jr.

Name and Title of Judge

12-10-2019

Date

# Claimant's Exhibit "E"

PROTECTED INFORMATION - This information is not to be used for any other purpose. This information is to be used only in association with this police case. Further dissemination to any unauthorized person or agency may result in both civil and criminal liability.



# Ogden Police
## Incident Report 19G40970

---

**Nature:** ROBBERY JO                    **Address:**

**Location:** OG8

---

**Offense Codes:** 1211
**Received By:** Stokes,K WD          **How Received:** 9                    **Agency:** OG
**Responding Officers:** Hinojosa,M OG, Robins,G OG, Johnson,M OG, Kearl,T OG
**Responsible Officer:** Hinojosa,M OG          **Disposition:** AA 06/05/19
**When Reported:** 12:12:49 06/04/19          **Occurred Between:** 12:12:36 06/04/19 and 12:12:56 06/04/19

---

**Assigned To:**                    **Detail:** OGMC                    **Date Assigned:** **/**/**
**Status:** AA                    **Status Date:** 06/06/19          **Due Date:** **/**/**

---

**Complainant:**
**Last:**                         **First:**                              PURSUANT to URCrP, Rule 16(e)
**DOB:** **/**/**                 **Dr Lic:**              **Mid:**       and UCS §77-38-6, the victim(s)
**Race:**          **Sex:**       **Home:**            **Address:**      and witnesses' identifying
                                  **Work:**            **City:**         information has been redacted
                                                       **Cell:**         from the enclosed documents.

## Offense Codes
**Reported:**                                   **Observed:**  1211 ROBB-BANK TYPE
                                                               INSTITUTION

**Additional Offense:** 1211 ROBB-BANK TYPE
                        INSTITUTION

**Responding Officers:**                        **Unit :**
        Hinojosa,M OG                           2F78
        Robins,G OG                             2f14
        Johnson,M OG                            2f17
        Kearl,T OG                              2FD12

**Responsible Officer:** Hinojosa,M OG          **Agency:** OG
**Received By:** Stokes,K WD                    **Last Radio Log:** 15:35:26 06/04/19 CMPLT
**How Received:** 9 911 Line                    **Clearance:** CI CLOSED BY INVESTIGATOR
**When Reported:** 12:12:49 06/04/19            **Disposition:** AA **Date:** 06/05/19

06/10/19

*Incident Report 19G40970*                                                     *Page 2 of 16*

---

|                       |        |                    |                      |
|-----------------------|--------|--------------------|----------------------|
| **Judicial Status:** RCP |     | **Occurred between:** | 12:12:36 06/04/19 |
| **Misc Entry:**       |        | **and:**           | 12:12:56 06/04/19    |

**Modus Operandi:**          **Description :**                    **Method :**

---

## Involvements

| Date     | Type     | Description                      | Relationship        |
|----------|----------|----------------------------------|---------------------|
| 06/05/19 | DS       | WCAO                             | OTHER               |
| 06/04/19 | Property | Money 4500                       | Stolen              |
| 06/05/19 | Property | Clothing 0                       | Evidence            |
| 06/04/19 | Name     | WELLS FARGO,                     | VICTIM BUSINESS     |
| 06/04/19 | Name     | LACEY, STACIE LEE                | VICTIM              |
| 06/05/19 | Name     | MAW, KERRY JASON                 | ARRESTEE            |
| 06/05/19 | Evidence | Hat/Watch from Kerry Maw         | Evidence Incident   |
| 06/04/19 | Offense  | Offense#: 107289 - F2 - 1 count  | Charged With        |
| 06/04/19 | Cad Call | 12:12:49 06/04/19 ROBBERY JO     | Initiating Call     |

06/10/19

_____

Approved by:

_____

Date

06/10/19

## Narrative

Hinojosa 969
BWC footage available

SYNOPSIS:
This is a bank robbery report.  Employees at Wells Fargo Bank at 4301 Harrison they had been
robbed and the suspect fled.  No suspects have been identified or apprehended as of yet.  CSI
 found latent prints on the interior of the main door.  Investigations and FBI responded to
investigate and handle the case.  No one was injured and no weapon was used or mentioned.

RELATED CASES:
19CS1007

INVOLVED PERSONS:
Wells Fargo - Victim Business
Stacie Lacey - Victim

NARRATIVE:
On 6-4-19 at 1213 I was dispatched to Wells Fargo Bank at 4301 Harrison.  A robbery had just
occurred and the suspect had fled.  Upon arrival the bank had been closed by employees and no
 customers were inside.  I spoke to the teller who was robbed, Stacie Lacey (Stacie).  Stacie
 said a man came to her counter and held up a note written on a piece of paper that read
"This is a robbery".  The man then spoke and said something to the effect of 'Give me all
your 100s.  Hurry.  Hurry'.  Stacie said she handed the man about $4,500 in 100 dollar bills.
 The man then left with the money and note.  Stacie's interaction with the man lasted ten
seconds or less, according to her.  Stacie described him as Caucasian, 60's, 6'0", thin, gray
 hair, dark ballcap, purple or blue sweatshirt.  She followed him out the door.  He got into
a forest green older Dodge Ram, possibly a 1990's model, which had a shiny metal tool box in
the bed.  It appeared the truck had no license plate.  It had been parked in the Bennion
craft store parking lot, which is near the bank.  The man got in and exited the lot onto
Harrison Blvd then went south on Harrison.  Officers Robins and Johnson arrived to assist.
See their supplemental narratives for details.  Detective Kearl arrived to investigate, as
did an FBI agent.  CSI McKenzie was summoned and she found partial latent prints on the
interior of the main door the suspect exited from.  Stacie said the suspect may have touched
the glass on the door as he exited.  Other bank employees completed witness statements, which
 were retained by Kearl.  Surveillance photos of the suspect were retrieved and disseminated
to officers and retained by Kearl for the investigation.  Surrounding businesses were asked
for any surveillance footage by Johnson but none was available.  The names and phone numbers
of bank customers who had been in the bank during the robbery were given to Kearl.  Weber
Dispatch ATL'd the suspect's description and the description of the truck.  The bank remained
 closed when I left the bank.

CONCLISION:
Wells Fargo Bank reported they had been robbed and the suspect fled.  No weapon was used or
mentioned and no one was injured.  The suspect fled with $4,500 of the bank's money.  CSI,
Investigations, and FBI responded to investigate and Investigations and FBI took over as
primary investigative units.  As of yet no suspect has been identified or apprehended.

Responsible LEO:

## Supplement - Johnson,M OG
Mark Johnson #1012

BWC activated

SYNOPSIS:
This is a supplemental report is a reference to a robbery at 4301 Harrison Blvd. Wells Fargo
on June 4, 2019. I assisted in the investigation by checking numerous surrounding businesses
for surveillance footage.

