IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KERRY JASON MAW,<br><br>                Plaintiff,<br><br>v.<br><br><br>TRAVIS KEARL, in his individual capacity; and LARRY LEWIS, in his individual capacity,<br><br>                Defendants. | MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT<br><br>Case No. 1:21-cv-80-BSJ<br><br><br>Hon. Bruce S. Jenkins |

On March 30, 2023, the Court held a hearing on the parties' respective motions for summary judgment [*see* ECF Nos. 33, 37 & 41]. Randall G. Phillips appeared on behalf of Plaintiff Kerry Jason Maw, and Matthew David Church and D. Addison Hunter appeared on behalf of Defendants. The Court having reviewed the summary judgment briefs submitted by the parties, the record filed in this action, and having heard oral argument from counsel, and for reasons discussed more fully below, hereby GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment and DENIES Plaintiff's motion for summary judgment. In summary, the Court concludes that, on this record, there remain factual issues to be determined at trial as to the whether Mr. Maw was unlawfully seized and whether Defendant Travis Kearl is entitled to qualified immunity.

1

## BACKGROUND

This case concerns a bank robbery on June 4, 2019, at a Wells Fargo bank in Ogden, Utah. Ultimately, it was determined that Anthony Thomas Murdzak committed this robbery and a second robbery at the same bank on June 24, 2019. Indeed, Mr. Murdzak pled guilty to charges that he committed both robberies and he has since been sentenced.[1]

The identity of the June 4, 2019, bank robber, however, was unknown immediately following the robbery. Defendant Travis Kearl, an Ogden City Police Detective, was assigned to investigate the robbery. Following some initial investigatory efforts, the Ogden City Police Department issued a press release with a picture taken by a surveillance camara in the hope that someone might identify the suspected bank robber.

Sometime after the press release was issued, Detective Kearl received a telephone call from Lt. Hanson of the Ogden City Police. Lt. Hanson directed Detective Kearl to contact Police Chief Maxwell Jackson of the Harrisville, Utah Police Department. Detective Kearl did so and, according to Detective Kearl, Chief Jackson said he had some information about a potential suspect in the bank robbery and provided the name Kerry Maw, the Plaintiff in this action. Chief Jackson informed Detective Kearl that he had received a call from Shanci Maw, Mr. Maw's

---

[1] *See United States v. Murdzak*, No. 1:19-cr-71, ECF No. 38 (D. Utah Dec. 11, 2019).

2

estranged wife, in which she purportedly identified the suspect as her husband, Kerry Maw.

Detective Kearl then retrieved and reviewed Kerry's Maw's driver's license photo. Detective Kearl's initial impression was that Mr. Maw did not appear to match the robbery suspect's description. At some later point, Detective Kearl and Shanci Maw spoke by telephone.[2] According to Detective Kearl, Shanci confirmed that the photo of the bank robbery suspect looked like her husband Kerry Maw. Detective Kearl obtained additional photographs of Kerry Maw and after reviewing them believed that those photos resembled the robbery suspect in the surveillance photos.

Sometime around 10:30 p.m. on June 4, 2023, Detective Kearl, accompanied by co-defendant Ogden City Police Detective Larry Lewis and by FBI Special Agent J. Hansen, went to Kerry Maw's home. Although Detective Kearl believed there was probable cause to arrest Mr. Maw for the bank robbery, Detective Kearl did not have a warrant for Mr. Maw's arrest and did not seek such a warrant.

When the three police officers arrived at Mr. Maw's home they began to pound on his door. Indeed, Detective Kearl testified that it was night, and he knew "[p]eople would be sleeping" and that he would "need to knock loudly and persistently." (Kearl Dep. at 103:14-17). Mr. Maw testified that he was in a basement room asleep and did not initially hear the officers. After several minutes

---

[2] It is not clear who called who and in what sequence. Shanci Maw has testified that on June 4, 2023, she did not call Detective Kearl directly but called a hotline number and left a message, and that she did not hear back from the Ogden City Police that night. (*See* Shanci Maw Dep. at 16:9-14; 17:2-5; 18:1-9).