RELATED CASES:
NONE

INVOLVED ENTITIES:
NONE

NARRATIVE:
On the above date, I was dispatched to assist with a robbery that had just occurred at the
Wells Fargo at 4301 Harrison Blvd.

When I arrived on the scene I was tasked with checking the surrounding area with surveillance
footage. I first started with the surrounding plaza. I made contact with employees at ACE
Hardware and the Bennion Crafts Store. At ACE hardware they had one outdoor camera that faces
the parking lot, however, they stated it only captures the first two rows. I asked them to
check anyways and provided them with a description of the vehicle and time frame. They took
the case number and informed me that they would call if they found anything.

At Bennion Crafts, they had no cameras on the outside of their building. They did have one
camera at the register that is directed out their front window towards the parking lot. They
also were going to check the camera and contact police if they found anything.
No other stores inside the plaza had cameras that would view the parking lot. So I went and
checked at Smith's, they had one camera that captured a small portion of the Wells Fargo
parking lot, but not the area where the suspect vehicle parked his truck. I went through the
video anyway with the employee to see if the vehicle still showed up in a frame, but I was
unable to locate it.

I then began searching stores outside the plaza and along the last known direction of travel
for the suspect. I started at the Taco Bell in the 4300blocks of Harrison and went all the
way up to the Ogden Clinic in the 4700 Block of Harrison. Only 2 businesses had exterior
cameras had external cameras that captured Southbound Harrison Blvd. Traffic. The Ogden
Clinic and Taco Bell.

Taco Bell's camera was damaged and would not provide a picture of what it was recording. The
Ogden Clinic had two camera angles that I was able to review, the first was on the south side
of their building, (that is located on the East side of Harrison) due to the time of day
this camera suffered a major glare and it was difficult to see the vehicles heading
Southbound on Harrison, also the camera is motion activated, so some of the Southbound
traffic is not recorded because the camera did not detect the motion. However I still
reviewed the footage, but I was unable to locate the suspect vehicle.

The clinic's second angle came from 46th St on the North East side of the building and The
camera just barely catches southbound traffic going through the intersection at 46 and
Harrison. Again the motion sensor came into play again, so while reviewing the footage I did
not observe the suspect vehicle, but chances are that it was able to make it through the
intersection at a time the camera was not recording because it did not detect the motion of
the vehicle.

After checking these businesses I went and informed Detective Kearl of what I had found. After briefing Detective Kearl, I had no further involvement in this case.

CONCLUSION:
I checked numerous surrounding businesses to see if they by chance had any surveillance footage of the suspect vehicle. I was unable to locate any footage of the suspect vehicle. There are still two businesses that have yet to get back with me with their results. They will notify the police as soon as they determine if they have footage of the suspect or not.

ATTACHMENTS:
None

## Supplement - Travis,J WD
CAD Call info/comments
=================================

12:13:06 06/04/2019 - Stokes,K WD
T/L 1 MIN S
12:13:15 06/04/2019 - Stokes,K WD
SUSP VEH IS A FORREST GRN TK / POSS DODGE RAM 1500
12:13:17 06/04/2019 - Stokes,K WD
UNK 28
12:13:22 06/04/2019 - Stokes,K WD
SB ON HARRISON /
12:13:39 06/04/2019 - Stokes,K WD
SINGLE SUSP / PURPLE SWEATSHIRT / WITH WHITE WRITING ON THE BACK
12:13:53 06/04/2019 - Graves,M WD
atl given county
12:14:00 06/04/2019 - Stokes,K WD
60 YOWM /
12:14:11 06/04/2019 - Johnson,D WD
PER 2FS1 CALL INTO BRIEFING
12:14:14 06/04/2019 - Stokes,K WD
NO WEAPON SEEN / SUSP GAVE A NOTE
12:14:19 06/04/2019 - Mack,C WD
atl south
12:14:26 06/04/2019 - Engstrom,E WD
atld north
12:14:41 06/04/2019 - Stokes,K WD
SUSP JUST SAID TO GIVE ME YOUR LOOSE MONEY
12:14:49 06/04/2019 - Johnson,D WD
2FS7 COPIED, WILL BE SENDING OUT ROSTER, AWARE OF CALL
12:15:08 06/04/2019 - Stokes,K WD
VEH HAD A SILVER TOOLBOX IN THE BED OF THE TK / MAY HAVE BEEN A LIFTED TK
12:15:19 06/04/2019 - Stokes,K WD
NEG INJS
12:17:04 06/04/2019 - Stokes,K WD
SUSP HAD A BB CAP / UNK COLOR
12:19:30 06/04/2019 - Stokes,K WD
DAVIS GIVEN ATL
12:33:30 06/04/2019 - Johnson,D WD - From: Hinojosa,M OG
SEND CSI FOR PRINTS
12:36:42 06/04/2019 - Johnson,D WD - From: Hinojosa,M OG
SUSP VEH 90S MODEL DODGE PU TK, FOREST GREEN, SHINY CHROME TOOLBOX IN BED
12:43:05 06/04/2019 - Johnson,D WD - From: Hinojosa,M OG
UPDATED SUSP DESC: WM, 600/THIN, 50-60YO, SCRUFFY GRAY FACIAL HAIR, GREY CAP,
BLUE SWEATSHIRT W/ LOGO
12:45:47 06/04/2019 - Graves,M WD
atl update given county
12:46:08 06/04/2019 - Engstrom,E WD
atld north
12:47:04 06/04/2019 - Mack,C WD
atl updated info south
12:59:43 06/04/2019 - Johnson,D WD - From: Hinojosa,M OG
CANCEL CKS
13:01:35 06/04/2019 - Johnson,D WD - From: Hinojosa,M OG
SUSP ALSO WORE EYEGLASSES WITH LARGE, DARK FRAMES
13:13:36 06/04/2019 - Peterson,A WD

```
csi case 19cs1007
13: 46: 52 06/04/2019 - Johnson,D WD - From: Johnson,M OG
AT OGD CLINIC, 4600 HARR IN REF
```

## Supplement - Kearl,T OG
Investigative Follow Up by Det. Kearl 894

On 06/04/2019 I was dispatched from an unrelated call out to the Wells Fargo Bank located at 4301 Harrison Blvd. on a reported robbery that had just occurred. Upon arrival I met with Officer Hinojosa and Officer Robins in the lobby. The front doors had been secured by the officers to protect any possible evidence left by the suspect. I was informed that Officer Johnson was doing a canvas of the area for cameras. I met with several employees and gathered written 1102 statements from them as I learned of what had taken place.