3

of this knocking with no answer (*id.* at 105:3-6), Detective Kearl called Mr. Maw on his mobile phone and demanded that Mr. Maw vacate his home and come outside. Detective Kearl told Mr. Maw that he was a suspect in the bank robbery and that Maw needed to come out or they would have to use force to extract him. Among other things, Detective Kearl told Maw that:

> "... we have video surveillance of you committing the bank robbery and eyewitnesses ... one of two things can happen. You can peacefully come outside or we can extract you from the house with force." (Phone Tr. at 4:15-25);[3]

> "you need to come out of the house." (Tr. at 5:9-10);

> "Kerry, I'm not going to sit here and go through the rounds with you and argue all night. Okay? So you have the opportunity to come out of your house peacefully right now or we can make it a big deal. And that's up to you." (Tr. at 6:20-25); and

> "Please just step out of the front door with both your hands up." (Tr. at 8:15-16).

Mr. Maw testified that the first time he realized there were people at his home was when he heard dogs barking and he saw flashlights in his yard. He then fled back to his basement and was "scared to death." (*See* Maw Dep. at 27:6-25; 28:1-20). He explained that he was "really petrified" and believed "there [was] a SWAT team standing outside my door with a battering ram." (*Id.* at 29:9-19; *see also* 211:7-11).

---

[3] A transcript of this phone conversation was filed by the Defendants. [*See* ECF No. 47-5.]

Mr. Maw testified that the banging on his door continued for 10 minutes. (*Id.* at 211:17-23).

Ultimately in response to Detective Kearl's commands Mr. Maw went to his front door and opened it. Detective Kerry testified that when Mr. Maw opened the door that Detective Kearl had his gun "out." (Kearl Dep. at 112:16-19). Detective Lewis also testified that he had his gun out. (Lewis Dep at 35:3-5). As Mr. Maw stepped out of his home, he was told to turn around and, while facing his glass storm door, Mr. Maw could see "red dots" from the officers' guns pointed at his head. (*See* Maw Dep. at 29:21-25; 30:1-3). Mr. Maw was then handcuffed, read his Miranda rights, and taken into custody. The next morning, June 5, 2023, a Utah state court judge ruled, based on an affidavit submitted by Detective Kearl, that there was probable cause to arrest Mr. Maw for the bank robbery. The same judge set bail for Mr. Maw and Mr. Maw was released that same day. Following the second bank robbery on June 24, 2023, and the identification of Mr. Murdzak as a suspect for that robbery and for the June 4, 2023, robbery, the charges against Mr. Maw were dismissed. It is incontrovertible that Mr. Maw was not involved in any bank robbery.

PROCEDURAL HISTORY

Mr. Maw commenced this action by filing his complaint on June 4, 2021. In his complaint he alleges that Detective Travis Kearl and Detective Larry Lewis in "their individual capacity" violated his constitutional rights and he seek damages under 42 U.S.C. § 1983. Mr. Maw has asserted seven separate causes of action

against the Defendants, including three unreasonable failure to investigate available exculpatory evidence claims (two claims solely against Detective Kearl and one against both Detective Kearl and Detective Lewis), one unlawful warrantless seizure claim against Detectives Kearl and Lewis, an unreasonable failure to protect from a Fourth Amendment violation claim against Detectives Kearl and Lewis, a malicious prosecution against Detectives Kearl and Lewis, and a "false affidavit" claim against Detective Kearl alone.[4] For several months the parties engaged in discovery. On November 17, 2022, Detectives Kearl and Lewis moved for summary judgment on all claims arguing that they are protected by qualified immunity. On January 24, 2023, Mr. Maw cross-moved moved for summary judgment on all claims.

## DISCUSSION

Title 42 U.S.C. § 1983 provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." An individual defendant may, however, raise a qualified immunity defense to a § 1983 claim. *See Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). Once a defendant claims qualified

---

[4] As identified in his complaint, Mr. Maw's First, Second, and Fourth Causes of Action are for failure to investigate purportedly exculpatory lines of inquiry. Mr. Maw's Third Cause of Action was for the alleged unlawful warrantless seizure of him in his home. The Fifth Cause of Action alleges Detective Kearl's and Detective Lewis' failure to intervene on Maw's behalf during his unlawful arrest and Maw's Sixth Cause of Action is for malicious prosecution. And, finally, Maw's Seventh Cause of Action is based on Detective Kearl allegedly falsifying an affidavit of probable cause. [*See* ECF No. 2.]