I spoke with employee Stacie Lacey. Stacie explained that while she was working the teller counter she was approached by a white male wearing a baseball cap, hoodie and who had scruffy hair. The male passed her a note that said "This is a bank robbery. Give me all your loose 100's. Hurry up Hurry up" Stacie stated she complied with the suspect and turned over thousands of dollars in cash to him. The suspect left the bank on foot and then drove away in a green pick up truck. Stacie did not see a gun nor was any weapon used during the robbery that was seen and/or apparent. I then spoke with Michael Pace, the manager, who told me he saw the suspect wearing a navy blue sweatshirt with white writing on the back of the sweatshirt give the teller a note and then run out of the store shortly thereafter. Michael stated the male suspect got into a green dodge ram pickup truck and leave southbound on Harrison Blvd. The truck was further described as being a late 90's or early 2000's model and was likely a single cab. Michael was not certain as to the truck being a single or extended cab but did state that there was a metallic tool box in the back of the truck.

While investigating this case I was passing information to the ATAC personnel and they began intel searches matching the descriptions I was given. The suspect was described as an older male, possibly in his 60's so we began our computer based searches using the provided demographics. I was also provided with a still photo of the suspect during the robbery by a Wells Fargo Corporate rep. I noted several unique features on the suspects face. The piece of skin near the entrance of the ear is known as the Tragus. This unique shape really stood out on the suspect when observed from a certain angle.  There were many prominent wrinkles and lines in the suspect's face. The suspect was wearing black framed glasses that were quasi-rectangular in shape and appeared to have a white and black color to the temple of the glasses. The suspect appeared older due to these facial features. No person with whom I spoke related seeing a weapon during the robbery. CSI McKenzie responded and processed the scene for fingerprints. She was able to lift partial prints from the interior glass door that leads into the breezeway (the only public entrance). See CSI's reports for further details. We ended our initial on-scene investigation. See assisting officer's reports for their detailed involvement in this case. It also appears as if the suspect is not wearing any gloves.

I disseminated and caused to be disseminated these gathered photographs of the suspect. An Ogden City Press Release was issued with the suspect's photograph and I began to follow all of the news articles and social media posts related to this case in the event a suspect was identified.  No leads were initially had so I ended my involvement for the day in this case. Around 2030 hrs this same day I was contacted by Lt. Hanson of the Ogden Police Department who relayed information to me that Chief Jackson of the Harrisville PD had suspect information. I contacted Chief Jackson and he stated the the suspect matched the description of Kerry Shaw. At this time, I am not releasing how Chief Jackson knew Kerry due to sensitive personal information and safety concerns. With this new information I ran the name and pulled up Kerry's DL photo. Initially Kerry's photo did not appear to match the suspect's description as it lacked the physical characteristics described above.  It is possible that this picture of Kerry is several years old and does not depict his current physical condition and appearance. I took my search to Facebook. I was able to locate a picture of Kerry by searching for it through the account of a family member who had a publicly available photograph. I saw this photograph and  recognized the same facial features in regards to facial hair, nose shape, facial wrinkles and ear shape that were consistent with the facial

characteristics of the suspect. The Tragus of Kerry's ear in the Facebook photo matched the Tragus of the suspect's ear. This was a very unique factor that helped me match the suspect description to Kerry. I was also given the phone number and was asked to contact Kerry's wife Shancie Maw. I called and spoke by phone with Shancie, who was aware of this case. She explained that she was familiar with the press release photo and identified the suspect as Kerry. Shancie was extremely scared of Kerry and was very hesitant about giving me information that may aggravate Kerry and cause him to retaliate. Shancie stated Kerry missed court mediation today regarding their "ugly divorce" because he owed his attorney $2,000. Shancie said Kerry needed to pay that amount or else the attorney wouldn't represent him further.

With this information in hand I called and spoke with my supervisor, Sgt. Keyes. I explained the new findings and responded back to work to continue investigating this case. I met with Agent J. Hansen of the FBI Violent Crimes Task Force and with Det. Lewis as well. Together we looked over and scrutinized the pictures of Kerry and the Wells Fargo pictures. I determined that probable cause, based on the matching suspect description was found to take Kerry into custody for the Utah State Code Violation of Robbery (F2). Det. Lewis, Agent Hansen and I went to Kerry's residence at 970 N Harrisville Road and attempted a knock and talk encounter. Kerry didn't answer the door, though he was home. This took place at or about 2130 hrs or so. After several attempts to get Kerry to come to the door, I called him on the phone. Kerry answered the phone and I requested several times that he exit his house and speak with us. Kerry refused at first but eventually I was able to talk him out of the house and to submit to custody without incident or use of force. Kerry was taken into custody and was read his rights per Miranda. I read Kerry his rights from a card and he stated he understood them when I asked. Kerry then requested a lawyer when asked if he wished to speak to me. Kerry went back and forth several times, trying to ask us questions but we continually told him that invoking Miranda meant we would not longer be able to ask him questions or converse with him about the case. I did explain to Kerry the charges he was facing but explained that I was not intending to illicit any response. Kerry appeared to go back and forth on speaking to me and other officers, but we did not, at any time, re-approach Kerry. Kerry did state, of his own volition, that he went to Weber Human Services for an appointment earlier today and that he withdrew $1,000 from his bank, Mountain America C.U.

I applied for and was granted a search warrant of the residence and entire curtilage of 970 N Harrisville Road. The search did not turn up the glasses worn by Kerry nor did we locate the clothing he was wearing at the time. We seized a hat and watch from his person as they seemed to match what he was wearing in the surveillance photo. The watch, specifically wasn't seen, but I am waiting on the video in it's entirety to arrive via mail from Wells Fargo Corporate to verify if the watch was being worn at the time of the robbery. These two items were booked into OPD Evidence and Kerry was booked into the Weber County Jail and charged with a single count of Robbery F2 in accordance with Utah State Code 76-6-301. We ended our involvement at that time after securing the house.

On 06/05/2019 I returned to work and was contacted by Shancie, by phone. Shancie explained that she had information that Kerry was at the Weber County Library on the day of the Robbery as well as the Liquor Store located at 1155 Patterson St. Det. Lewis and I responded to these two locations and have requested video surveillance footage to verify and see if Kerry has been there. After speaking with Shancie, I was contacted by our secretary who stated that a Tiffany Maw was at the station to speak with me. I went into the lobby and invited Tiffany and an unknown male companion up to the interview room where I turned on the recorder and began speaking with her. Tiffany came in very heated and derogatory. Tiffany, not knowing that I had just spoken with Shancie, explained that she was with Kerry all day on the 4th. Tiffany stated we had the wrong guy and she could prove it. When provided with an 1102 statement Tiffany took the form but declined filling it out without her attorney's permission. I explained to Tiffany that obstructing an investigation by lying was an arrestable offense.
Tiffany left with her male companion.