6

immunity, the plaintiff must show that (1) the defendant violated his constitutional rights; and (2) that the right was clearly established at the time of the alleged violation. *See Hemry v. Ross*, 62 F.4th 1248, 1253 (10th Cir. 2023) (citations omitted). And "[c]learly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *Id. (quoting District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). To overcome a qualified immunity defense, the United States Supreme Court has explained that a plaintiff must "identify a case where an officer acting under similar circumstances was held to have violated the constitutional right at issue. *See id.* (citing *Wesby*, 138 S.Ct. at 590). As discussed below, the doctrine of qualified immunity protects Detectives Kearl and Lewis against all but one of Mr. Maw's claims.

> *A. Qualified Immunity Bars Maw's First, Second, Fourth, Fifth, Sixth, and Seventh Causes of Action*

Mr. Maw's First, Second, Fourth, Fifth, Sixth, and Seventh Causes of Action are grounded on an argument that there was no probable cause to arrest Mr. Maw. As a threshold matter, the fact that a Utah state court judge determined there was probable cause for Mr. Maw's arrest, based on the same evidence Detective Kearl had access to, is fatal to these claims.[5]

---

[5] Maw acknowledges that a judge's issuance of a warrant is "the clearest indication that the officers acted in an objectively reasonable manner or 'objective good faith.'" [*See* ECF No. 41 at 38 *(citing Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245 (2012) *(quoting United States v. Leon*, 468 U.S. 897, 922-23 (1984))].

7

One of Mr. Maw's main arguments is that the photographs of himself and the robbery suspect did not match. Whether they did or did not exactly match is of no moment, however.[6] Detective Kearl thought they did. Mr. Maw's wife thought they did too. And so too did Chief Jackson. That these persons, who personally knew Mr. Maw,[7] thought he looked like the man who had robbed the bank, amounted to reliable evidence to support Detective Kearl's opinion that Mr. Maw should be considered a robbery suspect and supported a probable cause affidavit. That Detective Kearl and the others turned out to have been mistaken in their identifications, does not make these initial identifications unreasonable. There is nothing in the record that would establish that Detective Kearl knew that these identifications were false or that Detective Kearl "had a reckless disregard" for the truthfulness of these identifications. *See Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 114 (10th Cir. 1994) (*quoting Franks v. Delaware*, 438 U.S. 154, 155-156, (1978)). It was reasonable for Detective Kearl and Detective Lewis to rely on these identifications. *See Beard*, 24 F.3d at 114-15.

Mr. Maw's malicious prosecution claim fails for similar reasons. To establish his claim, he must prove that: (1) the defendant caused the plaintiff's continued

---

[6] These photographs were presented in support of summary judgment. The Court has reviewed them and there is at least some resemblance between Mr. Maw and the photos of the robbery suspect.

[7] Indeed, in his complaint Mr. Maw acknowledged that Chief Jackson "knew the physical features of [Maw's] face sufficiently to accurately determine whether or not [Maw's] face matched that of the OPD Facebook media photograph of the robbery suspect," [*See* ECF 2 ¶ 33], and Maw's estranged wife Shanci, who had been married to Mr. Maws for 23 years, confirmed both to Chief Jackson and to Detective Kearl that suspect was her husband.

confinement or prosecution; (2) the original action terminated in plaintiff's favor; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff was damaged. *See Margheim v. Buljko*, 855 F.3d 1077, 1085 (10th Cir. 2017); *Wilkens v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). Again, it is the determination that probable cause existed for Mr. Maw's arrest that dooms his claim. Probable cause "exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed." *See United States v. Traxler*, 477 F.3d 1243, 1246 (10th Cir. 2007). And on this record there appears to have been probable cause to support the arrest of Mr. Maw for the bank robbery. His wife and an acquaintance, who also happened to be a police chief, identified Mr. Maw as the suspect. Detective Kearl's own review of photographs convinced him that Mr. Maw was the suspect. And a Utah state judge found that probable cause existed for Mr. Maw's arrest. Under these facts Mr. Maw cannot establish that the Defendants' conduct violated his constitutional rights, and his malicious prosecution claim fails as a matter of law because there was probable cause to make Mr. Maw's arrest.