After this, I was contacted by a Library rep who stated the footage wouldn't be ready until tomorrow. Det. Lewis and I responded to the liquor store and viewed their video surveillance. A copy wasn't available because corporate had to made it available. I was, however, able to view the footage. I observed Kerry walk into the liquor store around 1611 hrs and only stay for a few minutes before purchasing a bottle of alcohol and then leaving. There is not an outside camera which shows the parking lot.


On 06/06/2019 I began follow up with voicemail messages left on my desk phone. I received eight phone calls regarding the robbery and called all of the numbers back. I spoke with an anonymous individual who stated that he knew the suspect while in prison around 2013 who only knew him as Bennett. There was no other description or ability to follow up on this lead. I next called and spoke with Todd Davis who stated he knew the suspect was "most definitely" Kerry Maw. Todd said he knows the family and is certain Kerry Maw is the suspect. Obviously by this time Kerry has already been arrested so while speaking with Todd, he confirmed that we had arrested the right person. Todd is willing to provide an 1102 of his identification of Kerry if necessary.

I then called and spoke with Lorene Herman who identified the suspect as Allen Malmstrom. I pulled up a DL photo of Malmstrom who's physical description is 6'04" tall and 180 pounds. After viewing his DL photo i noted he lacks the face shape and other facial characteristics of the suspect in the bank photos.  Malmstrom is too tall and weighs too much to be the suspect.

Next, I contacted Trevos Snell who stated he believed the suspect was a co-worker of his named Robert Reister. I looked up Robert's DL photo and description. Robert is 6'01" tall and 185 pounds. Again, this suspect would be too tall and weigh too much to be the suspect. Also, looking upon Robert's DL photo I noted his face shape, hair color and general features did not match that of the suspect. Snell did tell me that Reister was missing from work at the time of the robbery but I have ruled him out as a potential suspect due to his appearance and physical characteristics.

I received a call as well from Kerry's wife Shancie, but did not call her back as she had already told me the suspect was her husband.

Lastly I called a "Heidi" but received no answer and left a message.

At this time, there are no other suspects in this case.




Attachments:

PC Statement

On 06/04/2019 just after 1200 hrs the Wells Fargo bank located at 4301 Harrison Blvd. a white male wearing a dark colored hat with an un-legible logo and a dark colored hoodie well as rectangle black framed glasses. The male was described to be older and possibly in his 60's with scruffy gray facial hair. the male suspect passed a note to the teller that sated "This is a bank robbery. Give me all your loose 100's" the teller complied with the suspect's demands and handed over $5400 in cash monies.
The suspect fled the bank and got into what was described by witnesses as a forest green Dodge pick up truck with a shiny metal tool box in the bed. the vehicle was last seen crossing southbound on Harrison Blvd. through the light at 4400 S.

Your affiant was sent photographs of the suspect by the reported victim after she received them from bank corporate personnel. the photographs were of the suspect as described above. A picture from the video surveillance was posted in an Ogden City Press release via social media. Around 2030 hrs I was contacted by Lt. Hanson of the Ogden Police Dept. who relayed to me that Chief Jackson of the
- Page 3 of Affidavit for Search Warrant No. 1953391 -
Harrisville Police Department knew who the suspect was. I contact Chief Jackson by phone and he gave me the name Kerry Maw as the possible suspect. I ran Maw's information and found a driver's license photo which made him look almost too young to be the suspect. I was able to find a facebook.com photo of Maw which matched the description of the bank robbery suspect. I noted the wrinkles in the face were consistent, the ear lobe shapes were consistent as well as other distinguishable facial features specific to Maw as well as the suspect. I responded in with Det. Lewis to contact Maw and was contacted by dispatch who put me into contact with Maw's ex-wife Shancie. I spoke with her and she told me that she saw the press release photo and she confirmed the suspect was Maw. I was also sent a photograph by Chief Jackson during this time that showed Maw wearing black framed glasses that matched the suspect's glasses.

## Supplement - Lewis,L OG

11: 32: 31 06/06/2019 - Lewis,L OG
This supplemental report pertains to a bank robbery that occurred at Wells Fargo
Bank located at 4301 Harrison Blvd on 6-4-19 at approximately 1212 hours. This
case is being investigated by Det. Kearl.

On 6-4-19 at approximately 2030 hours, I was contacted at home by Det. Kearl.
Det. Kearl advised me that he had received information about the identity of the
suspect who robbed the Wells Fargo Bank located at 4301 Harrison Blvd earlier in
the day. Det. Kearl requested I assist him in following up on this case. Det.
Kearl and I met up with Agent Hansen from the FBI Violent Crimes Task Force. The
suspect was identified as Kerry Maw. We then went to Kerry's listed address of
970 North Harrisville Rd. We walked around the residence.  Det. Kearl knocked on
the front door numerous times and received no answer. Det. Kearl then called
Kerry on his cellphone. After speaking with Kerry for several minutes Kerry
stated he would exit his residence out the front door. Kerry came out the front
door and was given commands to keep his hands up where we could see them. I went
up on the porch and Kerry was taken into custody without incident. (It should be
noted that I had my body worn camera on me, but forgot to turn it on until after
Kerry was taken into custody.) Once in custody I searched Kerry for any weapons
and then had him sit down on a chair on the front porch. Det. Kearl read Kerry's
his rights per Miranda. Kerry thought about it and stated he better have his
attorney with him before he talked to us. Det. Kearl walked Kerry to my vehicle
that was parked across the street. Kerry sat in the backseat of my police
vehicle. Sgt. Talbot from the Pleasant View Police Department arrived at our
location. Sgt. Talbot transported Kerry to the Weber County Jail. For further
details see case number 19PV3415. While at the jail CSI Investigator Brady took
photographs of Kerry and collected his baseball hat. For further details see CSI
case number 19CS1012.

Det. Kearl drafted a search warrant for Kerry's residence. Once the warrant was
approved Det. Kearl, Agent Hansen, Officer Caygle, and Sgt. Vanderwarf served
the search warrant. Kerry was asked previously if anyone else was in the
residence, which he stated he was the only one. The search warrant was a knock
and announce search warrant. Det. Kearl knocked on the front door and after
receiving no answer we entered the residence. We cleared the residence of any
persons. Once the residence was cleared my body worn camera was turned off. CSI
Investigator Brady photographed and collected any evidence. I was assigned to
search the residence. I searched the residence and did not locate anything of
evidentiary value. I had no further involvement in this case at this time.