Although Mr. Maw alleges that Detective Kearl intentionally misrepresented or omitted material information from the Probable Cause Affidavit in violation of his constitutional rights, such a violation occurs only when it can be established that "an officer: (1) deliberately or recklessly makes false statements or omissions in a warrant affidavit, and (2) correcting the false statements or including the omissions would have vitiated probable cause." *Hemingway v. Russo*, No. 2:16-CV-

00313, 2018 WL 4082201, at *7 (D. Utah Aug. 27, 2018) (*citing Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990)). But the record does not support such a claim. Mr. Maw cannot point to any statement Detective Kearl included in his Probable Cause Affidavit that was deliberately or recklessly false. Detective Kearl fairly recounted the identifications he received and the evidence he had gathered. Mr. Maw does not point to anything in the record that would have informed Detective Kearl that he should have disregarded those identifications. Nor has Mr. Maw established that Detective Kearl omitted material information that would have vitiated a probable cause finding. Mr. Maw has argued that the Affidavit omitted the facts that the suspect was wearing a hat so that his "facial features were covered," and that that the "ear lobe shape" of the suspect and Mr. Maw did not exactly match. But Mr. Maw has not demonstrated how the inclusion of these facts would have or could have changed the probable cause determination. Similarly, the omission of Mr. Maw's age—48 years old—from Detective Kearl's Affidavit does not salvage this claim. First, the Affidavit included Detective's Kearl's disclosure that the suspect "was described to be older and possibly in his 60's" and that Detective Kearl initially reviewed a driver's license photo of Mr. Maw that made him "look almost too young to be the suspect." Thus, the age difference was not omitted from the probable cause analysis but integrated in it. And given the identifications of Mr. Maw, particularly the identification by his wife, Mr. Maw is unable to establish that inclusion of his exact age in the Affidavit would have changed the probable cause determination.

Even assuming that he could prove that these actions violated his constitutional rights, on this record and on these facts, Mr. Maw is unable to demonstrate that it "was clearly established at the time of the incident 'such that a reasonable person in the defendant's position would have known that his conduct violated that right.'" *See Schultz v. Utah County*, 966 F. Supp. 2d 1246, 1262 (D. Utah 2013) (citations omitted). In the analysis currently applicable to a qualified immunity defense, Mr. Maw must establish that the Defendants were on notice that their conduct was clearly unlawful, something that requires a Tenth Circuit or Supreme Court decision on point to show that the show that the law was clearly established. *See Woodward v. City of Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992). Mr. Maw has not and cannot do so.

Starting with Mr. Maw's First, Second, Fourth, and Fifth Causes of Action, he cannot establish that the Defendants' actions violated clearly established law. Essentially Mr. Maw argues that the Detectives were mistaken in their identification of him as a suspect and should have done a better job investigating before arresting him. But Mr. Maw cannot point to a case that shows, on these same facts, that Detective Kearl's and Detective Lewis' conduct violated law that was clearly established. Mr. Maw argues that the Detectives should have done a better job investigating the robbery and confirming that he was a suspect. He may be right. But under the current qualified immunity analysis, the fact that the Detectives may not have been as thorough as they could have, or that they may have rushed to a judgment, or that they were actually wrong, does not mean that

11

they violated Mr. Maw's clearly established constitutional rights. "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004) (*citing Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Because there was no "existing law" that placed the constitutionality of the Defendants' conduct beyond debate, the qualified immunity defense to these claims must be sustained. *See Hemry*, 62 F.4th at 1253 (*quoting Wesby*, 138 S.Ct. at 589).

A similar result bars Mr. Maw's Sixth and Seventh Causes of Action for malicious prosecution and false affidavit. As noted, both claims rely on Mr. Maw's allegation that Detective Kearl left out information in the Affidavit of Probable Cause. Again, on these record facts (and even assuming Detective Kearl left out information), Mr. Maw cannot point to any caselaw establishing that unintentionally leaving out information in the probable cause analysis qualifies as malicious prosecution or a false affidavit. While there is substantial authority that an officer who intentionally includes false information or lies under oath may have violated a right that was clearly established, the facts, as alleged and set forth in the record here, do not fall into that category.