## Sentryx Booking Information:

| | | | |
|---|---|---|---|
| **Sentryx Booking Number:** 19-09355 | | **Name Number:** 408330 | |
| **Name:** MAW, KERRY JASON | | **Address:** 970 N HARRISVILLE RD; 400 W | |
| **Phone:** (801)540-2600 | | HARRISVILLE, UT 84404 | |
| **DOB:** 08/30/70 | | **Dr Lic:** 148842560 | |
| **Assigned Bed:** " | | **Current Location:** " | |
| **Booking Date:** 06/04/19 | | | |

### Alert Codes:

DNA DNA on File

## Sentryx Arrest # 48143

| | | | |
|---|---|---|---|
| **Time/Date:** 12:12:49 06/04/19 | **Agency:** OG | | |
| **Age at Arrest:** 48 | **Location:** 4301 HARRISON BLVD; S 1200 E; WELLS FARGO | **Officer:** Kearl,T OG | |
| **Arrest Type:** A | **Area:** OG8 | **Reference:** | |
| **Disposition:** N | | | |

## Sentryx Offense # 107289

| | | | |
|---|---|---|---|
| **Statute:** 76-6-301 | | **NCIC:** | |
| **Offense:** 1203 ROBB-BUSINESS STRONGARM | | **Crime Class:** F2 | |
| **Offense Reference:** | **Offense Type:** S | **Offense Area:** OG8 | |
| **Related Incident:** 19G40970 | | **Law Jurisdiction:** U | |
| **Entry Code:** | | **Offense Location:** | |
| **Court Code:** ODC | | **Offense Time/Date:** 12:12:49 06/04/19 | |
| **Offense Disposition:** ARR | | **Disposition Date:** **/**/** | |

06/10/19

## Property

| | | | |
|---|---|---|---|
| **Property Number:** | G1908123 | | |
| **Item:** | Money | **Owner Applied Nmbr:** | |
| **Brand:** | | **Model:** | |
| **Year:** | 0 | **Quantity:** | |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $4,500.00 | **Color:** | |
| **Owner:** | | | |
| **Agency:** | OG Ogden Police | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Hinojosa,M OG |
| **UCR:** | MON MONEY | **UCR Status:** | SNR |
| **Local Status:** | NA | **Storage Location:** | |
| **Crime Lab Number:** | | **Status Date:** | 06/04/19 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | Approx. $4,500 in 100 dollar bills. | | |
| **Property Number:** | G1908143 | | |
| **Item:** | Clothing | **Owner Applied Nmbr:** | |
| **Brand:** | | **Model:** | |
| **Year:** | 0 | **Quantity:** | 2 |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | |
| **Owner:** | | | |
| **Agency:** | OG Ogden Police | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Kearl,T OG |
| **UCR:** | CLO CLOTHES OR FURS | **UCR Status:** | |
| **Local Status:** | SE | **Storage Location:** | |
| **Crime Lab Number:** | | **Status Date:** | 06/05/19 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | hat and watch taken from Kerry Maw | | |

06/10/19

Robbery.

DATED this 1st day of July, 2019.

_____
JEREMY FOWLKE, Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me this 1st day of July, 2019.

_____
DUSTIN B. PEAD
United States Magistrate Court Judge

APPROVED:

JOHN W. HUBER
United States Attorney

_____
VEDA M. TRAVIS
Assistant United States Attorney

# Claimant's Exhibit "F"



# Claimant's Exhibit "G"



# Claimant's Exhibit "H"



# Claimant's Exhibit
# "I"



THIS IS THE INITIAL COMPARISON PHOTO I FOUND ON F.B.

— KEARL #894

# Claimant's Exhibit
# "J"

# IN THE

## 2ND DISTRICT COURT - OGDEN

### COUNTY OF WEBER, STATE OF UTAH

| | |
|---|---|
| State of Utah<br><br>vs.<br><br>**KERRY JASON MAW**<br>Date of Birth:  08/30/1970<br><br>Arrestee | **Affidavit of Probable Cause** |

On  06/04/2019 22:26    the defendant was arrested for the offense(s) of:

| | Offense Date | Offense Description | Statute | Gov Code | Severity | DV |
|---|---|---|---|---|---|---|
| 1 | 06/04/2019 | ROBBERY | 76-6-301 | UT | F2 | No |

I believe there is probable cause to charge the defendant with these charges because:

On 06/04/2019 just after 1200 hrs the Wells Fargo bank located at 4301 Harrison Blvd. a white male wearing a dark colored hat with an un-legible logo and a dark colored hoodie well as rectangle black framed glasses. The male was described to be older and possibly in his 60's with scruffy gray facial hair. the male suspect passed a note to the teller that sated "This is a bank robbery. Give me all your loose 100's" the teller complied with the suspect's demands and handed over $5400 in cash monies.
The suspect fled the bank and got into what was described by witnesses as a forest green Dodge pick up truck with a shiny metal tool box in the bed. the vehicle was last seen crossing southbound on Harrison Blvd. through the light at 4400 S. Your affiant was sent photographs of the suspect by the reported victim after she received them from bank corporate personnel. the photographs were of the suspect as described above. A picture from the video surveillance was posted in an Ogden City Press release via social media. Around 2030 hrs I was contacted by Lt. Hanson of the Ogden Police Dept. who relayed to me that Chief Jackson of the - Page 3 of Affidavit for Search Warrant No. 1953391 -
Harrisville Police Department knew who the suspect was. I contact Chief Jackson by phone and he gave me the name Kerry Maw as the possible suspect. I ran Maw's information and found a driver's license photo which made him look almost too young to be the suspect. I was able to find a facebook.com photo of Maw which matched the description of the bank robbery suspect. I noted the wrinkles in the face were consistent, the ear lobe shapes were consistent as well as other distinguishable facial features specific to Maw as well as the suspect. I responded in with Det. Lewis to contact Maw and was contacted by dispatch who put me into contact with Maw's ex-wife Shancie. I spoke with her and she told me that she saw the press release photo and she confirmed the suspect was Maw. I was also sent a photograph by Chief Jackson during this time that showed Maw wearing black framed glasses that matched the suspect's glasses.

| Officer Name:   TRAVIS LUKE KEARL | Badge ID:      894 |
|---|---|

| I am a sworn officer with:  UT0290100 - Ogden City Police Dept ||

| Arresting agency case number:   19G40970 | Associated citation number: |
|---|---|

I declare under penalty of perjury and under the laws of the State of Utah that the foregoing is true and correct.