*B. Maw's Claim for Warrantless Seizure*

Unlike Maw's other claims, his Third Cause of Action for Warrantless Seizure in his home has a more substantial legal and factual footing.

Under the Fourth Amendment a search or seizure within your home without a warrant is "presumptively unreasonable." *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (cleaned up). Over forty years ago, in *Payton v. New York*, 445 U.S. 573, 576 (1980), the Supreme Court clearly established that, absent exigent circumstances, a police officer may not enter a person's home without consent to make a warrantless arrest even if probable cause exists to arrest the person. And the Tenth Circuit has made it clear that "officers need not physically enter the home for *Payton* to apply." *United States v. Reeves*, 524 F.3d 1161, 1165 (10th Cir. 2008).

In fact, it has been established that "*Payton* is violated where there is such a show of force that a defendant comes out of a home under coercion and submits to being taken into custody ... it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." *See United States v. Maez*, 872 F.2d 1444, 1451 (10th Cir. 1989) (cleaned up). The Tenth Circuit has also held that if "an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." *See Reeves*, 524 F.3d at 1168 (*citing United States v. Flowers*, 336 F.3d 1222, 1226 n.2 (10th Cir. 2003)). In *Reeves*, the Tenth Circuit further noted that "*Payton* is violated where there is such a show of force that a defendant comes out of a home under coercion and submits to being taken in custody." *Reeves*, 524. F.3d at 1168-70.

13

Given these many cases going back over forty years, it is not surprising that a defense of qualified immunity is generally unavailable to an officer that makes a warrantless seizure by coercing the person to leave his home and be taken into custody. Despite the obviousness of this proposition, Detective Kearl nevertheless attempts to argue that Mr. Maw's right to be free from such a warrantless seizure was not clearly established on the night of June 4, 2019. Although *Payton* was decided in 1980 and *Maez* in 1989, and *Reeves* in 2008, Detective Kearl argues those cases do not control here because they are "different" from the facts and circumstances of Mr. Maw's seizure.

Detective Kearl argues that *Maez* satisfied the coercion element because there was a SWAT team with 10 officers, using loudspeakers, and with weapons drawn outside the suspect's home. *See Maez*, 872 F.2d at 1450-51. And *Reeves* is different, Detective Kearl argues, because the officers were knocking on Reeves' hotel door for twenty minutes at 3:00 a.m. demanding that he come out. *See Reeves*, 524 F.3d at 1169.

Detective Kearl, however, ignores the similarities with these cases. Like *Maez*, the officers at Mr. Maw's home had their guns drawn. Detective Kearl and Detective Lewis have admitted that their guns were drawn and at the ready. (*See* Kearl Dep. at 112:16-19; Lewis Dep. at 35:3-5). And like *Reeves* the police approached Mr. Maw's residence at night when he was sleeping, with Detective Kearl loudly banging on Mr. Maw's door for ten minutes. Dogs were barking and Detective Kearl's fellow police officers walked around Mr. Maw's house shining

14

flashlights into his yard. Mr. Maw testified that he retreated to his basement because he was "scared to death" and "petrified."

Detective Kearl also downplays the substance of his phone call with Mr. Maw—a conversation that has been transcribed and made a part of the record. Among other things, Detective Kearl misleadingly told Mr. Maw that he had to come out of his house because "we have video surveillance of you committing a bank robbery and eyewitnesses." (Tr. at 4:15-17). But there was no eyewitness to the robbery that had identified Mr. Maw and the record is unclear as to whether any video surveillance of the robbery even existed. Detective Kearl then informed Mr. Maw that "one of two things can happen," you can come out or "we can extract you from the house with force." (Tr. at 4:21-24). A reasonable person when faced with a threat that he would be forcibly extracted from his home at night by armed police officers might have believed that "had to come out of the home and submit to the show of authority." *See Maez*, 872 F.2d at 1450.[8]

And when Mr. Maw tried to explain that he did not commit any bank robbery, Detective Kearl doubled down on his unsubstantiated claim that he had video of the bank robbery and again demanded that Mr. Maw come out or a less "peaceful" result would follow:

MR. MAW: You know, I didn't rob no bank.

DETECTIVE KEARL: Okay.