/s/  TRAVIS LUKE KEARL

**SUBMISSION IDENTIFICATION INFORMATION**

| Booking agency:   WEBER CO SO | | Booking agency ORI: UT0290000 |
|---|---|---|
| Booking agency case number:   19-09357 | SID: | OTN: |
| Booking UserID:  wmoss | Booking date/time:  06/05/2019 01:35 | Submission ID: 613291 (Version 1) |

# Claimant's Exhibit
# "K"

The Order of the Court is stated below:
Dated:   June 05, 2019          /s/  JOSEPH BEAN
             08:19:56 AM                    District Court Judge

# IN THE OGDEN DISTRICT COURT
## FOR WEBER COUNTY, STATE OF UTAH

| STATE OF UTAH | Order to Hold With Bail |
|---|---|
| v. | Probable Cause ID : 145801 |
| | Submission ID : 613291 |
| **Kerry Jason Maw** | Judge : JOSEPH BEAN |

Based on the affirmation of Travis Luke Kearl, the arresting officer, the undersigned magistrate finds that probable cause existed for the arrest without a warrant of Kerry Jason Maw. Kerry Jason Maw may post bail in the amount of $10,000.00

76-6-301                    ROBBERY

If Kerry Jason Maw posts bail as stated above, Kerry Jason Maw is hereby ordered to be released with the following conditions:

- Mandatory Court Appearance

In those jurisdictions where pretrial release and supervision authority has been granted by written agreement, defendants may be released to pretrial services without posting bail, consistent with the terms of that agreement.

# Claimant's Exhibit "L"

 **Ogden Police UT**
June 5, 2019

Date: June 5, 2019
Subject: Bank Robbery, OPD Case # 19G40970
Point of Contact: Ogden Police Department, Duty Lieutenant (801) 629-8060
Release: **UPDATE**
On 06-04-2019, at 1212 hours, OPD officers responded to a bank robbery at the Wells Fargo bank, located at 4301 Harrison Blvd. The suspect fled the scene prior to the officers' arrival. The suspect presented a note which demanded money. Once the suspect had the money in hand, he fled southbound on Harrison Blvd in a green dodge pick-up truck.

On 06-04-2019, at approximately 2300 hours, Kerry Jason Maw, DOB 08-03-1970, was taken into custody by OPD Major Crimes Detectives. He was booked into the Weber County Jail and charged with the robbery. This investigation is ongoing.



# Claimant's Exhibit "M"

SECOND DISTRICT COURT - OGDEN
WEBER COUNTY, STATE OF UTAH

SHANCI MAW vs. KERRY JASON MAW

CASE NUMBER 194900656 Divorce/Annulment                    **** PRIVATE ****

CURRENT ASSIGNED JUDGE
        CAMILLE NEIDER

CURRENT ASSIGNED COMMISSIONER
        CHRISTINA WILSON

PARTIES
        Petitioner - SHANCI MAW

        Respondent - KERRY JASON MAW
        Represented by: JASON SCHOW
        Represented by: RANDALL PHILLIPS


ACCOUNT SUMMARY
                Total Revenue Amount Due:       433.00
                        Amount Paid:            433.00
                      Amount Credit:              0.00
                           Balance:               0.00
        REVENUE DETAIL - TYPE: DIVORCE/CUST&SU PETN
                   Original Amount Due:         310.00
                   Amended Amount Due:          310.00
                        Amount Paid:            310.00
                      Amount Credit:              0.00
                           Balance:               0.00

        REVENUE DETAIL - TYPE: VITAL STATISTICS FEE
                   Original Amount Due:           8.00
                   Amended Amount Due:            8.00
                        Amount Paid:              8.00
                      Amount Credit:              0.00
                           Balance:               0.00

        REVENUE DETAIL - TYPE: DIVORCE COUNTER
                   Original Amount Due:         115.00
                   Amended Amount Due:          115.00
                        Amount Paid:            115.00
                      Amount Credit:              0.00
                           Balance:               0.00

CASE NUMBER: 194900656 Divorce/Annulment                    **** PRIVATE ****

CASE NOTE

PROCEEDINGS
04-10-2019  **** PRIVATE **** Filed: Petition for Divorce
04-10-2019  **** PRIVATE **** Filed: Vital Statistics/UDOH Certificate
04-10-2019  **** PRIVATE **** Filed: Petition
04-10-2019  Fee Account created Total Due: 310.00
04-10-2019  Fee Account created
04-10-2019  Fee Account created Total Due: 8.00
04-10-2019  Fee Account created
04-10-2019  DIVORCE/CUST&SU PETN  310.00
04-10-2019  VITAL STATISTICS FEE  8.00
04-10-2019  Judge CAMILLE NEIDER assigned.
04-10-2019  Commissioner CATHERINE CONKLIN assigned.
04-10-2019  Note: discovery tier set to 2
04-10-2019  **** PRIVATE **** Filed: Return of Electronic Notification
04-22-2019  **** PRIVATE **** Filed return: Acceptance of Service upon
            JASON T. SCHOW for
04-22-2019  **** PRIVATE **** Filed: Summons
04-22-2019  **** PRIVATE **** Filed: Return of Electronic Notification
04-23-2019  **** PRIVATE **** Filed: Appearance of Counsel/Notice of
            Limited Appearance
04-23-2019  **** PRIVATE **** Filed: Return of Electronic Notification
04-24-2019  Minute Entry - PROTECTIVE ORDER
                Clerk: andreab
            PRESENT
                Petitioner's Attorney: PETER E BRACKEN
                Petitioner(s): SHANCI MAW
                Other Parties: MICHAEL FORSBERG
                Attorney for the Respondent: JASON T SCHOW
                Respondent(s): KERRY JASON MAW
                Audio
                Tape Number: 3B 042419 Tape Count: 9:45-9:53
            HEARING

CASE NUMBER: 194900656 Divorce/Annulment                    **** PRIVATE' ****

Time is set for protective order hearing in c..es 194900544
and 194900544.
Mr. Schow addresses the Court and indicates the parties
have reached a resolution to dismiss both protective orders
and enter a mutual restraining order in the parties'
divorce action (194900656).
Mr. Schow reads the agreement on the record.
Mr. Bracken makes some clarifications regarding
disparagement and discussion and that the agreement is to
be a non-prejudicial temporary resolution.
Mr. Forsberg, Guardian ad Litem, has no objections and
believes the temporary orders address the concerns.
The parties agree to the terms of the mutual restraining
order to be entered in the divorce and agree to the
dismissal of both protective orders.
The Court accepts the stipulation of the parties.
Based upon the agreement of the parties, the matter is
dismissed without prejudice.
Mr. Schow is to prepare the proposed mutual restraining
order in case 194900656.