---

[8] Detective Kearl also told Maw that his coming out of the house was the "most peaceful" option and the "best resolution" that Maw had. (Tr. at 3:8-12). And later Detective Kearl informed Maw that "coming out of--coming out of the house is not an option; you--you need to come out of the house." (Tr. at 5:7-10).

MR. MAW: You've got to call my attorney.

DETECTIVE KEARL: I'm not going to call your attorney and argue about the video that I have. I'm more than happy to present that--that evidence to your attorney, but I'm--

MR. MAW: What video do you got?

DETECTIVE KEARL: We have it from the bank.

MR. MAW: From where?

DETECTIVE KEARL: We have it--listen. Kerry, I'm not going to sit here and go the rounds with you and argue with you all night. Okay? So you have the opportunity to come out of your house peacefully right now or we can make it a big deal. And that is up to you.

(Tr. at 6:9-25).

Whether Detective Kearl's command that Mr. Maw would be forcibly extracted from his home, accompanied by a show of force by police officers who admittedly had their weapons drawn, and the late hour of the confrontation presents facts that are significantly analogous to *Maez* and *Reeves,* and establishes that Mr. Maw was seized without a warrant within his home, is a close call. *See Reeves*, 524 F.3d at 1167 (noting that "[c]ircumstances that indicate a seizure include, 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled'" (*quoting United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see*

16

*Maez*, 872 F.2d at 1450. In fact, there are many other cases, with even less coercive facts, that support a determination that Mr. Maw was unlawfully seized. For example, in *Storey v. Taylor*, 696 F.3d 987, 993 (10th Cir. 2012), there were just two officers involved in a daytime encounter in which the officers repeatedly commanded the defendant to "step out of the house." The court found that these circumstances amounted to a warrantless seizure noting that "a sufficient coercive order requesting an individual to leave his own house counts as a seizure subject to the protections of the Fourth Amendment." *Id.* And in *United States v. Flowers*, 336 F.3d 1222, 1226 & n.2 (10th Cir. 2003), there were four armed officers who, during a nighttime encounter at the defendant's home, uttered a single command: "Tulsa Police Department, open the door," which the court found, under the totality of the circumstances, amounted to a seizure in the house.[9] As these cases make clear, coercive police conduct targeting people in their home can result in a warrantless seizure, even if the person ultimately opens the door in response to a show of authority.

Here the record presented in this case by Mr. Maw on coercion is sufficient to survive summary judgment on his Third Cause of Action. A factfinder must be called upon to determine whether a reasonable person in these same circumstances would feel compelled to submit to this show of authority so that Mr. Maw's opening

---

[9] *See also United States v. Warford*, No. 20-cr-1208, 2022 WL 17620770, at *27 (D. N.M. Dec. 13, 2022) (determining that when a police officer informed a suspect in his home that "you're going to be under arrest, Man. So we're going to be here until you come outside," confirmed that a "reasonable person in his position would no longer feel free to terminate the encounter" and amounted to a seizure within the home) (*citing Florida v. Bostick*, 501 U.S. 429, 436 (1991)).

of his front door was compelled, and he was therefore unlawfully seized. If so, Detective Kearl would not be entitled to qualified immunity. Thus, a determination of whether Detective Kearl's conduct on the evening of June 4, 2019, amounts to a warrantless seizure under *Payton*, *Maez*, or *Reeves* cannot be determined on this record. There remain disputed issues of fact and credibility determinations concerning the voluntariness of Mr. Maw's actions that must be made before that legal question can be answered. Accordingly, Detective Kearl's summary judgment motion for qualified immunity on Mr. Maw's unlawful warrantless seizure claim must be denied.[10]

## CONCLUSION

Accordingly, based on the foregoing, Defendants' motion for summary judgment on qualified immunity (ECF No. 33) is DENIED IN PART and GRANTED IN PART. Plaintiff's cross motion for summary judgment (ECF No. 37 & 41) is DENIED. The only claim that remains is Plaintiff's Third Cause of Action based on an unlawful warrantless seizure and only as against Defendant Travis Kearl.

DATED this 11th day of July 2023.

BY THE COURT:

Hon. Bruce S. Jenkins
United States District Judge

---

[10] However, Detective Lewis' similar motion is granted. The record does not contain any evidence that Detective Lewis' individual conduct may have coerced Mr. Maw into leaving his home.