| | |
|---|---|
| 04-30-2019 | **** PRIVATE **** Filed: Notice of Mediation |
| 04-30-2019 | **** PRIVATE **** Filed: Return of Electronic Notification |
| 05-01-2019 | **** PRIVATE **** Filed: Divorce Ed Cert - Petitioner |
| 05-01-2019 | **** PRIVATE **** Filed: Divorce Orientation Course Certificate - Petitioner |
| 05-01-2019 | **** PRIVATE **** Filed: Return of Electronic Notification |
| 05-15-2019 | **** PRIVATE **** Filed: Order (Proposed) Mutual Restraining Order and Other Temporary Orders (Approved ATF) |
| 05-15-2019 | **** PRIVATE **** Filed: Return of Electronic Notification |
| 05-17-2019 | **** PRIVATE **** Filed: Answer and Counterclaim - Domestic |
| 05-17-2019 | Note: Certificate of Readiness for Trial due 04/29/2020 |
| 05-17-2019 | Fee Account created Total Due: 115.00 |
| 05-17-2019 | Fee Account created |
| 05-17-2019 | DIVORCE COUNTER  115.00 |
| 05-17-2019 | Filed: NOTICE OF EVENT DUE DATES |
| 05-17-2019 | **** PRIVATE **** Filed: Return of Electronic Notification |
| 05-22-2019 | Note: Order Mutual Restraining Order and Other Temporary Orders sent to CLW for review. |
| 05-22-2019 | **** PRIVATE **** Filed: Commissioner Order Mutual Restraining Order and Other Temporary Orders (Approved ATF) |
| 05-22-2019 | **** PRIVATE **** Filed: Return of Electronic Notification |
| 05-24-2019 | Filed order: Order Mutual Restraining Order and Other Temporary Orders (Approved ATF) |
| | Judge CAMILLE NEIDER |
| | Signed May 24, 2019 |
| 05-24-2019 | **** PRIVATE **** Filed: Return of Electronic Notification |

CASE NUMBER: 194900656 Divorce/Annulment                    **** PRIVATE ****

```
05-31-2019   **** PRIVATE **** Filed: Financial Declaration
05-31-2019   **** PRIVATE **** Filed: Financial Declaration Exhibits (1/4)
05-31-2019   **** PRIVATE **** Filed: Financial Declaration Exhibits (2/4)
05-31-2019   **** PRIVATE **** Filed: Financial Declaration Exhibits (3/4)
05-31-2019   **** PRIVATE **** Filed: Financial Declaration Exhibits (4/4)
05-31-2019   **** PRIVATE **** Filed: Return of Electronic Notification
05-31-2019   **** PRIVATE **** Filed: Return of Electronic Notification
05-31-2019   **** PRIVATE **** Filed: Certificate of Service (Petitioners
             Initial Disclosures)
05-31-2019   **** PRIVATE **** Filed: Return of Electronic Notification
06-04-2019   **** PRIVATE **** Filed: Affidavit/Declaration in Support of
             Motion for Temporary Orders and for Order to Show Cause for
             Contempt
06-04-2019   **** PRIVATE **** Filed: Motion for Order to Show Cause for
             Contempt
06-04-2019   **** PRIVATE **** Filed: Motion for Temporary Order
06-04-2019   **** PRIVATE **** Filed: Order to Show Cause (Proposed) for
             Contempt
06-04-2019   **** PRIVATE **** Filed: Return of Electronic Notification
06-05-2019   **** PRIVATE **** Filed: Affidavit/Declaration in Support of
             Motion for Temporary Restraining Order
06-05-2019   **** PRIVATE **** Filed: Motion for Temporary Restraining Order
06-05-2019   **** PRIVATE **** Filed: Request/Notice to Submit for Decision
06-05-2019   **** PRIVATE **** Filed: Rule 65(A)(b)(1)(B) Certificate of
             Notice
06-05-2019   **** PRIVATE **** Filed: Temporary Restraining Order (Proposed)
06-05-2019   **** PRIVATE **** Filed: Return of Electronic Notification
06-05-2019   MOTION FOR TEMP ORDERS/OTSC scheduled on August 01, 2019 at
             02:00 PM in 2nd Floor Southeast with Commissioner CATHERINE
             CONKLIN
06-05-2019   NOTICE for Case 194900656 ID 20076231
                  Commissioner: CATHERINE CONKLIN
             MOTION FOR TEMP ORDERS/OTSC is scheduled.
                  Date: 08/01/2019
                  Time: 02:00 p.m.
                  Location: 2nd Floor Southeast
                  SECOND DISTRICT COURT
                  2525 GRANT AVENUE
                  OGDEN, UT 84401
                  Before Commissioner: CATHERINE CONKLIN
                  IF YOU FAIL TO APPEAR AT THIS HEARING, THE COURT MAY ENTER
                  YOUR DEFAULT.
06-05-2019   Filed: Notice for Case 194900656 DA
06-05-2019   Issued: Order to Show Cause for Contempt
                  Clerk SHANNON CAMP
06-05-2019   **** PRIVATE **** Filed: Return of Electronic Notification
```

# Claimant's Exhibit "N"

# Return of Electronic Notification

| Recipients | |
|---|---|
| **CATHERINE CONKLIN** | - Notification received on 2019-06-04 16:04:14.51. |
| **KENNETH W BURTON** | - Notification received on 2019-06-04 16:04:25.453. |
| **JASON T SCHOW** | - Notification received on 2019-06-04 16:04:25.47. |
| **PETER E BRACKEN** | - Notification received on 2019-06-04 16:04:25.47. |

****** IMPORTANT NOTICE - READ THIS INFORMATION *****

NOTICE OF ELECTRONIC FILING [NEF]

| | |
|---|---|
| **A filing has been submitted to the court RE:** | 194900656 |
| **Case Title:** | MAW, SHANCI  vs.  MAW, KERRY JASON |
| **Judge:** | CAMILLE NEIDER |
| **Commissioner:** | CATHERINE CONKLIN |
| **Official File Stamp:** | 06-04-2019 16:03:37 |
| **Court:** | SECOND DISTRICT COURT - OGDEN |
| | District |
| | Ogden |
| **Document(s) Submitted:** | Affidavit/Declaration in Support of Motion for Temporary Orders and for Order to Show Cause for Contempt |
| | Motion for Temporary Order |
| | Motion for Order to Show Cause for Contempt |
| | Order to Show Cause (Proposed) for Contempt |
| **Filed by or in behalf of:** | PETER E BRACKEN |

This notice was automatically generated by the courts auto-notification system.

**The following people were served electronically:**

JASON T SCHOW for KERRY JASON MAW

KENNETH W BURTON for SHANCI MAW

PETER E BRACKEN for SHANCI MAW

**The following people have not been served electronically by the Court.  Therefore, if service is required, they must be served by traditional means:**

Minor Child R. M.

# Claimant's Exhibit "O"

CHRISTOPHER F. ALLRED, NO. 7801
WEBER COUNTY ATTORNEY
LETITIA J. TOOMBS, NO. 12696
DEPUTY COUNTY ATTORNEY
2380 WASHINGTON BLVD., STE 230
OGDEN, UT 84401-1464
Telephone: (801) 399-8377
FAX: (801) 399-8604

IN THE SECOND JUDICIAL DISTRICT COURT OF WEBER COUNTY
STATE OF UTAH, OGDEN DEPARTMENT

| STATE OF UTAH, | **INFORMATION** |
|---|---|
| Plaintiff, | |
| vs. | CASE NO. |
| KERRY JASON MAW, | JUDGE |
| DOB: 08/30/1970 | OTN# 58225277 |
| Defendant. | |

The undersigned LETITIA J. TOOMBS, DEPUTY COUNTY ATTORNEY, under oath states on information and belief that the defendant, in WEBER COUNTY, STATE OF UTAH, committed the following crime(s):

**COUNT** 1: ROBBERY, a Second Degree Felony, in violation of Utah Code Ann. § 76-6-301, as follows: That the above named defendant, on or about June 4, 2019, did (a) unlawfully and intentionally take or attempt to take personal property in the possession of another from his person, or immediate presence, against his will, by means of force or fear, and with a purpose or intent to deprive the person permanently or temporarily of the personal property; or
(b) intentionally or knowingly use force or fear of immediate force against another in the course of committing a theft or wrongful appropriation.

**PROBABLE CAUSE:** On 06/04/2019 just after 1200 hrs the Wells Fargo bank located at 4301 Harrison Blvd. a white male wearing a dark colored hat with an un-legible logo and a dark colored hoodie well as rectangle black framed glasses. The male was described to be older and possibly in his 60's with scruffy gray facial hair. the male suspect passed a note to the teller that sated "This is a bank robbery. Give me all your loose 100's" the teller complied with the suspect's demands and handed over $5400 in cash monies.

The suspect fled the bank and got into what was described by witnesses as a forest green Dodge pick up truck with a shiny metal tool box in the bed. the vehicle was last seen crossing southbound on Harrison Blvd. through the light at 4400 S. Your affiant was sent photographs of the suspect by the reported victim after she received them from bank corporate personnel. the photographs were of the suspect as described above. A picture from the video surveillance was posted in an Ogden City Press release via social media.

Around 2030 hrs I was contacted by Lt. Hanson of the Ogden Police Dept. who relayed to me that Chief Jackson of the Harrisville Police Department knew who the suspect was. I contact Chief Jackson by phone and he gave me the name Kerry Maw as the possible suspect. I ran Maw's information and found a driver's license photo which made him look almost too young to be the suspect. I was able to find a facebook.com photo of Maw which matched the description of the bank robbery suspect. I noted the wrinkles in the face were consistent, the ear lobe shapes were consistent as well as other distinguishable facial features specific to Maw as well as the suspect. I responded in with Det. Lewis to contact Maw and was contacted by dispatch who put me into contact with Maw's ex-wife Shancie. I spoke with her and she told me that she saw the press release photo and she confirmed the suspect was Maw. I was also sent a photograph by an officer during this time that showed Maw wearing black framed glasses that matched the suspect's glasses.

This information is based on evidence obtained from the following witness:
MATTHEW B HINOJOSA, Ogden City PD


DATED this 6th day of June, 2019.

Authorized for presentment and filing:

By /s/ LETITIA J. TOOMBS
LETITIA J. TOOMBS
DEPUTY COUNTY ATTORNEY

# Claimant's Exhibit "P"

**LETITIA TOOMBS, # 12696**
**WEBER COUNTY ATTORNEY'S OFFICE**
**2380 WASHINGTON BLVD., STE 230**
**OGDEN, UTAH 84401**
**TELEPHONE: (801) 399- 8377**
**FAX: (801) 399-8304/EMAIL: ltoombs@co.weber.ut.us**

## IN THE SECOND JUDICIAL DISTRICT COURT OF WEBER COUNTY,
## STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH, | STATE'S MOTION TO DISMISS |
| Plaintiff, | |
| | Case No. 191901305 |
| vs. | |
| KERRY JASON MAW, | Judge: RUBEN J. RENSTROM |
| Defendant. | |

COMES NOW, Letitia Toombs, Deputy County Attorney, and respectfully requests this

Court dismiss the above captioned matter without prejudice as new facts have come to light

which necessitate additional investigation.

RESPECTFULLY SUBMITTED this ___25th___ day of June, 2019.

___/s/ <em>Letitia J. Toombs</em>_____
Letitia Toombs
Deputy Weber County Attorney

STIPULATED TO BY:

*/s/ Ryan Bushell, attorney for Defendant*

## CERTIFICATE OF DELIVERY

I hereby certify that a true and correct copy of the foregoing Motion was submitted the

Court's *efile* system and email to:

Ryan Bushell

ryan@rjb-law.com

Dated this 25th day of June, 2019.

/s/ Letitia J. Toombs

# Claimant's Exhibit
# "Q"

**The Order of the Court is stated below:**
**Dated:** June 27, 2019          /s/ REUBEN J RENSTROM
          10:42:01 AM                District Court Judge



LETITIA J. TOOMBS, NO 12696
Weber County Attorney's Office
2380 Washington Blvd., Suite 230
Ogden, Utah 84401
Telephone: (801) 399-8377
Fax: (801) 399-8304
ltoombs@co.weber.ut.us

---

## IN THE SECOND JUDICIAL DISTRICT COURT OF WEBER COUNTY
### STATE OF UTAH, OGDEN DEPARTMENT

| | |
|---|---|
| STATE OF UTAH, | ORDER DISMISSING CASE |
| Plaintiff, | |
| vs. | Case No. 191901305 |
| KERRY JASON MAW, | Judge RUBEN J. RENSTROM |
| Defendant. | |

---

### **ORDER**

Based upon the State's Motion and stipulation of the parties this case has been dismissed

without prejudice.

**The Court's signature will appear at the top of the first page.**

**CERTIFICATE OF SERVICE**
   This is to certify that a true and correct copy of the foregoing ORDER DISMISSING
CASE was delivered via the Court's *efile* system and email to:
   Ryan Bushell
   ryan@rjb-law.com

DATED this 25th day of June, 2019.

/s/ Letitia J. Toombs s Weber County Attorney's Office